# Exhibit 9

Dr. Douglas Chrissan - December 18, 2023

1               THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF TEXAS

3                    MARSHALL DIVISION

4        _____
                                         )
5       HEADWATER RESEARCH, LLC,         )
                                         )
6                       Plaintiff,       )
                                         )
7            vs.                         )  Case No.
                                         )  2:22-CV-00422-RG-RSP
8                                        )
        SAMSUNG ELECTRONIC CO., LTD      )
9       AND SAMSUNG ELECTRONICS          )
        AMERICA, INC.,                   )
10                                       )
                        Defendants.      )
11       _____)

12

13

14

15

16

17     VIDEO RECORDED DEPOSITION UNDER ORAL EXAMINATION OF

18                    DR. DOUGLAS CHRISSAN

19                  DATE: December 18, 2023

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR

Dr. Douglas Chrissan - December 18, 2023

```
1

2

3

4

5

6

7

8                    TRANSCRIPT of the deposition of the

9       DR. DOUGLAS CHRISSAN, called for Oral Examination in the

10      above-captioned matter, said deposition being taken

11      by and before MICHAEL FRIEDMAN, a Notary Public and

12      Certified Court Reporter of the State of New Jersey,

13      located at ZOOM VTC, all parties remote, on December

14      18, 2023, commencing at approximately 8:04 in the

15      morning, Pacific Standard Time.

16

17

18

19

20

21

22

23

24

25
```

Dr. Douglas Chrissan — December 18, 2023

Page 3

```
 1     A P P E A R A N C E S:

 2

       RUSS, AUGUST & KABAT
 3     12424 Wilshire Blvd.
       Los Angeles, CA  90025
 4     BY:   KRISTOPHER R. DAVIS, ESQ.
       Attorneys for Plaintiff
 5

 6

       FISH & RICHARDSON
 7     1000 Maine Avenue, SW
       Washington, DC  20024
 8     BY:   BENJAMIN THOMPSON, ESQ.
             THAD KODISH, ESQ.
 9     Attorneys for Defendants

10

11     ALSO PRESENT:   GUS PHILLIPS, Videographer

12

13                     * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

Dr. Douglas Chrissan - December 18, 2023

```
 1                      I N D E X

 2     WITNESS NAME                        PAGE

 3     DR. DOUGLAS CHRISSAN

 4              By Mr. Thompson            8,133

 5              By Mr. Davis               130

 6

 7                     * * * * *

 8

 9                 E X H I B I T S

10     EXHIBIT NO.                          PAGE

11     EXHIBIT 1      231128 Chrissan Decl      11
                      ISO Headwater's Markman
12                    Briefing (EDTX-422)

13     EXHIBIT 2      US9143976_HW_00004783     110

14     EXHIBIT 3      US9277433_HW_00005741     116

15     EXHIBIT 4      US9277445_HW_00002011     126

16

17                     * * * * *

18

19

20

21

22

23

24

25
```

Dr. Douglas Chrissan - December 18, 2023

```
 1                  Deposition Support Index

 2

 3      Direction to witness not to answer

 4      Page Line  Page Line  Page Line  Page Line

 5      None

 6

 7      Request for production of documents

 8      Page Line  Page Line  Page Line  Page Line

 9      None

10

11      Questions marked

12      Page Line  Page Line  Page Line  Page Line

13      None

14

15                      * * * * *

16

17

18

19

20

21

22

23

24

25
```

Dr. Douglas Chrissan - December 18, 2023

1          THE COURT REPORTER:  My name is

2     Michael Friedman, a Certified Shorthand

3     Reporter.  This deposition is being held

4     via videoconferencing equipment.

5          The witness and reporter are not in

6     the same room.  The witness will be sworn

7     in remotely, pursuant to agreement of

8     all parties.  The parties stipulate that

9     the testimony is being given as if the

10    witness was sworn in person.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Douglas Chrissan - December 18, 2023

```
 1          THE VIDEOGRAPHER:  We are now on
 2     the record for the video deposition of
 3     Dr. Doug Chrissan.
 4          The time is 8:04 a.m. December 18,
 5     2023 in the matter of Headwater Research
 6     LLC versus Samsung electronics Co.,
 7     Limited, et al, case number
 8     2:22-CV-00422RG, being held in the
 9     United States District Court for the
10     Eastern District of Texas.  Marshall
11     Division.
12          The court reporter is Michael
13     Friedman.  The videographer is Gus
14     Phillips.  Both are representatives of
15     Gregory Edwards LLC.
16          (Whereupon a discussion was held
17     off the record.)
18          THE VIDEOGRAPHER:  All appearances
19     will be stated on the stenographic
20     record.
21          Will the court reporter please
22     administer the oath.
23
24
25
```

Dr. Douglas Chrissan - December 18, 2023

1    D R.   D O U G   C H R I S S A N,

2              called as a witness, having been first

3    duly sworn according to law, testifies as follows:

4

5    EXAMINATION BY MR. THOMPSON:

6         Q    Good morning, Dr. Chrissan.

7         A    Good morning.

8         Q    My name is Ben Thompson, and I'm

9    with the firm of Fish & Richardson, who

10   represents Samsung in this matter.

11             I will be asking you a number of

12   questions today, starting by asking you to

13   state your full name for the record, please.

14        A    My name is Douglas A. Chrissan.

15        Q    And, Dr. Chrissan, I take it from

16   reviewing your CV it's likely that you've

17   been deposed before.

18             Is that correct?

19        A    Yes, I have.

20        Q    Do you have a ballpark of about how

21   many times you've been deposed?

22        A    About 20.

23        Q    Okay.  Did any of your previous

24   depositions relate to the patents in this

25   case as far as you're aware?

Dr. Douglas Chrissan - December 18, 2023

```
1          A    No, they did not.
2          Q    Okay.  Have any of your previous
3     depositions had any relationship to Samsung?
4          A    No, they did not.
5          Q    Okay.  And did any of your previous
6     depositions relate to the plaintiff,
7     Headwater?
8          A    No, they did not.
9          Q    Okay.  You probably heard these
10    ground rules before, but I will go over them
11    anyway so we're on the same page.
12              Starting with you understand that
13    you're testifying under oath today?
14         A    Yes, I do.
15         Q    And can you think of any reason why
16    you would be unable to testify truthfully and
17    accurately today?
18         A    No.
19         Q    I'm going to ask you a good number
20    of questions today, and if at any point in
21    time you don't understand my question, will
22    you please let me know?
23         A    Yes, I will do that.
24         Q    And if you answer a question that
25    I've asked, I'm going to assume that you
```

Dr. Douglas Chrissan - December 18, 2023

1     understood the question as I asked it.

2              Is that fair?

3     A    Yes, that's fair.

4     Q    I'm going to try to take a break

5     about every hour during this deposition, but

6     I'll confess to you sometimes I'm not very

7     good at that, so if at any time you'd like to

8     take a break, please let me know.

9              I will just ask that you answer any

10    questions pending prior to taking that break

11    unless the break concerns any sort of

12    privileged discussions or questions about

13    privilege that you might want to discuss with

14    your counsel.

15             Does that all make sense?

16    A    Yes, I understand.

17    Q    Okay.  You submitted a declaration

18    in this case in support of the plaintiffs'

19    claim construction positions.

20             Is that correct?

21    A    Yes, I did.

22    Q    Do you have a copy of that

23    declaration with you to aid in your testimony

24    today?

25    A    I do not.  I was not told to have

Dr. Douglas Chrissan - December 18, 2023

1    one.  I figured you could drop me one.

2         Q    I plan to do that.  Just wanted to

3    check.

4              MR. THOMPSON:  So I'm going to drop

5         into the chat right now what will be

6         Exhibit 1.

7              (Whereupon the above mentioned was

8         marked for identification.)

9         Q    This is the expert declaration of

10   Douglas A Chrissan, Ph.D., and please let me

11   know if you're able to download and access

12   that.

13        A    I have it.  I am viewing it.

14        Q    Okay.  And do you recognize

15   Exhibit 1?

16        A    (Witness reviewing.)

17             You mean the file -- Exhibit 1 of

18   this deposition, the file you just

19   downloaded -- the file you just gave me?

20        Q    Yes.

21        A    Yes, that's my declaration.  I'll

22   scan through it, but I'm sure you -- I trust

23   that you gave me my own declaration back

24   correctly.

25        Q    If at any point in time today you

Dr. Douglas Chrissan - December 18, 2023

1    recognize something missing from that

2    declaration, please let me know.

3            I'll represent that it was my

4    intent to provide to you as Exhibit 1 the

5    precise declaration that we received from

6    counsel.

7       A    Yes, this looks accurate.

8       Q    Okay.  If you turn with me to

9    section 7 of your declaration, which begins

10   on the bottom of page 5.  Let me know when

11   you're there.

12      A    Okay.  I'm there.

13      Q    Does section 7 contain your

14   opinions specific to the term that is in

15   dispute?

16      A    Yes, it does.  I would say terms

17   that are in dispute, but those terms are

18   similar and addressed as one, and as I have

19   mentioned in one of the paragraphs of this

20   declaration.

21      Q    Okay.  What's your understanding as

22   to what are the disputed terms?

23      A    (Witness reviewing.)

24           Well, okay.  So it's listed right

25   there under section 7A:

Dr. Douglas Chrissan - December 18, 2023

```
 1              "A representation of the disputed

 2    term is that the user of the device...

 3    perceiving any benefit from that

 4    application."

 5              If we want to be more specific, we

 6    can go down to claim 2 on native page 7.   In

 7    bold it says, "The application is running in

 8    a background state when a user of the device

 9    is not directly interacting with that

10    application or perceiving any benefit from

11    that application."

12              My understanding is that the

13    dispute is primarily over the "perceiving any

14    benefit from that application" phrase.

15        Q    Okay.  And if you will look with me

16    at paragraph 25 of your declaration.

17        A    Yes.

18        Q    And the last sentence of that

19    paragraph states, "My analysis herein recites

20    the '701 patent but applies similarly to all

21    of the challenged claims."

22              Do you see that?

23        A    Yes.

24        Q    What did you mean by that

25    statement?
```

Dr. Douglas Chrissan - December 18, 2023

1          A    I meant exactly what's written in

2     all of paragraph 25.

3               I note -- I noted when I looked

4     through all of the patents and their claims

5     for the disputed terms, because I received

6     information that -- from counsel about the

7     specific patents and claims with the term in

8     dispute, so I wanted to look at all of those

9     claims and see if the wording was identical

10    or a little bit different.

11              And I did see that the wording is a

12    little bit different in some of the claims

13    and I note that here, although I don't note

14    all of the differences.

15              But what I identified was that the

16    wording -- the disputed wording across the

17    one, two, three, four, five, six, seven

18    patents in dispute, I felt that the wording

19    was comparable enough that the -- that one

20    argument would be sufficient and one

21    explanation and one opinion would be

22    sufficient to address all of the

23    variations in -- all of the minor variations

24    in claim wording across those seven patents.

25    That's what that meant.

Dr. Douglas Chrissan - December 18, 2023

Page 15

1        Q    Okay.  Would you agree with me then
2    that the analysis of the disputed terms in
3    your declaration, it applies across all the
4    claims that include this phrase?
5             Is that a fair statement?
6        A    That's a fair statement with any
7    minor adjustments that are needed to address
8    minor wording changes, but in general, yes,
9    that's the intent of this paragraph 25 is to
10   state that my opinion in this declaration
11   applies to all of the -- all seven of those
12   patents.
13       Q    To be clear, your declaration, it
14   doesn't provide an opinion that the
15   disputed -- one of the disputed terms is any
16   more or less clear than any of the other
17   disputed terms.
18            Is that correct?
19       A    Just so that I make sure I catch
20   every word, please repeat your question.
21       Q    Sure, and I'll modify it slightly
22   to potentially make it more clear what I'm
23   going after.
24            Is it true that in your declaration
25   you don't have any opinion that one of the

Dr. Douglas Chrissan - December 18, 2023

1       disputed terms is any more or less clear in

2       scope as it appeared in one patent compared

3       to a similar term from another patent?

4              A     That's correct.

5              Q     Do you understand that it's

6       Samsung's position that the disputed terms

7       render the challenged claims indefinite?

8              A     That's my understanding.

9              Q     And at least one of the reasons for

10      Samsung's position is that the scope of the

11      challenged claims is not reasonably clear to

12      a person of skill in the art?

13                   Is that your understanding of

14      Samsung's position?

15             A     Generally, yes.

16                   My understanding as well is that

17      Samsung's position is that the claim terms

18      would involve a subjective inquiry.

19             Q     Okay.  Let's talk about that.

20                   If you can turn with me to

21      paragraph 23 of your declaration.

22             A     Yes.

23             Q     And I'm going to read to you a

24      portion of that paragraph where it says, "My

25      understanding is that Samsung believes that

Dr. Douglas Chrissan - December 18, 2023

Page 17

```
 1      whether a person is perceiving any benefit
 2      from an application is a subjective inquiry
 3      and that the specification allegedly provides
 4      no objective boundaries to clarify the scope
 5      of the claimed invention.  I disagree."
 6             Do you see that?
 7      A    Yes.
 8      Q    So is it your opinion that the
 9      specification together with the claims of the
10      relevant patents provides objective
11      boundaries to clarify the scope of the
12      disputed terms?
13      A    Yes, I do.
14      Q    I think we realized this before,
15      but do you agree that the disputed
16      limitations concern whether a user of the
17      device is perceiving any benefit from an
18      application?
19      A    Could you repeat the question?
20      Q    Sure.
21             Do you agree that the disputed
22      limitations concern whether a user of a
23      device is perceiving any benefit from an
24      application?
25             MR. DAVIS:  Object to form.
```

Dr. Douglas Chrissan - December 18, 2023

```
 1        A    That's one portion of the claim.

 2             With respect to the claim that I'm

 3    looking at in my declaration, the application

 4    is running in a background state when a user

 5    of the device is not directly interacting

 6    with that application or perceiving any

 7    benefit from that application.

 8             As a person of skill in the art at

 9    the time of the patent, I consider or view

10    that entire folded -- that entire bolded

11    phrase, and it -- that particular phrase

12    states, "Not directly interacting or

13    perceiving a benefit."

14             So I will go back and ask you

15    again:  Can you ask your question again?

16             This is -- this is one of the cases

17    that having the Realtime would help, but I'm

18    happy to ask you to restate the question.

19        Q    Sure.

20             My question was whether you agree

21    the disputed limitation concerns whether a

22    user is or is not perceiving any benefit from

23    an application.

24        A    That is true, qualified by the

25    statement that there is further context
```

Dr. Douglas Chrissan - December 18, 2023

```
1    provided by additional claim language, as I
2    explain in my deposition.
3         Q    Yeah, and I don't disagree with you
4    that -- I'm not trying to read the whole
5    claim.  I'm just trying to focus on the
6    portion of the claim that is most relevant to
7    our discussion, and that is the focus of your
8    declaration.
9              Do you understand that?
10        A    Yes.
11        Q    Okay.
12        A    And for that we can go back to the
13   disputed -- the disputed term is a term
14   disputed by counsel, and I believe you have
15   stated the disputed term.
16        Q    Okay.  So do you believe that for a
17   given device user and application a person of
18   ordinary skill in the art would reasonably
19   determine whether that particular device
20   falls within the scope of the claims at
21   issue?
22        A    Your question conflates a number of
23   things that in my opinion divert from the
24   claim language.
25              Could you ask the question that's
```

Dr. Douglas Chrissan - December 18, 2023

1      more directed to the claim language?

2          Q    Would you agree that the -- say

3      claim 2 of the '701 patent, for example -- do

4      you have that in mind?

5          A    I'm looking at it.

6          Q    Okay.  And claim 2 of the '701

7      patent incorporates claim 1.

8               Correct?

9          A    Yes.

10         Q    Okay.  And claim 1 recites a

11     wireless end user device?

12         A    Yes.

13         Q    And claim 1 and claim 2 also

14     reference a user?

15         A    Yes.

16         Q    And claim 2, for example,

17     references an application?

18         A    Yes.

19         Q    So my question to you is given a

20     particular device user and application, can a

21     person of ordinary skill in the art

22     reasonably determine whether that particular

23     device falls within the scope of the

24     claims -- claim 2, for example?

25         A    So your question is about the

Dr. Douglas Chrissan - December 18, 2023

```
 1    device?
 2         Q     Yeah.   That's the subject of
 3    claim 1 and claim 2.
 4         A     Let me go back and read claim 1.
 5               (Witness reviewing.)
 6               MR. THOMPSON:   I'll withdraw that
 7          question, and perhaps I can shortcut
 8          that for us.
 9         Q     If I were to describe for you a
10    device and an application, are you able to
11    tell me whether or not a user would be
12    perceiving any benefit from that application?
13         A     Well, I was taking the time to read
14    claim 1 and 2, which I would want to do
15    anyway, so let me finish.
16               (Witness reviewing.)
17               Okay.   Could you ask your question
18    again?
19         Q     Sure.
20               If I were to describe for you an
21    instance involving a user and an application
22    in the context of the disputed claims, will
23    you be able to tell me whether the user is
24    perceiving any benefit from the application?
25               MR. DAVIS:   Object to form.
```

Dr. Douglas Chrissan - December 18, 2023

```
1          A    The answer is yes, with the
2   qualification that I would need sufficient
3   detail about all of those things, but if you
4   provide me all of the sufficient detail that
5   I need, I would be able to give you a clear
6   answer.
7               I would apply the principles in my
8   declaration.
9          Q    Okay.  If I can turn you to
10  paragraph 26.
11         A    Yes.
12         Q    And you state about midway through
13  this particular paragraph that, "The
14  application is determined to be running in a
15  background state when either of two
16  conditions is met; number 1, when the user is
17  not directly interacting with the
18  application, or number 2, when the user is
19  not perceiving any benefit from the
20  application."
21              Do you see that sentence?
22         A    Yes.
23              (Whereupon a discussion was held
24  off the record.)
25         Q    So under your interpretation, if
```

Dr. Douglas Chrissan - December 18, 2023

```
1      either of the conditions you listed here is

2      found to be true, the application is in a

3      background state.

4            Correct?

5      A    Please repeat your question.

6      Q    Sure.

7            If either of the conditions I just

8      read from your declaration is true, is it

9      your opinion the application would be in a

10     background state?

11     A    You're diverting from the claim.

12     Let's read claim 2.

13           "The wireless end user device of

14     claim 1 wherein the one or more processors

15     are configured to determine that the first

16     end user application is running in a

17     background state when a user of the device is

18     not directly interacting with that

19     application or perceiving any benefit from

20     that application."

21           If I'm a person of skill at the

22     time of the patent that reads this patent and

23     says, "I want to implement this invention,"

24     then what that means is that when I write my

25     software for the one or two processors, it's
```

Dr. Douglas Chrissan - December 18, 2023

Page 24

1    going to be -- I'm going to configure it to

2    determine that the application is running in

3    a background state when A or B.

4          And then further explanation of how

5    and why we do that is contained throughout my

6    declaration.

7    Q    Right.  So if the processor

8    determines that either A or B is true, then

9    the application will be determined to be

10   running in a background state.

11         Correct?

12   A    More or less.  You twisted up a

13   couple of the words of the claim, but

14   generally, yes.

15         The processor makes a

16   determination, and this claim describes how

17   that processor makes that determination.

18   Q    In paragraph 27 you state that,

19   "The surrounding claim language makes clear

20   that the question of whether a user is

21   perceiving a benefit from the application is

22   not a subjective inquiry."

23         Do you see that?

24   A    (Witness reviewing.)

25         Yes, I do.

Dr. Douglas Chrissan - December 18, 2023

Page 25

1      Q    What did you mean by the word
2   "subjective" in this context?
3      A    (Witness reviewing.)
4           I can -- well, the term,
5   "subjective query" was provided to me as a
6   legal term.
7           My understanding of subjective is
8   subject to some -- one possible
9   interpretation is subject to some uncertainty
10  or subject to perceiving different answers if
11  asked from different sources.
12     Q    The word "subjective" can mean
13  based on personal opinions as opposed to
14  facts.
15          Is that consistent with the
16  understanding you applied as part of your
17  analysis?
18     A    Could you repeat your question and
19  that phrase?
20     Q    Sure.
21          The word "subjective" can mean
22  based on personal opinion as opposed to fact.
23          Is that consistent with the
24  understanding of the word "subjective" you
25  applied as part of your analysis?

Dr. Douglas Chrissan - December 18, 2023

1      A    Generally, yes.  Certainly the

2   personal opinion part, and I think sometimes

3   personal opinions can be derived from facts,

4   but that's a hypothetical thing.  That's not

5   at issue here.

6           Just subjective can mean subject to

7   personal opinion.

8      Q    Was it your opinion that where the

9   disputed claims state that a user of the

10  device is or is not perceiving any benefit

11  from an application, that is not subject to

12  personal opinion.

13          Is that fair?

14     A    Please restate your question.

15     Q    Sure.

16          Is it your opinion that where the

17  disputed claims state that a user of the

18  device is or is not perceiving any benefit

19  from an application, that's not subject to a

20  personal opinion?

21     A    That's correct, especially in the

22  context of these claims related to a

23  processor that's making a determination, and

24  that's explained clearly in this declaration

25  as well starting at paragraph 27.

Dr. Douglas Chrissan - December 18, 2023

1          Q     In the context of the disputed

2     claims, are there any instances when one user

3     might perceive a benefit from an application

4     and another user would not perceive a benefit

5     from that same application?

6               MR. DAVIS:  Object to form.

7          A     That is outside of the -- how a

8     person of skill interprets the claim

9     language, which is paragraph 27.  I'll read

10    it for the record.

11              "This surrounding claim language

12    makes clear that the question of whether a

13    user is perceiving a benefit from the

14    application is not a subjective inquiry.

15              "The challenge claim recites that

16    one or more processors determine whether an

17    application is running in a background state

18    or is a foreground application.

19              "This determination considers

20    whether a user is or is not perceiving a

21    benefit from the application which a POSITA

22    would understand to be indicated by whether

23    the device is or is not performing operations

24    that are noticeable to the user.

25              "Any information from an

Dr. Douglas Chrissan - December 18, 2023

1     application that is noticeable to a user is

2     expected to be perceived by the user and to

3     be beneficial to the user or else the

4     application would not waste resources

5     presenting it; i.e., making it noticeable."

6              I think another point to add is

7     that a person of skill reading this claim

8     understands that a processor is making a

9     determination.  The processor is not required

10    to read the user's mind.

11      Q    Okay.  So your declaration is

12    submitted as an exhibit, and I appreciate

13    that there are other portions of your

14    declaration, but I'm -- I want to focus you

15    more on my question.

16             I'm not sure I got an answer to the

17    question.  Maybe I did, but let me ask it

18    again and see if we can find some common

19    ground here.

20             In the context of the disputed

21    claims, are there any instances when one user

22    might perceive a benefit from an application

23    while another user would not perceive a

24    benefit from that same application?

25      A    Could you repeat your question?

Dr. Douglas Chrissan - December 18, 2023

```
1        Q    Sure.

2             In the context of the disputed

3   claims, are there instances when one user

4   might perceive a benefit from an application

5   and another user would not perceive a benefit

6   from that same application?

7        A    Not in the context of the claims.

8             The claims, as I state, presume

9   that if the application and the device are

10  performing an operation that is noticeable to

11  the user, then the user is capable of sensing

12  that as a benefit of the application.

13       Q    Are you familiar with the concept

14  of a term of degree as it relates to patent

15  claims?

16       A    I have encountered that phrase

17  before.

18       Q    You don't have any opinion in this

19  particular case that the disputed term

20  involves a term of degree.

21            Is that correct?

22       A    Could you ask that question again?

23       Q    Sure.

24            Do you have any opinions as to

25  whether the disputed term involves a term of
```

Dr. Douglas Chrissan - December 18, 2023

1    degree?

2         A    I don't think it involves a term of

3    degree.

4         Q    Okay.  I think I understood you

5    previously to testify that according to the

6    disputed claims, it's the device processor

7    that would determine whether a user perceives

8    a benefit from an application.

9              Is that correct?

10        A    Could you repeat your question?

11        Q    Sure.

12             I think I understood you previously

13   to testify that according to the disputed

14   claims, it's the device processor that would

15   determine whether a user perceives a benefit

16   from an application.

17             Is that correct?

18        A    Yes, that's essentially the claim

19   language.

20        Q    So I'm going to refocus our

21   attention on a portion of paragraph 27 that I

22   believe you just recently read that states,

23   "Whether a user is or is not perceiving a

24   benefit from the application" -- and I'm fast

25   forwarding a bit here -- "is indicated by

Dr. Douglas Chrissan - December 18, 2023

1    whether the device is or is not performing

2    operations that are noticeable to a user."

3              Is it your understanding that what

4    the claim means when it discusses determining

5    whether a user is perceiving a benefit from

6    an application, that means whether or not the

7    device is performing operations that are

8    noticeable to the user?

9         A    Yes.  That is how a person of skill

10   would have interpreted it at the time of the

11   invention, and that's how I would have

12   interpreted it at the time of the invention,

13   and that's how I interpret it now.

14             Again, this claim is not about the

15   processor being required to read the user's

16   mind.

17        Q    The interpretation I just

18   questioned you about, that's the

19   interpretation that you applied across all of

20   the disputed claims?

21        A    With minor adjustments for minor

22   variations in claim language, yes.

23             And is that interpretation a binary

24   determination, meaning if the application and

25   operation is noticeable to the user, the user

Dr. Douglas Chrissan - December 18, 2023

1    is perceiving a benefit, whereas if the

2    application operation is not noticeable to

3    the user, the user is not perceiving a

4    benefit.

5            Please restate your question.

6        Q    Sure.

7            I'm trying to determine whether or

8    not your interpretation of this disputed

9    phrase, "implies a binary determination," and

10   meaning that if the application operation is

11   noticeable to the user, that would be the

12   user is perceiving a benefit from that

13   application.

14           On the flip side, if the

15   application operation is not noticeable to

16   the user, that would mean the user is not

17   perceiving a benefit from that application.

18           Is that your understanding?

19       A    Within the scope of this claim,

20   what it means is that the processor would

21   determine that the application is running in

22   a background state when the user is not

23   directly interacting with that application,

24   and the user is not -- yeah, and the

25   application is not performing an operation

Dr. Douglas Chrissan - December 18, 2023

1    that the noticeable to the user.

2              So if the application -- what that

3    means is that if the user is not directly

4    interacting with the application and the

5    application is not performing an operation

6    that is noticeable to the user, then yes,

7    that's -- that's the background state.

8         Q    Okay.

9         A    Or no, that's not the background

10   state.  Sorry.

11        Q    Yeah, I understood.

12             So let me just try and refocus our

13   attention to just the perceiving a benefit

14   portion.

15             Is it the case that if an

16   application is not performing an operation

17   that is noticeable to the user, the user is

18   not perceiving any benefit from that

19   application?

20        A    Within the -- within the language

21   of this particular claim and the processor's

22   determination, yes, I believe that's correct.

23        Q    Okay.  And on the converse of that

24   would be in the context of these claims, if

25   an application is performing an operation

Dr. Douglas Chrissan - December 18, 2023

1    that is noticeable to the user, the user

2    would be perceiving a benefit from that

3    application.

4            Correct?

5        A    Could you state your question

6    again?

7        Q    Yeah.

8            I'm intending to just take the flip

9    side of what I just stated and we agreed to,

10   but if I'm not saying it correctly, let me

11   know.

12           And my question is in the context

13   of the disputed claims if an application is

14   performing an operation that is noticeable to

15   the user, the user will be perceiving a

16   benefit from that application.

17           Is that correct?

18       A    Yes.

19       Q    Okay.  And remaining in

20   paragraph 27, you state that -- I'm reading

21   the last sentence -- "Any information from an

22   application that is noticeable to a user is

23   expected to be perceived by the user and to

24   be beneficial to the user," and your sentence

25   goes on.

Dr. Douglas Chrissan - December 18, 2023

Page 35

```
 1              Do you see that sentence?

 2       A    (Witness reviewing.)

 3              Yes, I see it.

 4       Q    And I assume we can agree that none

 5   of the disputed claims recite the phrase,

 6   "Expected to be perceived by the user."

 7              Can we agree on that?

 8       A    The claims do not state that

 9   explicitly.

10       Q    According to your interpretation of

11   the disputed terms, there's an expectation

12   that every operation that an application

13   performs and a user notices would be

14   perceived as beneficial.

15              Correct?

16              MR. DAVIS:  Object to form.

17       A    Could you state your question

18   again?

19       Q    Sure.

20              According to your interpretation of

21   the disputed terms, there's an expectation

22   that every operation that an application

23   performs and a user notices would be

24   perceived as beneficial.

25              Correct?
```

Dr. Douglas Chrissan - December 18, 2023

1          MR. DAVIS:  Same objection.

2      A    Your wording is a little different

3    than the claim.

4          Perceiving -- perceiving any

5    benefit of the application, the wording of

6    the claim is, "Perceiving any benefit," which

7    I and a person of skill would interpret it as

8    perceiving any benefit of the application.

9          This claim, you know, the claim

10   language is not -- the claim language doesn't

11   say perceiving a great benefit or puts -- the

12   claim doesn't put some degree on it.  It

13   says, "Perceiving any benefits."  It's

14   binary, zero or some benefit, small or large,

15   so a person of skill interprets benefit as

16   benefit of the application, "Perceiving any

17   benefit of the application."

18          This claim is not about whether the

19   user thinks the benefit is trivial or life

20   changing.  The claim is simply about whether

21   the processor and the application are

22   performing an operation that's noticeable to

23   the user.

24      Q    Okay.  I didn't use the word

25   "great" anywhere in my question, so I'm not

Dr. Douglas Chrissan - December 18, 2023

Page 37

1    sure why that was incorporated into your

2    answer.

3           So I'll reask my question again,

4    which is:  According to your interpretation

5    of the disputed terms, is there an

6    expectation that every operation that an

7    application performs and a user notices would

8    be perceived as a benefit of that

9    application?

10          MR. DAVIS:  Same objection.

11      A    Yeah.   Your question changed,

12   because I know in the first incarnation you

13   used the word "beneficial."  So could you

14   restate your question, the exact question you

15   just asked?

16      Q    I will.  I was trying to

17   incorporate from your language so that we

18   could reach a common ground and address some

19   of the distinctions I heard you'd be making,

20   so I'll reask the question that I just asked.

21          According to your interpretation of

22   the disputed terms, is there an expectation

23   that every operation that an application

24   performs and a user notices would be

25   perceived as a benefit of that application?

Dr. Douglas Chrissan - December 18, 2023

1          MR. DAVIS:  Objection to form.

2     A     Please give me your question one

3  more time.

4     Q     Sure.

5          According to your interpretation of

6  the disputed terms, is there an expectation

7  that every operation that an application

8  performs and a user notices would be

9  perceived as a benefit of that application?

10         MR. DAVIS:  Same objection.

11    A     I will answer your question, but

12 before that I want to put into the record the

13 dictionary definitions of perceive as stated

14 in my declaration, which would be to become

15 aware of directly by the senses, especially

16 to see or hear.

17         So that is my understanding of the

18 word "perceived," and I believe that the

19 answer to your question is yes, but give me

20 your question one last time.

21    Q     Sure.

22         According to your interpretation of

23 the disputed terms, is there an expectation

24 that every operation that an application

25 performs and a user notices would be

Dr. Douglas Chrissan - December 18, 2023

1    perceived as a benefit of that application?

2         A    At least within the scope of this

3    claim at the time the processor is

4    determining, then yes, I believe the answer

5    is yes.

6              I state that in my paragraph 27,

7    "Any information from an application that is

8    noticeable to a user is expected to be

9    perceived by the user, i.e., seen, heard or

10   felt, and to be beneficial to the user or

11   else the application would not waste

12   resources presenting it."

13             Yeah, that's in my declaration.  I

14   stand behind it.  I think that's what your

15   question was about.

16        Q    In your experience with mobile

17   device applications, did the applications

18   ever provide information that a user notices

19   but would not believe to be beneficial?

20        A    Well, benefit -- okay.  So claim 2

21   uses the word "benefit."  A person of skill

22   interprets that as a benefit of the

23   application.

24             So in that context, what is your

25   question again?

Dr. Douglas Chrissan - December 18, 2023

```
 1          Q    Sure.
 2               I'm asking in the context of mobile
 3     devices.  Do you have a mobile device, a
 4     mobile phone?
 5          A    Yes, I do.
 6          Q    Does your mobile device ever
 7     provide you with information within an
 8     application that doesn't provide any benefit
 9     to you?
10          A    I consider anything an application
11     does to be a benefit of that application.
12               Again, the claim is not about what
13     any -- you know, the value that any given
14     user may subjectively give to a benefit.  The
15     claim is simply:  Does the device perform an
16     operation that's noticeable and that is
17     considered a benefit of the application?
18          Q    Can you think of any examples where
19     a mobile application provides noticeable
20     information that the user might not care
21     about?
22          A    That's a hypothetical.  I haven't
23     thought about it or don't have an opinion.
24               Do you have a specific case, case
25     study?
```

Dr. Douglas Chrissan - December 18, 2023

Page 41

```
1          Q    I was just wondering, sitting here
2    right now, can you think of any instances
3    where a mobile application would provide
4    noticeable information that a particular user
5    wouldn't have any interest in?
6          A    Not as I sit here today.
7               Again, that's a subjective and --
8    that's, you know, that's -- that would depend
9    on the user.
10         Q    Just sitting here today, you can't
11   provide me any examples of an instance where
12   a mobile application provides noticeable
13   information to a user that a particular user
14   would not have any interest in.
15              Is that fair?
16         A    Yeah, as I sit here, I don't.
17   Again, that's outside of the scope of the
18   claim.
19         Q    I will turn your attention to
20   paragraph 29.  Just let me know when you're
21   there.
22         A    Okay.  I'm there.
23         Q    Okay.  At the start of this
24   paragraph you start by discussing information
25   displayed on the device's screen.
```

Dr. Douglas Chrissan - December 18, 2023

Page 42

```
 1              Do you see that in the first
 2   sentence?
 3         A    Yes, I do.
 4         Q    Okay.  And that would be
 5   information that a user could perceive using
 6   his or her senses.
 7              Correct?
 8         A    Yes.
 9         Q    Okay.  Further down that paragraph,
10   you state, "A POSITA would have understood
11   that such information would constitute a
12   benefit to the user regardless of the user's
13   subjective opinions."
14              Do you see that?
15         A    Yes.  That's what we've been
16   discussing.
17         Q    And the information you're
18   referring to in that second sentence would
19   include information that appears on the
20   device's screen.
21              Correct?
22         A    I wanted to reread all of
23   paragraph 29.  Could you state your question
24   again?
25         Q    Sure.
```

Dr. Douglas Chrissan - December 18, 2023

Page 43

```
1              The information you're referring to
2      and the sentence I read, that begins, "A
3      POSITA would have understood that such
4      information, that information would include
5      information appearing on the device display."
6              Correct?
7      A    Yes.   That's correct.
8      Q    So under your interpretation of the
9      disputed terms, any information that appears
10     on a device's display screen will be
11     perceived as a benefit to the claim's user.
12             Correct?
13     A    A benefit of the application, yes.
14     I would consider information displayed on the
15     device's screen to be noticeable to the user.
16             So within the -- within the scope
17     of all the other claim language about the
18     processor and the application, et cetera,
19     applying -- I will follow -- that applies as
20     well.
21             Simply put, information viewed on
22     the display screen is noticeable to the user,
23     and that is a benefit of the application, as
24     I stated before.
25             If it weren't, the application
```

Dr. Douglas Chrissan - December 18, 2023

1     would not have been programmed to waste the

2     resources to present it.

3          Q    In general, do you agree that

4     applications can have features that benefit

5     some users but not other users?

6          A    Are you asking a question about

7     terms of degree?

8          Q    No, I'm just asking the question

9     about your general understanding of software

10    applications and whether or not you agree

11    with me that applications such as Smartphone

12    apps can have some features that benefit some

13    users but not others.

14         MR. DAVIS:  Objection to form.

15         A    Yeah, that -- that's a

16    hypothetical.  Do you have a specific case?

17         Q    I'm just asking whether you can

18    agree with me that there exists Smartphone

19    applications or apps that have features that

20    would benefit some users and not others.

21         A    That's outside the scope of the

22    claim, for one.

23              Do you mean varying degrees of

24    benefit or zero benefit?  I can -- I don't

25    know that any feature of any app would have

Dr. Douglas Chrissan - December 18, 2023

Page 45

1      zero benefit to a user.

2           Q    Okay.  So sitting here today, you

3      can't think of an example of an application

4      that would have a feature that would provide

5      zero benefit to any user?

6                Let me rephrase that, because that

7      last part was ambiguous.

8                Sitting here today, you cannot

9      think of an example of an app, a Smartphone

10     app, that would have a feature that would

11     provide zero benefit to a user?

12          A    Just to make sure I have this

13     right, go ahead and restate the question.

14          Q    Sitting here today, you cannot

15     think of an example of a Smartphone app that

16     would have a feature that would provide zero

17     benefit to a user.

18                Is that correct?

19          A    That's a true statement.

20          Q    Okay.  Let's turn to paragraph -- a

21     portion of paragraph 29 that you referenced

22     earlier where you provide certain dictionary

23     definitions.

24                Are you familiar with that portion

25     of your declaration?

Dr. Douglas Chrissan - December 18, 2023

```
 1          A    Yes.
 2          Q    You don't include a definition of
 3    the word "benefit" in your declaration.
 4               Is that right?
 5          A    (Witness reviewing.)
 6               I think we would need to go through
 7    all of the attachments and extend the
 8    examples.  I thought that -- okay.
 9               Yeah, at least in my declaration I
10    note that the Oxford English dictionary
11    defines benefit as, "For the advantage of or
12    on behalf of."
13               So can you go back and ask the
14    question again.
15          Q    Sure.
16               And I understand you have a
17    definition for the phrase, "For the benefit
18    of." Is that where you were just reading
19    from?
20          A    Yes, I was reciting towards the end
21    of paragraph 29.
22          Q    Yeah.  I was asking whether or not
23    anywhere in your declaration you discuss the
24    definition of the word "benefit."
25          A    (Witness reviewing.)
```

Dr. Douglas Chrissan - December 18, 2023

Page 47

1              Could you ask your question again?

2        Q    Yeah.  I'm just asking whether or

3   not your declaration discusses a definition

4   of the word "benefit."

5        A    I would need to review all of the

6   attachments.  I searched my declaration for

7   benefit, and I think that it addresses what

8   benefit means, including examples from --

9   well, an excerpt from the '701 patent.

10  Anyway, I'll stop there.

11             I believe that the -- I believe

12  that the declaration sufficiently addresses

13  what a person of skill would understand a

14  benefit to be.

15       Q    Let me narrow my question.

16             Your declaration doesn't provide

17  any dictionary definition of the word

18  "Benefit."

19             Correct?

20       A    I would disagree with that.  I

21  think that that paragraph 29 defining, "For

22  the benefit of," even though that's a phrase,

23  it -- it strongly equates benefit -- the

24  single word "benefit" with the single word

25  "advantage."

Dr. Douglas Chrissan - December 18, 2023

Page 48

1      Q    So do you believe that the plain

2   meaning of the word "benefit" is advantage?

3      A    I think that's one example of a

4   benefit, or one example description is that

5   it's an advantage.

6      Q    Did you review any other

7   definitions of the word -- dictionary

8   definitions of the word "benefit" in the

9   context of your analysis for your

10   declaration?

11      A    Not that I recall.

12      Q    And are you applying the ordinary

13   meaning of the word "benefit" when you're

14   interpreting the disputed terms?

15      A    Yes, I am.

16      Q    What is the ordinary meaning of the

17   word "benefit"?

18      A    Helpful, advantage.  I think those

19   are applicable.

20      Q    And what is helpful or what is an

21   advantage is a subjective determination.

22           Isn't it?

23      A    Not in the scope of these claims.

24   The benefit is not used in this claim as a

25   term of degree.  It's zero benefit or

Dr. Douglas Chrissan - December 18, 2023

Page 49

1    non-zero benefit.

2            And a person of skill, as I said

3    many times, equates that, given that a

4    processor has to make a determination with

5    whether the application is performing an

6    operation that's noticeable to the user.

7        Q    Would you agree that where there's

8    a term used in accordance with its plain

9    meaning, a court should not recharacterize it

10   using different language?

11       A    I believe that's a statement in

12   legal principle sections of my declaration

13   here, but there's no -- there's no

14   reinterpretation of benefit required, you

15   know, or performed.

16       Q    Do you agree that -- strike that.

17           Do you agree that what might be

18   considered an advantage to one person might

19   not be considered an advantage to another

20   person?

21       A    I think you asked me the exact same

22   question before but used the word "benefit"

23   instead of "advantage," so my answer is

24   already on the record.  That's outside the

25   scope of this claim and these patents.

Dr. Douglas Chrissan - December 18, 2023

1          How is your line of questioning

2     going?  We will take a break if you've got a

3     lot longer.  Finish the line of questioning

4     and we'll take a break.

5          Q     Sure.

6          Let me just ask you, do you agree

7     under the plain meaning of the word

8     "benefit," whether something provides a

9     benefit is a personal opinion?

10         A     That's outside the scope of the

11    claim language.  The claim language turns on

12    the benefit of the application, and benefit

13    of the application is not subjective.  We've

14    discussed that many times already.

15         Q     Let me just ask you, in the context

16    of the plain and ordinary meaning of the word

17    "benefit" as it would appear in the

18    dictionary, do you agree that whether

19    something provides a benefit is based on

20    personal opinion?

21         A     So you're saying completely outside

22    of processors and devices and computers and

23    applications, you're talking about the stock

24    market or something?  Could you give a

25    specific example?

Dr. Douglas Chrissan - December 18, 2023

1        Q    I'm just talking about the plain

2    meaning of the word "benefit" as it would be

3    in a dictionary.

4             Applying that main meaning of

5    benefit, do you agree that whether something

6    provides a benefit is based on personal

7    opinion?

8        A    Completely outside of the context

9    of this claim.  My answer is maybe yes, maybe

10   no.  Depends on the specific situation.

11       Q    So under just the plain and

12   ordinary meaning of the word "benefit," there

13   are instances where one person might perceive

14   something as a benefit while another person

15   does not perceive something as a benefit.

16             Do you agree with that?

17       A    Outside of the context of this

18   patent and this claim?  Maybe yes, maybe no.

19   We can -- I would want to go through a

20   specific case study.

21       Q    One last question, and I'll direct

22   your attention back to claim 2 as it's copied

23   into your declaration on page 7.

24             Let me know when you're there.

25       A    Yes.

Dr. Douglas Chrissan - December 18, 2023

Page 52

1      Q    The claim ends in, "Perceiving any
2    benefit from that application."
3           Are you interpreting that to mean
4    perceiving any benefit of that application?
5      A    Well, I replace "benefit" --
6    benefit means benefit of that application, so
7    I interpreted it as benefit of that
8    application from that application.
9      Q    Is there any difference between the
10   language "benefit of that application" and
11   "benefit from that application"?
12     A    I think there's a difference.
13   There's some overlap, but they're different.
14     Q    What differences can you think of?
15     A    Well, just the -- what the term
16   means.  I would have to -- I'd have to think
17   about it.  I have not considered that
18   exactly.  There's definitely overlap.
19          From means... benefit of that
20   application means benefit related to that
21   application, and from that application means
22   as a result of.
23          There's a slight difference.
24   There's some overlap.  I would need more time
25   to give you a precise answer.

Dr. Douglas Chrissan - December 18, 2023

```
1        Q    Okay.  So there's some overlap in
2   scope between the terms "benefit from that
3   application" versus "benefit of that
4   application," but there's also some
5   difference in the scope between those two
6   phrases.
7             Is that fair?
8        A    There may be some difference in
9   scope.  I said I would want to analyze that
10  in detail before I gave you a final answer.
11       Q    Okay.
12            MR. THOMPSON:  I think this is a
13  good time to take a break.
14            THE VIDEOGRAPHER:  We are off the
15  record.
16            The time is 9:16 a.m.
17            (Brief recess taken.)
18            THE VIDEOGRAPHER:  We are back on
19  the record.
20            The time is 9:27 a.m.
21       Q    Dr. Chrissan, can I turn your
22  attention back to claim 2 of the '701 patent
23  as it appears on page 7 of your declaration?
24       A    Yes.
25       Q    And let's focus on the portion of
```

Dr. Douglas Chrissan - December 18, 2023

Page 54

1    the claim that says, "Perceiving any benefit

2    from that application."

3            Do you see that?

4        A    Yes, I see that.

5        Q    Okay.

6        A    I wanted to clarify something that

7    we talked about before the break, a benefit

8    of the application versus from the

9    application.

10            So as I mentioned in my -- in one

11    of my answers, a benefit of the app is a

12    benefit provided by the application or

13    programmed into the application, whereas the

14    benefit from that application refers to the

15    noticeable part of a person of skills

16    interpretation, and that the app is

17    performing an application that's noticeable

18    to the user.

19        Q    So that I'm clear, is it still your

20    testimony that the phrase "benefit from that

21    application" may have a difference in scope

22    compared to the phrase "benefit of that

23    application"?

24        A    My answer remains the same.  They

25    are -- there is overlap, but there is some

Dr. Douglas Chrissan - December 18, 2023

Page 55

1    difference.  "Of" and "from" are two

2    different words.

3         Q    Okay.  And your interpretation of

4    the claim -- the claim would replace "benefit

5    from that application" with "benefit of that

6    application."

7              Is that still true?

8         A    No, that's not correct.  I said my

9    interpretation would replace "benefit from

10   that application" with "benefit of that

11   application from that application."

12             So in other words, benefit refers

13   to a benefit programmed into or provided by

14   the application.  That's how a person of

15   skill would understand the word "benefit".

16   That's the only clarification.

17        Q    Okay.  I think I understand now.

18             Your interpretation, your

19   interpretation of the claim replaces "benefit

20   from that application" with "benefit of that

21   application," from that application.

22             Is that correct?

23        A    That's how a person of skill would

24   interpret the claim, yes.

25        Q    Okay.  Did you have any

Dr. Douglas Chrissan - December 18, 2023

Page 56

1      conversations during the break with your

2      counsel about your response to that question?

3           A    No, I did not.

4           Q    Okay.

5           A    We did not talk at all.

6           Q    That's unfortunate, because Chris

7      seems like a really nice guy.

8                Okay.   Looking back at claim 2, I

9      want to focus you on the portion that we were

10     just discussing, which is perceiving any

11     benefit from that application.   Okay?

12          A    Yes.

13          Q    If I were to remove the portion of

14     that phrase that says, "Any benefit from,"

15     such that the claim just read, "Perceiving

16     that application," how would that affect the

17     scope of the claim, if at all?

18               MR. DAVIS:  Objection to form.

19          A    I don't have an opinion on that.  I

20     wouldn't be able to give you one on the fly.

21     I would have to go back and read everything

22     in detail.

23          Q    Okay.   So just sitting here today,

24     you cannot identify for me any difference in

25     your interpretation of the claim as written

Dr. Douglas Chrissan - December 18, 2023

Page 57

1      versus if I remove the term "any benefit

2      from."

3              Is that correct?

4         A    That's not what I said.  I said I

5      don't have an opinion one way or the other.

6      I would need to go off and do a full

7      analysis.

8         Q    That's why I said, "Sitting here

9      today."

10             Without going off and doing a full

11     analysis, you cannot identify for me any

12     difference between your interpretation of the

13     claim as written versus if I remove the

14     terms, "any benefit from," from the longer

15     phrase.

16             Is that correct?

17        A    Intuitively, it seems as though

18     there would be some difference.  I'm not in a

19     position to analyze it and identify the

20     answer to your question right now as I sit

21     here.

22        Q    Just sitting here right now, can

23     you identify any differences in claim scope

24     for claim 2 as written versus if I remove the

25     words "any benefit from"?

Dr. Douglas Chrissan - December 18, 2023

Page 58

```
1         A    My answer is the same.
2    Intuitively, it seems as though there should
3    be a difference, but I would need to analyze
4    everything in full.
5              How much time do you want to give
6    me?
7         Q    I'm just wondering if you were able
8    to provide any differences, but if you need
9    to go off and take time to do that, we can
10   move on.
11             Let me ask you a different
12   question.
13        A    Instantaneously, I -- it's
14   something that I haven't thought about.
15        Q    Okay.  What if I replaced the word
16   "benefit" in the disputed phrase with
17   "operation"?  Does that affect the scope of
18   the claims under your interpretation?
19        A    That would make the claim
20   significantly different.  I don't have an
21   opinion on that, either.
22        Q    Okay.  Can you identify what a
23   single difference in the scope of the claim
24   if I replaced the word "benefit" within the
25   disputed phrase to the word "operation"?
```

Dr. Douglas Chrissan - December 18, 2023

Page 59

```
1          A    Well, because operation can mean so
2    many different things with respect to
3    computers and devices and applications.
4               Benefit does mean something.  A
5    benefit of the application is some feature.
6               I used the word "helpful."
7    Typically a programmer of an application
8    considers a benefit a feature from the user's
9    standpoint.
10              Operation can mean anything.
11         Q    Can you give me an example of an
12   instance when if I replace the word "benefit"
13   with "operation," it would change whether or
14   not this particular phrase is satisfied?
15         A    Again, I -- I don't have an answer
16   on the fly.  I've learned not to provide, you
17   know, answers that take hours of
18   analysis in -- you know, I've learned not
19   to -- I've learned not to answer questions
20   that take hours of analysis in five seconds,
21   because after this deposition I'll think of
22   something else or some different way I should
23   have put it or something else that I should
24   have thought of.
25              But I explained -- I gave a
```

Dr. Douglas Chrissan - December 18, 2023

Page 60

```
1    reasonably thorough explanation of why I
2    thought "operation" would change the scope of
3    the claim or might change the scope of the
4    claim significantly.
5         Q    I'm just wondering whether you can
6    give me an example, a real life example of an
7    instance when a user would perceive a benefit
8    from that application, while a user would not
9    receive an operation from the application, or
10   vice versa.
11        A    Now, again, the claim scope would
12   change enough that I wouldn't even try to
13   come up a with hypothetical or a specific
14   example on the fly right here.
15             I gave you an overall explanation
16   that operation is not -- is different than
17   benefit.
18        Q    Yeah, I'm just trying to understand
19   how it's different under your interpretation,
20   and I'm asking whether you can give me an
21   example that illustrates your opinion as to
22   how it's different.
23             Just saying it's different,
24   unfortunately, isn't as helpful as if you
25   could explain an example.
```

Dr. Douglas Chrissan - December 18, 2023

Page 61

```
 1         A    I described my interpretation of

 2    benefit.  I described my interpretation of

 3    operation as much broader and more general

 4    than benefit, so I think that's sufficient.

 5              Any specific example, I'd have to

 6    go off and analyze it.

 7         Q    So then it would be -- if

 8    perceiving an operation, in your opinion, is

 9    more general than perceiving a benefit,

10    presumably there would be instances where a

11    user could perceive an operation from an

12    application but not perceive a benefit from

13    an application.

14              Is that correct?

15         A    I did not say that perceiving any

16    operation is more general than perceiving any

17    benefit.

18              I said it just seems to me as

19    though -- it doesn't seem.  As a person of

20    skill, I know that the word "operation" has a

21    much broader interpretation to a person of

22    skill than the word "benefit".  I didn't add

23    any "perceiving" or any other words of the

24    claim.

25              That's why I'm saying I would need
```

Dr. Douglas Chrissan - December 18, 2023

Page 62

1      to go off and do a full analysis within the

2      scope of all the other claim language.

3           Q    So it's your opinion that operation

4      is broader than benefit.

5                Correct?

6           A    Yes, that's what I stated.

7      Generally speaking, the word "operation" is

8      broader than the word "benefit" in the

9      context of computing devices.

10          Q    If I replace the word "benefit" in

11     a claim with "noticeable operation," does

12     that change the scope of the disputed term?

13               MR. DAVIS:  I will object to form.

14          A    I believe in my declaration that I

15     say -- this is paragraph 27 -- "This

16     determination considers whether a user is or

17     is not perceiving a benefit from the

18     application which a POSITA would understand

19     to be indicated by whether the device is or

20     is not performing operations that are

21     noticeable to the user."

22               So I'd say you're pretty close.  I

23     would -- again, I can't give you a yes or no

24     without going back and evaluating every word

25     just to be sure that I don't make a mistake,

Dr. Douglas Chrissan - December 18, 2023

Page 63

1      but noticeable operation is -- seems to be

2      pretty close to the opinion I state in 27,

3      which is the opinion of a person of skill.

4          Q    If I were to replace "benefit"

5      within the disputed terms with "noticeable

6      operation," sitting here today, you can't

7      think of any differences that would change

8      the claim scope according to your

9      interpretation.

10             Is that fair?

11             MR. DAVIS:  Same objection.

12         A    Could you ask your question again?

13         Q    If I were to replace "benefit"

14     within the disputed terms with "noticeable

15     operation," sitting here today, can you think

16     of any differences -- let me phrase it a

17     little bit differently.

18             If I were to replace the word

19     "benefit" within the disputed terms with the

20     words "noticeable operation," would that

21     change the scope of the claims, the disputed

22     claim terms according to your interpretation?

23             MR. DAVIS:  Object to form.

24         A    I would want to qualify it.  I

25     would not use that language exactly.  I would

Dr. Douglas Chrissan - December 18, 2023

Page 64

1    say "noticeable operation" related to a

2    feature or benefit.

3            So, again, you're pretty close, but

4    before I would say exactly, I would want to

5    do a thorough analysis, because, you know, my

6    opinion is if the user is going to notice --

7    if the user is going to perceive, sense, see,

8    hear, feel if the phone vibrates, if a user

9    is going to see, hear or feel a benefit, then

10   the user is going to notice an operation

11   that's associated with a feature or benefit.

12           So you're pretty close, but I would

13   want to think about it a little bit before I

14   said that the claim scope is exact.

15       Q    Okay.   Sitting here right now

16   without further analysis, can you identify

17   for me any differences in the claim scope of

18   the disputed terms if I replace the word

19   "benefit" with "noticeable operation"?

20       A    I already answered your question.

21   It's on the record.   It's the same that I

22   said before.

23       Q    The answer is no?

24       A    The answer is there might be.    I

25   might want to put in a couple of extra words

Dr. Douglas Chrissan - December 18, 2023

Page 65

1     to clarify that the noticeable operation is
2     related to a feature.
3            Again, we're getting into territory
4     that I haven't -- I didn't plot through or
5     form an opinion on.
6            So, you know, I'm saying, yeah,
7     you're generally close, but I would need to
8     go off and do a thorough analysis before I
9     agreed exactly in terms of how a person of
10    skill would interpret, you know, all of these
11    details and changes.
12       Q    Let's look back at paragraph 30 of
13    your declaration.
14       A    Yes.
15       Q    Okay.  And there's an example you
16    provide in here -- and I'm paraphrasing a
17    bit, but please feel free to refresh yourself
18    with the hypothetical.  It involves a music
19    application, for example, Spotify running as
20    a foreground application and then at some
21    point the user, they stop directly
22    interacting with their device and they place
23    it on the table, and then they're still
24    perceiving a benefit from the application
25    because the music is continuing to play.

Dr. Douglas Chrissan - December 18, 2023

Page 66

1                  Do you recall that hypothetical?

2          A     Let me read -- the answer to your

3    question is yes.  Let me read paragraph 30.

4          Q     Sure.

5          A     (Witness reviewing.)

6                  Okay.  What is your question about

7    paragraph 30?

8          Q     You state towards the end of that

9    paragraph that, "The application would still

10   be considered a foreground application and

11   not in a background state because the user is

12   perceiving a benefit from the music

13   application."

14                 Do you see that?

15         A     Yeah, the user is sensing the

16   music, hearing the music.

17         Q     And is that why your opinion, the

18   user is still perceiving a benefit from the

19   application, because the user still is

20   hearing the music?

21         A     Yes, I consider that an operation

22   that is noticeable to the user.

23         Q     Okay.  Let's now extend your

24   hypothetical, and the user has -- is not

25   interacting with the application.  They

Dr. Douglas Chrissan - December 18, 2023

1    placed it on the table and they put in their

2    ears some really effective earplugs so they

3    can't hear a thing.

4          Do you understand the hypothetical

5    so far?

6          A    Yes, I do.

7          Q    Is that user still perceiving a

8    benefit from the music application?

9          A    I'll refer to 27.   Within the scope

10   of the claim, the answer is yes.

11         And as I say at the end of

12   paragraph 27, any information from an

13   application that is noticeable to a user is

14   expected to be perceived by the user and to

15   be beneficial to the user, or else the

16   application would not waste resources

17   presenting it.

18         Whether the user puts in earplugs

19   is outside of the scope of the claim and my

20   analysis.

21         As I mentioned earlier in this

22   deposition, it's -- the claim states that a

23   processor is configured to determine.   A

24   person of skill interpreting and implementing

25   that claim understands that the processor

Dr. Douglas Chrissan - December 18, 2023

Page 68

```
1     doesn't -- you know, is not required to have
2     a connection to the user's brain or read the
3     user's mind or consider whether the user has
4     put in earplugs in or not.
5              The processor is simply configured
6     to determine, and then -- you know, I won't
7     recite the rest of the claim, and that's
8     based on whether the processor and the device
9     are performing an operation that is
10    noticeable to a user that's actually
11    interacting with and paying attention to the
12    device.  That's how a person of skill
13    interprets the claim.
14         Q    Well, you agree that the person
15    with earplugs in won't notice the music
16    application playing music.
17              Correct?
18         A    Under your hypothesis, that person
19    wouldn't hear the music.  They still may be
20    aware of it.
21         Q    How did the processor know whether
22    the user is noticing the music application or
23    not?
24         A    Well, that gets back to my previous
25    answer.  That's outside of the scope of the
```

Dr. Douglas Chrissan - December 18, 2023

Page 69

1      claim.

2              The processor is not required to

3      know if the user has put in earplugs.  The

4      processor is not required to know if the, you

5      know, the processor is not required to read

6      the user's mind or have a wire into the

7      user's brain.

8              A person of skill understands that

9      that's not within the scope of the claim.

10       Q    Let's just continue in my

11     hypothetical, that the user who put in the

12     earphones, they're not aware of the music

13     playing anymore.  They can't hear it.

14     They're not aware that it's playing.

15             In that instance, is the music

16     application performing a noticeable

17     operation?

18       A    Yes.

19       Q    How so?

20       A    If the music application is still

21     playing music, it's noticeable to a user that

22     is -- that is there or presumed to be there

23     and interacting formally with the phone.

24       Q    Okay.  So if the application is

25     playing music, has a really good battery life

Dr. Douglas Chrissan - December 18, 2023

1       and the user flies across the country from

2       the United States to China, is the user still

3       perceiving the benefit from that application?

4           A    That is far outside the scope of

5       the claim.  At that point they're so far

6       disconnected that the user may not be

7       perceiving in terms of -- to the extent

8       perceiving means see, hear, feel, be aware

9       of, at that point the user may not be

10      perceiving the phone because there's --

11      because at that point they're so far

12      disconnected and it's so far outside the

13      claim, but the processor is still doing

14      something noticeable to any user that happens

15      to be interacting with it, or, you know,

16      operating with it as you and I would normally

17      use and work with and operate our device.

18          Q    So if the person left their phone

19      on the table and traveled to China where they

20      can no longer see or hear their phone, would

21      they satisfy the requirement of perceiving a

22      benefit from the application?

23          A    At that point they're not even a

24      user of the device.  It's just -- that's --

25      yeah, at that point they're not even a user

Dr. Douglas Chrissan - December 18, 2023

Page 71

1    of the device.  It's so far fetched that the

2    claim interpretation has been completely

3    distorted.

4         Q    What if the user put the phone

5    down, just took the dog for a walk in the

6    front yard and they can't see or hear the

7    device anymore?  Are they still perceiving a

8    benefit from the application?

9         A    My answer is the same.  The back

10   yard or the next door neighbor or China, at

11   some point they don't even qualify as a user

12   of the device, even if they happen to be the

13   owner of it.

14          You know, the -- as I mention in

15   claim 27, a person of skill interprets this

16   as meaning that the user of the device is, in

17   fact, able to see, feel, hear the device.

18        Q    How is a -- let's take a deaf

19   person.  A deaf user of the phone can't hear

20   the music application.

21          Correct?

22        A    Okay.  Under your hypothetical, we

23   can -- we can take that as a given in your

24   hypothetical.

25        Q    Would a deaf person be perceiving

Dr. Douglas Chrissan - December 18, 2023

1    any benefit from the music application if

2    they set it down on the table and walked

3    away?

4         A    I can't answer that as I sit here.

5    I only know that the person presumably

6    wouldn't be able to hear it.

7            Again, that's outside of the scope

8    of how a person of skill interprets this

9    claim.

10        Q    What do you mean when you say that?

11        A    Well, I say -- I refer to my -- at

12   the end of my paragraph 27.   In a deaf

13   person, it's certainly a corner case.

14           My -- my declaration at the end of

15   paragraph 27 says, "Any information from an

16   application that is noticeable to a user is

17   expected to be perceived by the user, wherein

18   perceived means sensed, see, feel, optically

19   recognized -- I'm sorry -- see, here,

20   optically recognized, et cetera, by the user

21   and to be beneficial to the user, or else the

22   application would not waste resources

23   presenting it."

24           Your example of a deaf person

25   breaks that presumption, but this is the

Dr. Douglas Chrissan - December 18, 2023

Page 73

1    presumption that a person of skill has when

2    programming and operating -- or when

3    programming the device.

4          I can say that because by the time

5    this patent rolled around, I had been making

6    electronic devices for 20 years.

7    Q    Right.  So then would -- at the

8    point in time when a deaf person is not

9    interacting with the music app and they place

10   the phone on the table and they walk away ten

11   feet, is the deaf person perceiving any

12   benefit from the application?

13   A    To me, at least with respect to

14   hearing, that's the same hypothetical as the

15   back yard, the next door neighbor or China.

16   Possibly not.

17   Q    So in that context, would the

18   application be in a background state?

19   A    Well, again, that's a completely

20   separate question, because your hypothetical

21   does not apply to the claim.

22   Q    How does my hypothetical not apply

23   to the claim?

24   A    A person of skill presumes that any

25   information from an application that is

Dr. Douglas Chrissan - December 18, 2023

```
 1      noticeable to a user is expected to be
 2      perceived by the user and to be beneficial to
 3      the user, or else the application would not
 4      waste resources presenting it.
 5              This is a variation.  All your
 6      questions are somewhat variations on the same
 7      theme, so my answers will be essentially the
 8      same answer.
 9              You know, the China, deaf -- I
10      forget what the other one was -- but it all
11      boils down to the fact that if the -- let me
12      get back to the language of claim 2.  "The
13      processor has to make a determination," and
14      if the -- if a device -- if an application is
15      playing music out the speaker of a device,
16      according to this claim the processor is not
17      going to consider that running in a
18      background state.
19              Along the same theme that I said
20      before, a person of skill interpreting and
21      implementing this claim understands that the
22      processor is not required to read the user's
23      mind, have a direct connection to the user's
24      brain, understand if the user is deaf, that's
25      outside of the scope of the claim.
```

Dr. Douglas Chrissan - December 18, 2023

Page 75

```
1              That's why I said your hypothetical
2     is outside the scope of the claim.
3         Q    Okay.  So in the -- returning to
4     the example of the person leaving their phone
5     on the table and taking a plane to China, and
6     the application, the music application is
7     still playing the music, is that an instance
8     when the application will still be in a
9     foreground state even though the user is not
10    directly acting with the application and is
11    not receiving a benefit from that
12    application?
13        A    And my answer is the same as
14    before.  At that point the person doesn't
15    even qualify as a user of the device.  It's a
16    completely different claim interpretation.
17        Q    How close do you have to be to the
18    phone to qualify as a user of the device?
19        A    As I said in my paragraph 27, any
20    information from an application that is
21    noticeable to the user is expected to be
22    perceived by the user and to be beneficial to
23    the user, or else the application would not
24    waste resources presenting it.
25             So close enough to see and be able
```

Dr. Douglas Chrissan - December 18, 2023

1      to see the screen for a noticeable operation

2      that's visual related, close enough and able

3      to hear for a operation that is noticeable by

4      hearing -- yeah, close enough and able to

5      hear for an operation that is related to

6      hearing, et cetera.

7              The claim -- there's no requirement

8      to the claim of how close.  It's just able to

9      see, hear, feel, be aware of the operation

10     that is noticeable to the user.

11     Q     Under your interpretation of the

12     disputed claims, the term "user" has a

13     requirement of a person that can perceive the

14     device.

15             Is that correct?

16             Let me strike that.  That's not the

17     question that I wanted to ask.

18             Under your interpretation of the

19     disputed claims, the term "user" has a

20     requirement of being a person that

21     concurrently perceives the device.

22             Is that correct?

23     A     The claim term is user of the

24     device.  I do not opine in this declaration

25     on exactly what qualifies as a user of the

Dr. Douglas Chrissan - December 18, 2023

```
 1     device.
 2               Again, in order to do that, if you
 3     wanted me to, it would take -- it would take
 4     longer than you want to give me right now.
 5               But at a high level, the user of
 6     the device does have plain and ordinary
 7     meaning as the person that uses the device,
 8     not a person who happens to own the device
 9     but doesn't take it with him or her to China.
10          Q    Does a user cease to be -- does a
11     person -- strike that.  I will start again.
12               Does a person cease to be a user of
13     the device as that term is used in the
14     disputed claims if the person walks outside
15     their house?
16          A    As I stated before, I'm not
17     prepared to get into exact, you know,
18     thorough analysis of when a user -- what does
19     or does not qualify as a user of the device.
20               But generally, yes, a person far
21     enough from the device that they have no
22     connection to it, a person of skill would
23     understand that that is not a user of the
24     device.
25          Q    How far does a person have to go to
```

Dr. Douglas Chrissan - December 18, 2023

Page 78

```
1    have no connection to their device and no

2    longer be a user of the device under the

3    terms of the claims?

4         A    I already answered that question.

5    If you can, just take my last answer.  I'm

6    not prepared to give an exact definition.

7              But, you know, plain and ordinary

8    meaning to a person of skill or even to a

9    commoner or a general layperson, it generally

10   understands that if you're too far from your

11   phone to have any connection to it of any --

12   I don't want to get into specific words --

13   but anyone would recognize, including a

14   person of skill, that there is at some point,

15   you know, a lack of association or connection

16   or distance you can have with your phone such

17   that you would not be considered a user of it

18   under the -- under the scope of this claim.

19        Q    Let's talk for a second about a

20   hypothetical alarm application, Smartphone

21   alarm application.

22             Are you familiar with such

23   applications?

24        A    I am somewhat familiar with those.

25        Q    Okay.  Let's say there's an alarm
```

Dr. Douglas Chrissan - December 18, 2023

Page 79

1    application that that's sole purpose it to

2    use heavy metal music to wake up the device

3    user at 3:00 a.m. in the morning, and within

4    the app there's terribly limited features.

5    You can't change the type of music or the

6    wake-up time.

7              Does that make sense so far?

8      A    You mean an alarm on your phone.

9           Right?

10     Q    Yes.

11     A    I was thinking of a home alarm

12   system when you said, "Alarm."

13            That's why the difference is --

14   that's an example of how differences in, you

15   know, the way people think of things can be

16   so different.

17            So it's important not -- for me not

18   to give answers on the fly and to go -- to

19   hypotheticals, but go ahead and ask your

20   hypothetical and I'll do my best.

21            But we're talking about an app on

22   your phone, and you can't control the time

23   and you can't control the music.

24     Q    Correct.  3:00 a.m., wake up every

25   day to heavy metal.

Dr. Douglas Chrissan - December 18, 2023

Page 80

```
 1            Are you with me so far?

 2       A    Okay.

 3       Q    Now we're going to consider my

 4  grandmother who hates heavy metal music more

 5  than any other type of music.  She really

 6  hates waking up before 6:00 a.m.

 7            Still with me?

 8       A    I'm with you.

 9       Q    All right.  And would you agree

10  with me that if this application is running

11  and wakes up my grandmother at 3:00 a.m.,

12  that will be something that is noticeable to

13  her.

14            Correct?

15       A    Yes, that would be noticeable to

16  her.

17       Q    And under your claim

18  interpretation, if I install this app on my

19  grandmom's phone and it wakes her up at

20  3:00 a.m. every day with heavy metal music,

21  and she's a device user, would she perceive a

22  benefit from that application?

23       A    I would have a number of additional

24  questions about your hypothetical that I --

25  I'm not sure I would even come up with all of
```

Dr. Douglas Chrissan - December 18, 2023

Page 81

```
 1      them right now.
 2              But either way, I still resort to
 3      my opinion in my paragraph 27.   Any
 4      information from an application that is
 5      noticeable to a user is expected to be
 6      perceived by the user and to be beneficial to
 7      the user or else the application would not
 8      waste resources presenting it.
 9              It goes back to the same theme that
10      I've said before.   The claim does not require
11      the processor to read the user's mind, if
12      your grandmother could even be a considered a
13      user of the device at that point, but that's
14      beside the point.
15              Again, I have a number of
16      questions.   The main thing, you know, I
17      repeat my same opinion:   The processor is not
18      required to read your grandmom's mind.
19              The processor is simply operating
20      with the understanding that any information
21      from an application that is noticeable to a
22      user is expected to be perceived by the user
23      and be beneficial to the user or else the
24      application would not waste resources
25      presenting it.
```

Dr. Douglas Chrissan - December 18, 2023

Page 82

```
 1        Q    Okay.  Well, I want to just step
 2   away from the discussion of the processor
 3   real fast.
 4             I want to just look at the claim
 5   language that concerns a user of the device
 6   is not directly interacting with that
 7   application or perceiving any benefit from
 8   that application.  Okay.
 9             So in the context of the
10   hypothetical I asked you, and let's take the
11   assumption that my grandmother would be
12   considered a user of the phone.  It's right
13   next to her on the bedside table.
14             Under your interpretation, if my
15   grandmother's phone is running the app that
16   wakes her up at 3:00 a.m. every morning with
17   heavy metal music, both of which she hates,
18   is she a user of the device perceiving a
19   benefit from that application?
20        A    The hypothetical is so far out
21   there that I can't answer yes or no.  I mean,
22   you've dictated so many of the terms.
23        Q    What more information do you need?
24        A    So you said... so you said first
25   off -- well, hold on.  Let me think about it.
```

Dr. Douglas Chrissan - December 18, 2023

Page 83

```
1              I have too many questions.
2         Q    What is the first one?
3         A    So why -- so first off, you're
4    dictating that your grandmother is a user of
5    the device.  You said that was a condition.
6              Right?
7         Q    Let's just assume that.
8         A    Again, we're -- we are -- this
9    hypothetical is so far outside of the scope
10   of the claim, but if your grandmother is not
11   perceiving a benefit, why is she allowing
12   this to happen?
13        Q    She doesn't know how to turn it
14   off.  She can't change the feature.  It's
15   been three days in a row.  She can't figure
16   out the settings, not very good with
17   technology, any of those things.
18             Why she's not turning it off
19   doesn't seem to matter here.  I'm just giving
20   you the facts of the scenario.
21        A    So -- so basically what -- you have
22   dictated a hypothetical -- let me make sure I
23   get this right.
24             You have dictated a hypothetical
25   where your grandmother is the user of the
```

Dr. Douglas Chrissan - December 18, 2023

Page 84

1    device, and you have essentially dictated the

2    hypothetical that your grandmother is not

3    perceiving a benefit.

4           Would you agree with that?

5      Q    If that is -- I agree with you that

6    that is true.

7      A    No, no, no, no, no.  You have

8    basically dictated a situation -- you have

9    dictated a situation that is -- that makes

10   no -- that doesn't make sense to me.

11          You have dictated the conditions

12   that your grandmother is the user of the

13   device, and she is not receiving any benefit

14   from it because you said she doesn't know how

15   to turn it off.

16          She doesn't know how to leave her

17   phone in the basement.  She doesn't know how

18   to call you up yelling at you, "Why did you

19   put this thing on my device?"

20          You basically dictated a

21   hypothetical that's outside the scope of the

22   claim.

23          So if you want to dictate that

24   hypothetical, give me your hypothetical

25   again.  I will do my best to give you some

Dr. Douglas Chrissan - December 18, 2023

Page 85

1          sort of an answer to your hypothetical that's

2          outside of the scope of the claim.

3              Q     Okay.   My hypothetical is, again,

4          grandmother hates heavy metal music.   She

5          hates getting up before 6:00 a.m.

6                    As a user of a Smartphone that has

7          an app that only does one thing, which is

8          wake people up at 3:00 a.m. with heavy metal

9          music, within the language of the claim would

10         my grandmother be a user of the device that

11         is perceiving a benefit from that

12         application?

13             A     I can't answer you -- I can't

14         answer that yes or no, honestly, honestly

15         because of how constrained and outlandish

16         your hypothetical is.

17                   I can only tell you that any

18         information from an application that is

19         noticeable to a user is expected to be

20         perceived by the user and to be beneficial to

21         the user, or else the application would not

22         waste resources presenting it, i.e., making

23         it noticeable.

24             Q     Do you agree with my hypothetical

25         that my grandmother would not be perceiving

Dr. Douglas Chrissan - December 18, 2023

1    any benefit from that application?

2         A    I can't even say that unless you

3    dictate to me that that is the truth of the

4    hypothetical.

5         Q    My grandmother hates the

6    application.  Does that mean that she's --

7    would you agree that means she's not

8    perceiving any benefit from the application?

9         A    Again, I can't read your

10   grandmother's mind, just like the processor

11   is not reading your grandmother's mind.

12            If you want to make it a condition

13   of your hypothetical that she is not

14   perceiving any benefit, which is what I think

15   you're trying to do, go ahead and state that.

16        Q    Okay.  My grandmother than hates

17   this app so much, and I asked her, I said,

18   "Grandma, are you receiving any benefit From

19   this application?"

20            And she said, "None whatsoever.  I

21   can't stand the thing."

22            Now, is the application running in

23   the background state?

24            MR. DAVIS:  Object to form.

25        A    So the processor, given that it is

Dr. Douglas Chrissan - December 18, 2023

1      under -- under the condition of this claim,

2      and notwithstanding the fact it's not

3      required to understand your grandmother or

4      her tastes, if the processor is performing an

5      operation that is noticeable to a user, then

6      it is -- it would determine that the

7      application is something other than running

8      in a background state.

9          Q    Would you agree within the context

10     of these disputed claims, there will be

11     instances when a user is perceiving no

12     benefit from an application -- strike that.

13             Let me take you to paragraph 32 of

14     your declaration.

15         A    Go ahead and finish your line of

16     questioning, but we'll start thinking about

17     the next break once it's done.

18             You said paragraph 32?

19         Q    Yes.

20         A    All right.  Let me read it.

21             (Witness reviewing.)

22             Okay.  I've read paragraph 32.

23         Q    Okay.  You state in paragraph 32

24     that if objective boundaries were required,

25     the specification provides several.

Dr. Douglas Chrissan - December 18, 2023

Page 88

```
1              Do you see that?
2         A    Yes.
3         Q    And you cite and reproduce a few
4    paragraphs from the '701 patent
5    specification.
6              Is that correct?
7         A    Yes.
8         Q    And in paragraph 33, you say these
9    examples from the specification provide
10   objective boundaries as to the scope of the
11   challenged claim term.
12             Do you see that?
13        A    Yes.
14        Q    Okay.  So is it your opinion that
15   the examples provided within the excerpts of
16   the specification reproduced in your
17   declaration provide objective boundaries for
18   the disputed claim terms?
19        A    Yes, that is what this declaration
20   states, and I agree.
21             These are examples -- there are
22   examples in here that would be noticeable to
23   a user, and there are examples that may be
24   related to operations that are not noticeable
25   to a user at a given instant.
```

Dr. Douglas Chrissan - December 18, 2023

Page 89

```
 1          Q    Is it your understanding that these
 2    examples in the specification would be
 3    sufficient for a person of ordinary skill in
 4    the art to understand the scope of the
 5    disputed claim terms?
 6          A    Yes, it is.
 7          Q    Do you agree that the specification
 8    doesn't provide any specific rules or
 9    definite standard to help or to inform a
10    person of ordinary skill in the art as to
11    when the disputed claim language is
12    satisfied?
13          A    Could you give me that question
14    again?
15          Q    Sure.
16               So we just talked about examples
17    from the specification that relate to the
18    disputed claim terms.
19               I'm asking you whether you agree
20    the specification doesn't provide a specific
21    rule or a defined standard to inform a person
22    of ordinary skill in the art as to the scope
23    of the disputed claim terms.
24          A    I think the spec is sufficient to
25    inform a person of skill as to the disputed
```

Dr. Douglas Chrissan - December 18, 2023

```
 1     claim terms.  That's what we've been
 2     discussing.
 3          Q    I'm not talking to the use of
 4     examples.  I'm talking about through a
 5     defined rule or stated standard as to when a
 6     user would perceive a benefit from an
 7     application versus when they would not.
 8               Do you understand what I'm -- the
 9     distinction I'm making there?
10          A    Not 100 percent.
11               Again, the specification,
12     especially the claim language can inform a
13     person of skill regarding the scope of the
14     claim.
15          Q    I have just a few more questions
16     before we take a break.
17               Paragraph 11 of your declaration,
18     it states that you have reviewed relevant
19     portions of the patent specifications and
20     claims, and it goes on beyond that.
21               Do you see that?
22          A    Yes.
23          Q    Did you review the entire patent
24     specification for the asserted patents?
25          A    They were long.  I did read them
```

Dr. Douglas Chrissan - December 18, 2023

Page 91

1    all.  I read one, every word, and then

2    read -- and then just looked for any

3    differences with the other patents.

4         Q    Okay.

5              MR. THOMPSON:  Why don't we take a

6         break now.

7              THE VIDEOGRAPHER:  We are off the

8         record.

9              The time is 10:32 a.m.

10             (Brief recess taken.)

11             THE VIDEOGRAPHER:  We are back on

12        the record.

13             The time is 10:46 a.m.

14        Q    The disputed claim terms, they

15   appear deep in the claims of the

16   corresponding patents.

17             Is that correct?

18        A    Yes, I believe they do in each

19   instance.

20        Q    And is it fair to assume you

21   reviewed the corresponding independent claims

22   for which those claims depend?

23        A    Yes, I did review them.

24        Q    And did you understand the scope of

25   the independent claims that corresponded to

Dr. Douglas Chrissan - December 18, 2023

Page 92

```
1      the -- deep in the claims that contain the
2      disputed terms?
3          A    Yes.
4          Q    Was there any portion of any of the
5      corresponding independent claims that you
6      didn't understand?
7          A    No, I understood them and I
8      understood their scope.
9               Since we're talking about them,
10     I'll go back and reread claim 1 of the '701.
11         Q    That's not necessary right now.   I
12     won't prevent you if you need to do that in
13     response to one of the questions, but let me
14     just stay on track for a moment.
15              I want to direct your attention to
16     paragraph 32 of your declaration and
17     specifically to a portion of paragraph 32
18     that is on page 11, your own page 11 looking
19     at paragraph 32.
20         A    (Witness reviewing.)
21              Okay.   I'm at paragraph 32.   It
22     starts on page 10?
23         Q    Correct.   I'm over on page 11, if
24     you want to turn to the next page.
25              There's a sentence that reads --
```

Dr. Douglas Chrissan - December 18, 2023

Page 93

1      it's about a third of the way through the

2      full paragraph that appears on page 11.  It

3      states, "As the specification explains and as

4      the claims recite, applications can be given

5      access to network resources when they are

6      benefiting the user but denied access when

7      they are not in order to conserve resources."

8              Do you see that sentence?

9      A     (Witness reviewing.)

10             I see that sentence.

11     Q     And when you're referring to the

12     claims recite, do you agree that the concepts

13     of getting access to network resources and

14     denying access to conserve resources, those

15     are aspects of the limitations of the

16     independent claims?

17     A     (Witness reviewing.)

18             Those could be aspects.  Let me

19     read the independent claim.

20             (Witness reviewing.)

21             Yeah, the independent claim says,

22     "Selectively block and allow access," so

23     that's related to a policy.

24     Q     So let's take a look at independent

25     claim 1 of the '701 that appears in your

Dr. Douglas Chrissan - December 18, 2023

Page 94

```
 1     declaration.
 2              You actually bolded a portion of
 3     claim 1 of the '701 patent on page 6 of your
 4     declaration, and that bolded portion reads,
 5     "Application capable of running in a
 6     background state and capable of running as a
 7     foreground application."
 8              Do you see that?
 9        A    Yes, I do.
10        Q    And in the context of the patents,
11     what is a foreground application?
12              MR. DAVIS:  Objection to form.
13        A    I would need to review the whole
14     patent spec before I gave you a conclusive
15     answer on that.
16        Q    You understood the scope of
17     claim 1, the '701 patent, when you reviewed
18     it.
19              Correct?
20        A    Yes, I did.
21        Q    Okay.  I'm just asking you to tell
22     me then, what is your understanding of the
23     term "foreground application"?
24        A    Well, I can -- a person of skill
25     reading claim 1 and seeing "foreground
```

Dr. Douglas Chrissan - December 18, 2023

Page 95

```
 1    application" knows that foreground

 2    application generally refers to something

 3    higher priority than background.

 4            Generally refers to interacting

 5    with the user, but for a detailed answer, a

 6    detailed answer may be dependent on any

 7    number of details in the specification.

 8        Q    There can be foreground

 9    applications that are positioned at lower

10    priority than background applications.

11            Correct?

12        A    Again, that -- I'm not in a

13    position right now to get into the details of

14    any given platform or system or how to

15    program them.  I don't offer opinions on the

16    inner workings of specific computing

17    platforms.

18        Q    In the context of claim 1 of the

19    '701 patent, how can I tell whether an

20    application is capable of running as a

21    foreground application?

22        A    I believe that those are well-known

23    terms of art, and a person of skill -- again,

24    I'll give you two answers.

25            One, I would want to read the
```

Dr. Douglas Chrissan - December 18, 2023

1    patent specification completely to review

2    where it used each of those terms, because

3    that might shape my answer somewhat.

4           But I will also say that background

5    stated foreground applications are well-known

6    terms of art in programming, such that a

7    person of skill would, you know, be able to

8    apply those terms to the platform that he or

9    she is working on in a well-known way.

10      Q    Well, then, do you believe that the

11   terms "background state" and "foreground

12   application" are used in the disputed patents

13   in accordance with their ordinary meaning?

14      A    I don't have an opinion on that as

15   we sit here right now.  My understanding

16   is -- I've not been told they were offered as

17   disputed claim terms, and under my knowledge

18   of patent law, that means that a person of

19   skill is supposed to give them their plain

20   and ordinary meaning in light of intrinsic

21   and extrinsic evidence.

22      Q    You gave the terms "background

23   state" and "foreground application" their

24   ordinary meanings as part of performing your

25   analysis in your declaration.

Dr. Douglas Chrissan - December 18, 2023

Page 97

1               Is that fair?

2        A    Yes, that's a fair statement for

3    claim 1.

4               For claim 2, it narrows -- you

5    know, narrows claim 1's --

6        Q    Okay.  Again, you understand the

7    scope of claim 1 in the '701 patent.

8               Correct?

9        A    Yes, I do.  I've read it several

10   times prior to this deposition today and did

11   not have any issues or concerns about my

12   understanding of it.

13              That said, I want to read claim 1

14   right now.

15              (Witness reviewing.)

16       Q    For the record, are you rereading

17   claim 1 of the '701 patent?

18       A    Yes, I am.  Page 6 of my

19   declaration.

20              (Witness reviewing.)

21              Okay.

22       Q    Having reread claim 1 of the '701

23   patent, can you now tell me what is the

24   ordinary meaning of foreground application

25   that you adopted as part of your analysis of

Dr. Douglas Chrissan - December 18, 2023

Page 98

1      these claims?

2           A    I give you the same answer.  A

3      person of skill -- number 1, I would want to

4      review the entire patent again.

5                But number 2, a person of skill

6      would apply the terms background state and

7      foreground application to his or her

8      particular computing platform when

9      implementing this claim.

10          Q    Okay.

11          A    I don't have any answer beyond what

12     I answered before.

13               The foreground application is

14     generally considered higher priority, and the

15     portions that -- you know, are user facing

16     versus the background state being lower

17     priority and things that are not user facing.

18          Q    Are there any other characteristics

19     that you would generally ascribe to compare

20     foreground applications to those running in

21     the background state besides higher priority

22     and user facing?

23          A    Even those are -- no.  The answer

24     so your question is no.

25               And even those examples are not

Dr. Douglas Chrissan - December 18, 2023

1       conclusive.  They're just off the top of my
2       head as a person of skill in response to your
3       answer -- in response to your question.
4               I would still want to go back and
5       read the whole patent because, you know, the
6       legal -- the legal interpretation is the
7       plain and ordinary meaning in ligOht of the
8       intrinsic and extrinsic evidence.
9        Q    If we look later in claim 1, which
10      spills over to page 7 of your declaration,
11      the claim recites, "Selectively block and
12      allow access by the first end user
13      application to the WAN modem."
14              Do you see that?
15       A    Yes.
16       Q    So when your declaration was
17      referring to the concept of denied access, is
18      this an example of the type of denied access
19      you were referring to?
20       A    (Witness reviewing.)
21              I am --
22              (Witness reviewing.)
23              I am looking at paragraph 32 in my
24      declaration.  I did a search, and that's the
25      only place I came up with the word "denied."

Dr. Douglas Chrissan - December 18, 2023

1            As a specification -- you're

2     referring to -- by paragraph -- by sentence

3     in my declaration at paragraph 32 that says,

4     "As the specification explains and as the

5     claim recite, applications can be given

6     access to network resources when they are

7     benefiting the user but denied access when

8     they are not in order to conserve resources."

9            That's the "denied" you were

10    referring to in your question.

11            Correct?

12        Q    Correct.  You state in that

13    sentence that we just read -- I think we read

14    it a few minutes ago -- as the claims recite,

15    I'm just wondering if this is one of the

16    claims that you're referring to.

17        A    Yeah, I think "selectively block"

18    would have been better wording than "denied,"

19    because the claim says, "Selectively

20    blocked."

21            So you can -- we'll just -- my

22    opinion is to replace that "denied" with

23    "selectively blocked," "denied" with

24    "selectively blocked," and then, yes, that

25    would be an example of the claim language.

Dr. Douglas Chrissan - December 18, 2023

1       Q    What does the claim mean when it

2  says, "Selectively block and allow access by

3  the first end user application to the WAN

4  modem"?

5       A    To me that means -- please recite

6  your question again.

7       Q    What does the claim mean where it

8  says, "Selectively block and allow access by

9  the first end user application to the WAN

10  modem"?

11       A    Well, it means exactly what it

12  states.  Selectively block and allow access

13  by the first end user application to the wide

14  area network modem, but I think the most

15  typical explanation of that is throttle the

16  cellular data connection, or have a policy --

17  sorry.

18            Where it says, "Selectively block

19  and allow access," I think the most typical

20  example of that is to have a policy that

21  allows you to throttle the cellular data

22  connection.

23       Q    And according to claim 1, what are

24  the circumstances under which an application

25  would not be able to communicate with the WAN

Dr. Douglas Chrissan - December 18, 2023

```
 1    modem?
 2         A    (Witness reviewing.)
 3              Could you ask your question again?
 4         Q    Sure.
 5              I'm just wondering in the context
 6    of claim 1, what are the specific
 7    circumstances under which an application
 8    would not be able to communicate with the WAN
 9    modem?
10              MR. DAVIS:  Object to form.
11         A    (Witness reviewing.)
12              Okay.  I read the whole claim
13    again.  Give me your question one more time.
14         Q    Sure.
15              I was asking in the context of
16    claim 1, what are the specific circumstances
17    under which an application would not be able
18    to communicate with the WAN modem?
19         A    My answer is the last element of
20    the claim, wherein the access is selectively
21    blocked based on a determination that the
22    first end user application is running in a
23    background state, and wherein the access is
24    selectively allowed based on a determination
25    that the first end user application is
```

Dr. Douglas Chrissan - December 18, 2023

Page 103

1      running as a foreground application.

2           Q    So just to try and simplify that to

3      some extent, for claim 1 of the '701 patent,

4      if, for example, the specific application is

5      determined to be in a background state,

6      that's an example of when the application

7      would not be able to communicate with the WAN

8      modem according to the claims.

9                Is that fair?

10          A    I think that's correct.

11          Q    Conversely -- well, strike that.

12               This claim concerns blocking access

13     to the WWAN modem, not the WLAN modem.

14     Correct?

15          A    Let me review.

16               (Witness reviewing.)

17               Yes, this is about the wide area

18     network, not about the wireless local area

19     network.

20          Q    And you understand there to be any

21     benefit provided by this claim and similar

22     claims across the disputed patents that block

23     access to the WWAN network and WLAN NETWORK?

24          A    Please reread the whole question.

25          Q    Sure.

Dr. Douglas Chrissan - December 18, 2023

1          What benefit is there, if any, of

2     blocking access to the WLAN modem as opposed

3     to the WWAN modem?

4          MR. DAVIS:  Object to form.

5     A     Are you asking that as -- from my

6     general understanding of a -- as a POSITA in

7     the intrinsic art?

8     Q     Yeah, and anything that you have

9     gleaned from your review of the materials you

10    analyzed for purposes of your declaration.

11    A     I mean, we can -- I would want to

12    go back to the patent and read my declaration

13    to give you a detailed answer, but I think at

14    a high level, a person of skill and the

15    patent acknowledged that resources tend to be

16    more limited and more expensive over a wide

17    area network than they are over a local area

18    network.

19    Q     Is that because, for example, wide

20    area networks often have associated costs?

21    A     I think at the time of the patent,

22    and even today in some networks, the answer

23    to your question is yes.

24    Q     Are you familiar with the concept

25    of a metered network?

Dr. Douglas Chrissan - December 18, 2023

1        A    I think so.

2        Q    What is your understanding of a --

3    what's referred to as a metered network?

4        A    Could you provide some more

5    narrowing of your example?  I consider my

6    electrical grid a metered network.

7        Q    In the context of cellular

8    communications or Smartphones, what is your

9    understanding of the concept of a metered

10   network?

11       A    I can think of a number of things

12   that might apply.  That's not a term that's

13   used a lot in communications that I know of,

14   at least in the areas that I'm familiar with.

15   You're welcome to read my CV.

16            So that said, can we -- let's pull

17   up the patent.  I want to review the patent

18   to see if it describes metered network.

19            Do you want to drop the '701 to me

20   or allow me to pull it up?

21       Q    I will represent to you the patent

22   doesn't use the word "metered."

23       A    Okay.  So then purely extrinsically

24   from the point of a -- from the point of a

25   person of skill, I would guess that a metered

Dr. Douglas Chrissan - December 18, 2023

```
1      network with respect to digital communication
2      data is a network where you -- the cost of
3      using some service is based, at least in part
4      somehow, on the amount of data that you send
5      over that communication network.
6           Q    Yeah, fair enough.
7                Are you aware of any instances
8      where WLAN networks might be metered?
9           A    Yes, I think within -- within the
10     scope of this patent, the one very obvious
11     example of a wireless wide area network is a
12     cellular network.
13               I know at least in some
14     circumstances, on some networks data usage is
15     metered.
16          Q    I think I was asking in the context
17     of a WLAN network, not a WWAN network.
18               Are you aware of instances when a
19     WLAN network might be metered?
20          A    Not as I sit here now.
21               Even back in the days where you
22     paid for WiFi, I think you just paid a
23     one-time fee.  They didn't bother to actually
24     track the traffic.  It's too hard.
25               But WiFi is not the only wireless
```

Dr. Douglas Chrissan - December 18, 2023

1    local area network, either, but it's the most

2    prevalent to us, that's for sure.

3        Q    If I were to modify the device

4    recited in claim 1 of the '701 patent such

5    that instead of determining whether the

6    connection was a WLAN modem or a WWAN modem,

7    it determined whether the connection was

8    metered or non-metered, would my alternative

9    accomplish all the same goals of the

10   invention of the '701 patent?

11       MR. DAVIS:  Object to form.

12       A    That's too big of a hypothetical

13   jump.  I would need to analyze a particular

14   scenario or situation.

15       I wasn't -- I don't believe I have

16   opined on benefits other than, you know, at a

17   high level that we discussed here.

18       THE VIDEOGRAPHER:  We are off the

19       record.

20       The time is 11:17 a.m.

21       (Whereupon a discussion was held

22       off the record.)

23       THE VIDEOGRAPHER:  We are back on

24       the record.

25       The time is 11:18 a.m.

Dr. Douglas Chrissan - December 18, 2023

Page 108

1        A    I did think of one clarification to
2    your last question.
3             Even if -- even if metered is not
4    the only distinguishing factor, because
5    capacity, capacity alone can be independent
6    of metered or not.
7        Q    Can you further explain your
8    additional testimony?
9        A    Yeah, it's no -- I think it's
10   fairly well known that the capacity -- the
11   data capacity of the cellular system in
12   general is lower than the data capacity of
13   your wireless land network unless your house
14   has a very low-budget internet service
15   provider.
16            I think Comcast is giving the 800
17   megabits per second to my house.  I don't
18   think my cellphone is doing it -- actually,
19   my phone -- no, actually -- I'll digress.
20            We actually -- we had a problem
21   with our cable, so we actually literally ran
22   a speed test on the phone through the cable
23   and through the cellular network, and the
24   cable was, I think 6 or 700 megabits per
25   second on an iPhone 10, and the cellular

Dr. Douglas Chrissan - December 18, 2023

1      network was pretty fast, pretty good and

2      respectable, but well under a hundred.

3          Q    Yeah, that sounds about right.

4          A    Okay.  So back to your questions.

5          Q    Yeah.

6               Fair to say that the claims, at

7      least we're talking about in the disputed

8      patents, make the distinction to selectively

9      block and allow traffic based on a WWAN

10     versus WLAN distinction, not based on whether

11     a connection is metered or not?  Can we agree

12     on that?

13         A    Generally, yes.

14              We've already discussed the

15     claim -- the claim discusses a WLAN.  It

16     discusses and recites WWAN.  It only talks

17     about what happens with the WWAN, and it

18     talks about the existence of a WLAN.  So to

19     the extent that matches your question, yes, I

20     agree.

21         Q    My initial point was that the

22     claims are -- the claims of the disputed

23     patents are agnostic as to whether or not

24     either connection is metered or not metered.

25              Is that fair?

Dr. Douglas Chrissan - December 18, 2023

1          A    That is correct.  The claims -- the

2   claim language in and of itself does not

3   discuss whether a network is metered or not.

4                MR. THOMPSON:  I want to drop an

5          exhibit into the chat.  Bear with me one

6          minute.

7                This will be Exhibit 2.

8                (Whereupon the above mentioned was

9          marked for identification.)

10         A    There we go.  It just came in.

11               MR. THOMPSON:  I will state for the

12         record that this is Exhibit 2, which

13         bears the Bates number HW, underscore,

14         00004783, and is U.S. patent number

15         9,143,976.

16         Q    After you've had a chance to take a

17   look at that exhibit, Dr. Chrissan, you can

18   tell me whether you recognize Exhibit 2?

19         A    (Witness reviewing.)

20               I see that Exhibit 2.  The file

21   that was transferred is the '976 patent.

22         Q    And if we can turn to the back

23   where claim 2 appears, my question will be:

24   Does claim 2 of this patent include the

25   disputed term?

Dr. Douglas Chrissan - December 18, 2023

```
 1          A     (Witness reviewing.)

 2                Claim 2 of the '976 includes one of

 3     the disputed terms.

 4          Q     Did you review claim 1 as part of

 5     forming your analysis in this case, claim 1

 6     of the '976 patent?

 7          A     Yes, I did.  I read the pending

 8     claim with the disputed language and its

 9     independent claims that it depends upon for

10     all of the disputed claims.

11          Q     I want to take a look at claim 1.

12     I will direct your attention to column 105,

13     and there's a portion of the claim that

14     appears at the bottom of that call.  It

15     starts with the word "Classified."

16                Do you see that?

17          A     Yes.

18          Q     And towards the end portion of that

19     limitation there's a clause that reads,

20     "Whether or not the first end user

21     application when running is interacting in

22     the device display foreground with the user."

23                Do you see that?

24          A     Yes, I see that.

25          Q     What does the portion of that
```

Dr. Douglas Chrissan - December 18, 2023

1    phrase that says, "Interacting in a device

2    display foreground with the user require"?

3         A    Let me read the whole --

4              MR. DAVIS:  Object to form.

5         A    Let me read the whole claim.

6              (Witness reviewing.)

7              Okay.  I have read the claim.  What

8    is your question?

9         Q    What is the portion of the claim

10   that says, "Interacting in a device display"

11   -- all right.  Strike that.

12             What does the portion of the phrase

13   that says, "Interacting in a device display

14   foreground with a user require"?

15             MR. DAVIS:  Object to form.

16        A    No -- interacting, the plain and

17   ordinary meaning of interacting is some kind

18   of two-way transfer.

19             So interacting, in my opinion,

20   requires, you know, some kind of input from a

21   user in some way, shape or form under some

22   context that a person of skill would apply in

23   his or her particular development and

24   programming scenario.

25             Other than that, I think the phrase

Dr. Douglas Chrissan - December 18, 2023

1    defines itself.

2         Q    We previously looked at claim 1 of

3    the '701 patent.  That's the claim that

4    appeared in your declaration, and it had a

5    phrase of, "Running in the foreground."

6         Do you recall that?  Feel free to

7    reference -- sorry to cut you off.

8         A    It says -- yeah, claim 1 says,

9    "Running as a foreground application."

10        Q    Correct.

11        Is there a distinction between,

12   "Running as a foreground application," and

13   the phrase, "Interacting in the device

14   display foreground with the user"?

15        MR. DAVIS:  Object to form.

16        A    As I sit here now, I think there

17   are distinctions between those two.

18        Q    Why do you say that?

19        A    As -- your two terms were "running

20   in the foreground" -- wait.  "Running as a

21   foreground application," versus, "Interacting

22   in the device display foreground with the

23   user," yes, those do not sound like the same

24   claim element to me.

25        Q    Okay.  Can you tell me any

Dr. Douglas Chrissan - December 18, 2023

1      differences?

2           A    (Witness reviewing.)

3                The '976 patent uses the term

4      "interacting."  I think the differences are

5      in the literal wording.

6                Running -- "Running as a foreground

7      application," is different than, "Interacting

8      in the device display foreground with the

9      user."  They're different terms.

10               Maybe there could be some overlap.

11     I would have to analyze a particular scenario

12     and do analysis on a particular platform that

13     this is being applied to, but I can say

14     definitely in general they're not the same

15     thing.

16          Q    Let me ask you this question:

17               If a device determines that an

18     application is running as a foreground

19     application, does that necessarily mean that

20     the application is interacting in the device

21     display foreground with the user?

22               MR. DAVIS:  Object to form.

23          A    Please state your question again.

24          Q    Sure.

25               I'm just trying to get an

Dr. Douglas Chrissan - December 18, 2023

1    understanding of the distinction you're

2    drawing.  I'm just trying to figure out

3    whether one of these terms is broader than

4    the other or what their relationship is to

5    provide some context.

6            My question is, if a device

7    determines that an application is running as

8    a foreground application, does that

9    necessarily mean that the application is also

10   interacting in the device display foreground

11   with the user?

12       A    No.

13       Q    Why not?

14       A    Because running -- your question

15   was running as a foreground application.

16            Right?

17       Q    Correct.

18       A    Yeah, running -- if you draw a Venn

19   diagram between running as a foreground

20   application and interacting in the device

21   display foreground with the user, that Venn

22   diagram probably has -- again, I would

23   need -- this is not a definitive answer.  The

24   Venn diagram would have non-zero area in all

25   four states.

Dr. Douglas Chrissan - December 18, 2023

```
1                  But I do know that running in a

2         foreground application is broader than --

3         broader in general -- not necessarily wholly

4         inclusive, but generally broader than

5         interacting in the device display foreground

6         with the user, because the -- you know, the

7         wording in the second case is more specific.

8         You have the word "interacting" and you have

9         the word "device display foreground" with the

10        user.

11                  MR. THOMPSON:  Let me provide you

12             with another exhibit.

13                  This will be Exhibit 3.

14                  (Whereupon the above mentioned was

15             marked for identification.)

16                  MR. THOMPSON:  And for the record,

17             Exhibit 3 bears the Bates number HW,

18             underscore, 00005741 and is U.S. patent

19             number 9277433.

20             Q    Doctor --

21             A    I have it.

22             Q    Dr. Chrissan, the first question

23        will be, do you recognize Exhibit 3?

24             A    Yes.

25             Q    And is Exhibit 3 one of the patents
```

Dr. Douglas Chrissan - December 18, 2023

1      you reviewed during the process of forming

2      the opinions in your declaration?

3          A    I believe so.  Let me check.

4               (Witness reviewing.)

5               Yes.

6          Q    And would you have reviewed claim 1

7      of the '433 patent as part of your analysis

8      in forming the opinions in your declaration?

9          A    (Witness reviewing.)

10              Yes, I reviewed claims 1 and 2 as

11     well as 3 of the '433.

12         Q    Okay.  I want to focus your

13     attention on the first portion of claim 1

14     that relates to the wide area network modem.

15              Do you see that?

16         A    Yes.

17         Q    And towards the end of that

18     limitation, it says, "The WWAN," W-W-A-N,

19     "having a corresponding network type of a

20     plurality of wireless network types."

21              Do you see that?

22         A    Yes.

23         Q    What is your understanding of the

24     phrase or term "network type" in the context

25     of this claim?

Dr. Douglas Chrissan - December 18, 2023

```
 1              MR. DAVIS:  Object to form.
 2        A    (Witness reviewing.)
 3              My answer is similar to the terms
 4    that you pointed out in the previous patent.
 5    I would want to search the patent first.
 6              Okay.  The first sentence of the
 7    abstract talks about multiple wireless
 8    network types.  I -- let me...
 9              (Witness reviewing.)
10              Okay.  This is what I had in my
11    head while I was searching.
12              So this -- the specification
13    corroborates my answer.  At column 95,
14    line 9, the patent says, "The wireless
15    networks 2404 can be identifiable by network
16    type, e.g., 2G, 3G, WiFi," et cetera.  So
17    that's what I was thinking.
18              My answer, if the patent hadn't
19    mentioned network type at all and I had to go
20    off plain and ordinary meaning, I would have
21    said, well, the network type just means
22    different kinds of networks, but the best
23    example that a person of skill would have is
24    2G versus 3G versus 4G versus 5G cellular
25    networks.
```

Dr. Douglas Chrissan - December 18, 2023

1          I suppose Y max is a possibility,
2    too, but that never took off.
3          Q     Right.  In the context of network
4    types corresponding to a WWAN, that would
5    include 2G, 3G, 4G, 5G and sometime down the
6    road probably 6G.
7          Is that fair?
8          A     Those would be examples that fall
9    within the scope of the claim.  I agree.
10         Q     Further down in claim 1 there's a
11   limitation that begins, "When the one or more
12   internet activity access controls."
13         Do you see that?
14         A     At line 65?
15         Q     Let me just confirm that.  I'm
16   looking at the same place.
17         A     It is.  I'm going to read the whole
18   claim anyway.
19         Q     Okay.  That's correct.
20         So let me ask you the question.
21   Then I'll give you some time to read.
22         That particular limitation uses the
23   phrase "aggregate network activity."  My
24   question to you will be, what does aggregate
25   network activity mean in that context?

Dr. Douglas Chrissan - December 18, 2023

```
 1         A    (Witness reviewing.)
 2              Okay.  Let me read the claim and
 3    search the patent, but I will read the claim
 4    first.
 5              (Witness reviewing.)
 6              MR. DAVIS:  Can I also ask that we
 7    take a break shortly?
 8              MR. THOMPSON:  Sure.  I'll get to
 9    that after the question is answered.
10         A    (Witness reviewing.)
11              I'm almost there.
12         Q    Okay.
13         A    (Witness reviewing.)
14              I'm writing down a column and line
15    number.
16              (Witness reviewing.)
17              Okay.  My -- my understanding as a
18    person of ordinary skill is that this -- and
19    then I took that and went back through the
20    patent to corroborate instances where it uses
21    the word "aggregated."  Aggregate would mean
22    combine and control a shared resource.
23              If you look -- I think that's how a
24    person of skill would generally interpret
25    aggregate, some kind of sharing, multiplexing
```

Dr. Douglas Chrissan - December 18, 2023

1    and control of the sharing and the

2    multiplexing.

3              And if you look at column 11 and

4    36...

5              (Witness reviewing.)

6              Wait.  Where is it?

7              (Witness reviewing.)

8              MR. DAVIS:  I see a column 11 at

9    36.  The term "aggregated" is used.

10         A    It says, "Aggregated or otherwise

11   controlled."

12             So I think aggravated -- aggregated

13   to a person of skill, the meaning is combined

14   and control of shared resource.

15         Q    Can you help me to understand that

16   in the context of the claims of the '433

17   patent where it talks about aggregating

18   network activity?

19         A    Yeah.  It says, "Aggregate network

20   activity for the first internet access

21   request with network activity for one or more

22   other data communication requests which are

23   not otherwise associated with the end user

24   application."

25             So I'll pause and say, you know, I

Dr. Douglas Chrissan - December 18, 2023

1    don't have -- I have not formulated my -- any
2    final given opinion on this.  I would need to
3    read the patent in its entirety to give you a
4    final interpretation.
5            But, you know, I represent myself
6    as a person of skill and you're asking me
7    these questions, so I'll do my best to
8    interpret some high-level stuff on the fly,
9    but any -- any final assessment would be in
10   an infringement report specific to a given
11   system.
12           But now I go back to my answer.  It
13   looks like what's being shared and controlled
14   is a first internet access request along with
15   other internet access requests and, you know,
16   the sharing and controlling looks like it
17   involves giving everybody else access before
18   the first internet access request.
19           That's my high-level assessment as
20   I sit here right now on the fly.  Any more
21   detail, you would have to give me the time to
22   go off and assess it in detail.
23           And it may apply -- it also may --
24   any given infringement read, which I have
25   none right now, would depend on the specific

Dr. Douglas Chrissan - December 18, 2023

1    system to which the claim is being read.

2         Q    I understand.

3              MR. DAVIS:  Are we able to take

4         that break?

5         A    Yes.  Do you have any other

6    questions in this line, or do you want to

7    give the gentleman his break?

8              MR. THOMPSON:  Sorry.  That took

9         longer than I expected.

10             I'll just caveat it with I think I

11        have a couple more questions on an

12        exhibit, which I can probably knock out

13        in five minutes, but if you would like

14        to take a break first we can do that as

15        well.

16             THE WITNESS:  Let's go ahead and

17        take the break.  It sounds like whoever

18        requested it wanted it.

19             MR. THOMPSON:  Sorry.

20             THE WITNESS:  We can keep it short,

21        say back at noon.

22             THE VIDEOGRAPHER:  Let's take us

23        off the record.

24             We are off the record.

25             The time is 11:54 a.m.

Dr. Douglas Chrissan - December 18, 2023

```
 1                    (Brief recess taken.)

 2                    THE VIDEOGRAPHER:  We are back on

 3          the record.

 4                    The time is 12:04 p.m.

 5          Q    Dr. Chrissan, we were just looking

 6     at an excerpt from the '433 patent, and you

 7     directed my attention to column 11 around

 8     line 36.

 9                    Do you recall that?

10          A    Yes.

11          Q    I want to ask you a related

12     question about a portion of the same call on

13     the -- that begins around line 49.

14                    Can you let me know when you're

15     there?

16          A    Yes.

17          Q    The sentence says, "For example,

18     some applications and/or OS functions have

19     limited capabilities to defer certain traffic

20     types."

21                    Do you see that?

22          A    Yes.

23          Q    What does the word "defer" mean

24     there in the context of these patents?

25                    MR. DAVIS:  Object to form.
```

Dr. Douglas Chrissan - December 18, 2023

Page 125

```
 1        A    Let me search the patent for
 2   "defer."  I'll also give you plain and
 3   ordinary meaning.
 4             (Witness reviewing.)
 5             The specification uses the word
 6   "defer" in context.
 7             For example, in column 74, it
 8   basically means delay some period of time or
 9   wait for some condition.
10        Q    We talked before in the context of
11   the '701 patent about selectively blocking
12   access.
13             Is there a distinction between
14   blocking access and deferring in the context
15   of these patents, according to your
16   understanding of a person of ordinary skill
17   in the art?
18        A    Let's go back to the '701 patent.
19   I'll just read the claim from my declaration.
20             (Witness reviewing.)
21             Okay.  Could you read me your
22   question again?
23        Q    Sure.
24             I referenced our earlier
25   conversation about the '701 patent and the
```

Dr. Douglas Chrissan - December 18, 2023

```
1     selectively blocking access, and I was asking
2     your understanding of whether there's a
3     distinction between blocking access and
4     deferring in the context of these patents
5     according to your understanding of an
6     ordinary person of skill in the art.
7          A    The answer to your question is yes,
8     there is a difference.
9               The claim term is "selectively
10    block and allow access," so that implies a
11    policy that could block and allow access on
12    any time granularity, whereas defer means, as
13    I said, wait or delay -- delay or wait for
14    conditions.
15              So there is some overlap.  A policy
16    that selectively blocks could do so -- a
17    policy that selectively blocks and allows
18    access could do so such that the end result
19    is a deferral.
20         Q    I see.
21              MR. THOMPSON:  I just dropped into
22         the chat, which should be Exhibit 4.
23              (Whereupon the above mentioned was
24         marked for identification.)
25         A    Okay.
```

Dr. Douglas Chrissan - December 18, 2023

```
1              MR. THOMPSON:  And Exhibit 4 bears
2        the Bates number HW, underscore,
3        00002011 and is U.S. patent number
4        9,277,445.
5        Q    And my first question once you have
6    a chance to access that, Dr. Chrissan, is do
7    you recognize Exhibit 4?
8        A    (Witness reviewing.)
9             Yes, the '445 is one of the patents
10   I opine on.
11       Q    And as part of coming up with your
12   analysis for your declaration, did you review
13   claim 1 of the '445 patent?
14       A    Yes, I did.
15       Q    You understood that claim?
16       A    Yes.  Like the other claims you've
17   asked about, when I read it and analyzed it
18   and compared it against the others,
19   everything made sense.
20       Q    I want to direct your attention to
21   a portion of claim 1 that appears in
22   column 106 that starts with, "Apply a
23   differential traffic control policy."
24            Do you see that?
25       A    Yes, I see it.
```

Dr. Douglas Chrissan - December 18, 2023

```
1          Q    And it later references a first and
2     second classification.
3               Do you see that?
4          A    (Witness reviewing.)
5               Yes, the next element says the
6     first and second classifications.
7          Q    And a little further down in
8     claim 1 there's a limitation that starts,
9     "Block the internet service access request in
10    a first state of the first and second
11    classifications."
12              Do you see that?
13         A    Yes, I see that element.
14         Q    And what's your understanding of
15    what that element means?
16         A    Let me read the claim from the top.
17              (Witness reviewing.)
18              MR. DAVIS:  And I will object to
19         form.
20         A    (Witness reviewing.)
21              There are a number of logical
22    conditions in this claim, but I can't explain
23    any of the words better than they appear on
24    the face.
25              Your question was what does the
```

Dr. Douglas Chrissan - December 18, 2023

Page 129

```
 1    block -- block the internet service request
 2    element mean?
 3        Q    Let me -- let me, given your
 4    response just now, let me ask maybe a simpler
 5    question.
 6            Is it your understanding that when
 7    a certain -- certain conditions are satisfied
 8    that are laid out in the claim, an
 9    application would be prevented from
10    requesting internet service access?
11            MR. DAVIS:  Object to form.
12        A    (Witness reviewing.)
13            That's not how I'm interpreting it.
14            Can you read your question again?
15        Q    Sure.  Let me try and rephrase it a
16    little bit.
17            Is it your understanding that there
18    are at least a first and second
19    classification, and whenever a particular
20    state of the first and second classifications
21    exist, an application is prevented from
22    requesting internet service access?
23            MR. DAVIS:  Same objection.
24        A    (Witness reviewing.)
25            Okay.  Please read the question one
```

Dr. Douglas Chrissan - December 18, 2023

```
 1    more time.
 2         Q    Yeah, sure.
 3              Is it your understanding that there
 4    are at least a first and a second
 5    classification recited in claim 1 of the '445
 6    patent, and whenever a particular state of
 7    the first and second classification exists,
 8    an application would be prevented from
 9    requesting internet service access?
10         MR. DAVIS:  Object to form.
11         A    I'm not seeing that in the claims.
12         Q    Okay.
13         MR. THOMPSON:  I don't have any
14    further questions.
15         MR. DAVIS:  All right.  I have just
16    a few questions for Dr. Chrissan.
17
     EXAMINATION BY MR. DAVIS:
18
19         Q    You recall talking through a number
20    of hypotheticals earlier.
21              Right?
22         A    Yes.
23         Q    Now, if a person uses a music
24    application like Spotify on their mobile
25    device to play music for a party that's going
```

Dr. Douglas Chrissan - December 18, 2023

Page 131

1    on at their house, and then that person walks
2    outside the house knowing that the music is
3    still playing, could they still be considered
4    a user of the mobile device?
5              In other words, if they're aware
6    that the music is still playing, could they
7    still be considered a user of the mobile
8    device?
9        A    Please ask your question one more
10   time.
11       Q    Sure.
12             If a person -- and if you need me
13   to break it up, I'm happy to do that, too,
14   but I'll take it from the top.
15             If a person uses a music
16   application like Spotify on their mobile
17   device to play music for a party that's going
18   on at their house, and then the person walks
19   outside the house but is aware that the music
20   is still playing, could they still be
21   considered a user of the mobile device?
22       A    We discussed -- we discussed a
23   number of scenarios, but if the -- if a user
24   is -- if a user sees, feels, hears, or is
25   aware of a -- an operation that is noticeable

Dr. Douglas Chrissan - December 18, 2023

```
1        to the user, then I would say yes, that
2        person could be considered a user of the
3        device.
4              We had -- you know, we had various
5        discussions about -- that, you know, the
6        ultimate decision of a user would be context
7        and situation dependent on the hypothetical.
8        Q    If the person walks outside their
9        house, aware that the music is still playing
10       for the party, can the phone still be
11       producing sound that can be perceived by
12       someone?
13       A    Can you please state your
14       hypothetical again?
15       Q    Sure.  Maybe I can simplify.
16             If a person starts playing music on
17       their phone and then steps away from their
18       phone, can the phone still be producing sound
19       that can be perceived by someone?
20       A    Yes.  That's a normal use case.
21       Q    Dr. Chrissan, you were asked about
22       a number of terms appearing in claim 1 of
23       certain asserted patents.
24             Do you recall that?
25       A    Yes, and -- yes, I do.
```

Dr. Douglas Chrissan - December 18, 2023

Page 133

```
1          Q    Were you asked to opine about -- in
2     creating your declaration, were you asked to
3     opine about any claim construction disputes
4     with respect to language that appears only in
5     claim 1 of any asserted patent?
6          A    No.  I was not asked to opine on
7     language that appears only in independent
8     claims.
9          Q    All right.
10              MR. DAVIS:  No further questions.
11              MR. THOMPSON:  Just one follow-up
12         question.
13
      EXAMINATION BY MR. THOMPSON:
14
15         Q    Dr. Chrissan, would you agree that
16    a device processor like the processor recited
17    in the claims of the disputed patents doesn't
18    know necessarily what a person necessarily
19    sees, feels or hears?
20              MR. DAVIS:  Object to form.
21         A    In a general sense, that is true.
22    That's why I said many times in this
23    deposition the scope of the claims does not
24    require a processor to read the user's mind.
25              MR. THOMPSON:  No further
```

Dr. Douglas Chrissan - December 18, 2023

Page 134

```
 1        questions.
 2             MR. DAVIS:  All right.  No further
 3        questions.
 4             THE VIDEOGRAPHER:  We are off the
 5        record.
 6             The time is 12:26 p.m.
 7             THE COURT REPORTER:  Mr. Davis, you
 8        want the same delivery as Mr. Thompson,
 9        correct?  Rough draft, seven-day final
10        plus rough?
11             MR. DAVIS:  Yes, thank you.
12             (Witness was excused.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Dr. Douglas Chrissan - December 18, 2023

Page 135

```
1                    C E R T I F I C A T E

2              I, MICHAEL FRIEDMAN, a Certified Court

3    Reporter and Notary Public, qualified in and for

4    the State of New Jersey do hereby certify that

5    prior to the commencement of the examination DR.

6    DOUGLAS CHRISSAN was duly sworn by me to testify to

7    the truth the whole truth and nothing but the

8    truth.

9              I DO FURTHER CERTIFY that the foregoing

10   is a true and accurate transcript of the testimony

11   as taken stenographically by and before me at the

12   time, place and on the date hereinbefore set forth.

13             I DO FURTHER certify that I am neither a

14   relative of nor employee nor attorney nor counsel

15   for any of the parties to this action, and that I

16   am neither a relative nor employee of such attorney

17   or counsel, and that I am not financially

18   interested in the action.

19

20

21   _____

22             MICHAEL FRIEDMAN, CCR of the

23             State of New Jersey

24             License No:  30XI00228600

25             Date:  December 20, 2023
```

Dr. Douglas Chrissan - December 18, 2023

Page 136

```
 1                          LAWYER'S NOTES
 2        PAGE  LINE
 3        ____  ____      _____
 4        ____  ____      _____
 5        ____  ____      _____
 6        ____  ____      _____
 7        ____  ____      _____
 8        ____  ____      _____
 9        ____  ____      _____
10        ____  ____      _____
11        ____  ____      _____
12        ____  ____      _____
13        ____  ____      _____
14        ____  ____      _____
15        ____  ____      _____
16        ____  ____      _____
17        ____  ____      _____
18        ____  ____      _____
19        ____  ____      _____
20        ____  ____      _____
21        ____  ____      _____
22        ____  ____      _____
23        ____  ____      _____
24        ____  ____      _____
25        ____  ____      _____
```

Dr. Douglas Chrissan — December 18, 2023

1                    DEPOSITION ERRATA SHEET

2

3

4

5

6

7          DECLARATION UNDER PENALTY OF PERJURY

8                I declare under penalty of perjury

9          that I have read the entire transcript of

10         my Deposition taken in the captioned matter

11         or the same has been read to me, and

12         the same is true and accurate, save and

13         except for changes and/or corrections, if

14         any, as indicated by me on the DEPOSITION

15         ERRATA SHEET hereof, with the understanding

16         that I offer these changes as if still under

17         oath.

18

19

20

21              Signed on the _____ day of

22              _____, 20____

23

24         _____

25                    DR. DOUGLAS CHRISSAN

Dr. Douglas Chrissan - December 18, 2023

Page 138

```
 1                    DEPOSITION ERRATA SHEET
 2        Page No. _____Line No. _____Change to:_____
 3        _____
 4        Reason for change:_____
 5        Page No. _____Line No. _____Change to:_____
 6        _____
 7        Reason for change:_____
 8        Page No. _____Line No. _____Change to:_____
 9        _____
10        Reason for change:_____
11        Page No. _____Line No. _____Change to:_____
12        _____
13        Reason for change:_____
14        Page No. _____Line No. _____Change to:_____
15        _____
16        Reason for change:_____
17        Page No. _____Line No. _____Change to:_____
18        _____
19        Reason for change:_____
20        Page No. _____Line No. _____Change to:_____
21        _____
22        Reason for change:_____
23
24        SIGNATURE:_____DATE:_____
25                  DR. DOUGLAS CHRISSAN
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 844-483-2643

Dr. Douglas Chrissan - December 18, 2023

Page 139

```
 1              DEPOSITION ERRATA SHEET
 2      Page No._____Line No._____Change to:_____
 3      _____
 4      Reason for change:_____
 5      Page No._____Line No._____Change to:_____
 6      _____
 7      Reason for change:_____
 8      Page No._____Line No._____Change to:_____
 9      _____
10      Reason for change:_____
11      Page No._____Line No._____Change to:_____
12      _____
13      Reason for change:_____
14      Page No._____Line No._____Change to:_____
15      _____
16      Reason for change:_____
17      Page No._____Line No._____Change to:_____
18      _____
19      Reason for change:_____
20      Page No._____Line No._____Change to:_____
21      _____
22      Reason for change:_____
23
24      SIGNATURE:_____DATE:_____
25              DR. DOUGLAS CHRISSAN
```