# Exhibit 10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 22-2008-GW-KSx | Date | April 19, 2024 |
|---|---|---|---|
| Title | *Puff Corp. v. SHO Products, LLC, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

PROCEEDINGS:   **IN CHAMBERS - FINAL RULINGS ON DEFENDANT SHO PRODUCTS, LLC AND MASTERMINDED, INC.'S OF DAUBERT AND FED. R. EVID. 702 MOTION [107, U/S 133]; DEFENDANTS SHO PRODUCTS, LLC AND MASTERMINDED, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT [108, U/S 132]; PLAINTIFF PUFF CORP.'S MOTION TO STRIKE OPINIONS OF DEFENDANTS' TECHNICAL EXPERTS [114]; PLAINTIFF PUFF CORP.'S MOTION TO AMEND CLAIM CONSTRUCTION [115, U/S 136]; PLAINTIFF PUFF CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT [118, U/S 135]; and PLAINTIFF PUFF CORP.'S MOTION TO STRIKE OPINIONS FROM DEFENDANTS' DAMAGES EXPERT SHELLY IRVINE [121, U/S 134]**

Attached hereto is the Court's *redacted* Final Rulings on the above-entitled Motions. Defendants' Motion to Exclude Certain Opinions and Testimony from David B. Francom is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Strike Opinions from Defendants' Damages Expert Shelly Irvine is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Strike Opinions of Defendants' Technical Experts is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Amend Claim Construction is GRANTED. Defendants' Motion for Partial Summary Judgment is DENIED. Plaintiff's Motion for Partial Summary Judgment is GRANTED.

                                                                              :

Initials of Preparer    JG

***Puff Corp. v. SHO Prods., LLC, et al.***; Case No. 2:22-cv-02008-GW-(KSx)
Final Rulings on: (1) Defendants' Motion to Exclude Certain Opinions and Testimony from Dr. David B. Francom; (2) Defendants' Motion for Partial Summary Judgment; (3) Plaintiff's Motion to Strike Opinions of Defendants' Technical Experts; (4) Plaintiff's Motion to Amend Claim Construction; (5) Plaintiff's Motion for Partial Summary Judgment; and (6) Plaintiff's Motion to Strike Opinions from Defendants' Damages Expert Shelly Irvine (Under Seal)[1]

### I.   Introduction

Plaintiff Puff Corporation ("Puffco" or "Plaintiff") filed this patent infringement action against Defendants SHO Products, LLC and Masterminded, Inc. ("SHO" or "Masterminded" individually, and "Defendants" collectively) alleging that Defendants infringed U.S. Patent No. 10,517,334 ("the '334 Patent") by selling the Carta OG, Carta 2, and Oura devices (the "Accused Products"). Docket No. 1; Docket No. 108; Docket No. 118. Defendants filed counterclaims against Plaintiff seeking a judicial declaration that the '334 Patent is invalid and that the Accused Products do not infringe it. Docket No. 29.

The following six pending motions are addressed herein:

> (1) Defendants' Motion to Exclude Certain Opinions and Testimony from Dr. David B. Francom (Motion, Docket No. 107; Opposition, Docket No. 152; Reply, Docket No. 162);
>
> (2) Defendants' Motion for Partial Summary Judgment (Motion, Docket No. 108; Opposition, Docket No. 148; Reply, Docket No. 165);
>
> (3) Plaintiff's Motion to Strike Opinions of Defendants' Technical Experts (Motion, Docket No. 114; Opposition, Docket No. 145; Reply, Docket No. 171);
>
> (4) Plaintiff's Motion to Amend Claim Construction (Motion, Docket No. 115; Opposition, Docket No. 142; Reply, Docket No. 169);
>
> (5) Plaintiff's Motion for Partial Summary Judgment (Motion, Docket No. 118; Opposition, Docket No. 144; Reply, Docket No. 168); and
>
> (6) Plaintiff's Motion to Strike Opinions from Defendants' Damages Expert Shelly Irvine (Motion, Docket No. 121; Opposition, Docket No. 143; Reply, Docket No. 170).

### II.   Background

#### A.   The '334 Patent

The '334 Patent, titled "Portable Electronic Vaporizing Device," was issued on December

---

[1] The parties filed portions of their briefs and accompanying exhibits under seal. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any material stated in this Order shall remain under seal as well as a proposed redacted version. The Court will then determine whether any portions of this Order will be redacted in the version filed on the public docket, with a corresponding, non-redacted version filed under seal.

31, 2019.  The '334 Patent claims priority to Provisional Patent Application No. 62/792,202, filed on January 14, 2019.  The '334 Patent relates to "portable electronic vaporizing devices for use with vaporizable products." '334 Patent at 1:16-17.  Figure 2, reproduced below, depicts an "exploded view" of an embodiment of the claimed invention:



FIG. 2

'334 Patent, Fig. 2; *see also id*. at 2:49-51.  The device includes three main parts: "mouthpiece **4**," "atomizer **3**," and "base **2**."  *Id*. at 3:42-44.

The "atomizer **3**" includes several components, as depicted in Figures 6A, 6B and 7, reproduced below:



FIG. 6A              FIG. 7

*Id.*, Figs. 6A, 7; *see also id.* at 2:56-58, 7:1-2.  Starting from the top of Figure 7, these components include "inner and outer annular insulating rings **5** [and] **6**" respectively, "container **7**," "heating element **8**," "bottom insulating element **9**," "atomizer housing **10**," "electrode insulator **11**," and "electrode **12**.  *See id.* at 7:1-8:7; 10:26-27.

The following inlets and outlets of "atomizer **3**" form the flow path of gas through the atomizer: "atomizer inlet **301** configured to receive a flow of gas into atomizer **3**," "first container inlet **305** capable of introducing gas into the container **7** to entrain vaporizable product therein," "second container outlets **306** capable of flowing the gas having the vaporizable product entrained therein into an atomizer internal flow path **308**," and "atomizer outlets **309** capable of receiving the flow of gas from the atomizer internal flow path **308**, and providing the flow of gas to the conduit inlet **201***a* of the base **2**."  *Id.* at 7:1-22.  Figure 6B, reproduced below, depicts the gas flow through the atomizer that includes a "carb cap **17**":



FIG. 6B

*Id.*, Fig. 6B; *see also id.* at 9:14-38 (describing the gas flow path in Fig. 6B).

Claim 1 of the '334 Patent recites:

1.   A portable electronic vaporizing device comprising:
   a base having a gas flow path conduit therein and a housing for one or more components for electrically connecting to a power source and/or controlling the device, the gas flow path conduit comprising a conduit inlet and a conduit outlet;

3

a mouthpiece that is removably attachable to the base, the mouthpiece comprising:

a mouthpiece housing comprising one or more mouthpiece walls at least partly defining a mouthpiece internal flow path through the mouthpiece housing;

an inhalation outlet formed in a region of the one or more mouthpiece walls; and

at least one mouthpiece inlet capable of being placed in communication with the conduit outlet of the base upon attachment of the mouthpiece to the base, to receive a flow of gas into the mouthpiece from the base; and

an atomizer that is removably attachable to the base, the atomizer comprising:

an atomizer inlet configured to receive a flow of gas into the atomizer;

an atomizer housing comprising one or more atomizer housing walls that at least partially define an atomizer internal flow path therein;

a container within the atomizer housing that is capable of holding a vaporizable product,

a heating element capable of heating the vaporizable product held in the container, the heating element being configured to be electrically connected to the one or more components for electrically connecting to the power source and/or controlling the device that are housed in the base;

a first container inlet capable of introducing gas into the container to entrain vaporizable product;

one or more second container outlets capable of flowing the gas having the vaporizable product entrained therein into atomizer internal flow path; and

one or more atomizer outlets capable of receiving the flow of gas from the atomizer internal flow path, and providing the flow of gas to the conduit inlet of the base,

wherein the flow of gas having the vaporizable product entrained therein flows from the atomizer internal flow path and through the gas flow conduit inlet of the base to the mouthpiece inlet, and along the mouthpiece internal flow path to the inhalation outlet.

'334 Patent, Claim 1. The other independent claim at issue is Claim 13, which recites:

13. A portable electronic vaporizing device comprising:

a base having a gas flow path conduit therein and a housing for one or more components for electrically connecting to a power source and/or controlling the device, the gas flow path conduit comprising a conduit inlet and a conduit outlet;

a mouthpiece that is removably attachable to the base, the mouthpiece comprising:

a mouthpiece housing comprising one or more mouthpiece walls at least partly defining a mouthpiece internal flow path through the mouthpiece housing;

an inhalation outlet formed in a region of the one or more mouthpiece walls;

4

and

at least one mouthpiece inlet capable of being placed in communication with the conduit outlet of the base upon attachment of the mouthpiece to the base, to receive a flow of gas into the mouthpiece from the base; and

an atomizer that is removably attachable to the base, the atomizer comprising:

an atomizer inlet configured to receive a flow of gas into the atomizer;

an atomizer housing comprising one or more atomizer housing walls;

a container within the atomizer housing that is capable of holding a vaporizable product,

a heating element within the atomizer housing capable of heating the vaporizable product held in the container, the heating element being configured to be electrically connected to the one or more components for electrically connecting to the power source and/or controlling the device that are housed in the base;

a container inlet capable of introducing gas into the container to entrain vaporizable product; and

one or more second container outlets capable of flowing the gas having the vaporizable product entrained therein out of the container,

wherein the flow of gas having the vaporizable product entrained therein flows from the one or more container outlets and is received by the conduit inlet of the gas flow conduit of the base, flows through the gas flow conduit of the base to the conduit outlet and is received by the mouthpiece inlet, and flows along the mouthpiece internal flow path to the inhalation outlet.

'334 Patent, Claim 13.

### B. The Prototype Peak Device

In January 2018, Defendant brought two prototypes of its commercial Peak device (collectively, "the prototype Peak device") for an event referred to as "Pepcom" in Las Vegas. *See* Docket No. 176 ¶¶ 35, 36.  Pepcom is an event attended by journalists where companies can show off their latest products. *Id.* ¶¶ 31-33.  Puffco did not sign any confidentiality agreements with any of the Pepcom attendees. *Id.* ¶ 37.  A publicly available video posted on YouTube depicts a journalist holding the prototype Peak device. *Id.* ¶ 63.  Within four days of the event, Puffco received four inquiries from commercial customers interested in the Peak. Docket No. 137-2 at 25-28.  Jim Walsh, Puffco's public relations consultant at the time of Pepcom, identified 22 articles that had been generated about Puffco and the prototype Peak device. *Id.* at 20-24.

## III. **Legal Standards**

### A. Summary Judgment

Summary judgment shall be granted when a movant "shows that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

To satisfy its burden at summary judgment, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*).

Alternatively, a moving party *with* the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]" to satisfy its burden at summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Therefore, in order to defeat such a motion, the nonmoving party need only raise a genuine issue of material fact in dispute on a single element of the claim.

    B. <u>Invalidity</u>

Claims of issued United States patents are presumed valid.  35 U.S.C. § 282.  "A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence."  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

A patent may be invalid if a claimed invention is anticipated by prior art or obvious in view of prior art references.  35 U.S.C. §§ 102, 103.  A reference qualifies as prior art if the claimed invention was disclosed before the effective filing date of an asserted patent.  *See* 35 U.S.C. § 102.  If the asserted patent is entitled to a right of priority or earlier filing date, then the reference must predate the filing date of the earliest such application.  35 U.S.C. § 102(d).

### C. Patent Infringement

A determination of patent infringement requires a two-step analysis.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step is to construe the claims; *i.e.*, to determine the scope and meaning of what is allegedly infringed.  *Id.*  This step is a question of law.  *Id.* at 970-71.  The second step is to compare the properly construed claims to the accused product to determine whether each of the claim limitations is met, either literally or under the doctrine of equivalents.  *Id.* at 976; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1173 (Fed. Cir. 1993) (although no literal infringement of a claim, an accused device may still infringe under the doctrine of equivalents.).  This determination is a question of fact.  *Bai v. L &L Wings Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

The patentee bears the burden of proving, by a preponderance of the evidence, that each accused product contains each limitation of the asserted claims.  *Bayer AG v. Elan Pharma. Res. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).  The absence of one claim element establishes non-infringement and makes immaterial whether there are any issues of fact as to infringement of any other claims. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

### D. Experts and *Daubert*

*Daubert*'s "gatekeeping obligation" requires "that all admitted expert testimony is both relevant and reliable."  *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).  In addition, expert testimony must "relate to scientific, technical, or other specialized knowledge,

which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). "The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

That being said, "far from requiring trial judges to mechanically apply the *Daubert* factors − or something like them − to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Exclusion of expert testimony is proper only when such testimony is irrelevant or unreliable because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

E. Rule 37(c) and Timely Disclosure of Information

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The burden is on the party facing the sanction to show that the failure to disclose is substantially justified or harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). "Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc*., 375 Fed. App'x. 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003)).

Generally, "the district court's discretion to issue sanctions under Rule 37(c)(1)" is given "particularly wide latitude." *Yeti by Molly*, 259 F.3d at 1107. However, discretion may be limited when the sanction amounts to dismissal of a claim. *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). In such a case, the district court is "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions." *Id.*

## IV.     Discussion

A.     <u>Defendants' Motion to Exclude Certain Opinions and Testimony from Dr. David B. Francom</u>

Defendants ask the Court to exclude Francom's damages opinion because (1) he failed to apportion profits between patented and unpatented features, (2) he improperly applied the entire market value rule ("EMVR")[2], and (3) he based his excess profits calculations on dissimilar technologies. *See generally* Docket Nos. 107, 133-1 (sealed).  For the following reasons, this Motion is **GRANTED IN PART** and **DENIED IN PART**.

### 1.     Francom's Apportionment Analysis

Defendants argue that Francom failed to apportion damages and instead improperly applied the EMVR.  *See* Docket No. 133-1 at 10.  Specifically, Defendants argue that Francom's royalty base failed to exclude: (1) items not covered by the claims of the '334 Patent, such as a battery and circuit board, and (2) features claimed by the '334 Patent that were known in the art. *Id.*  Docket Nos. 107, 133-1(sealed) at 7-9; Docket Nos. 162, 164-1 (sealed) at 3-4.

Plaintiff argues that Francom addressed apportionment in determining both the royalty base and the royalty rate.  Docket Nos. 152, 161 (sealed) at 14.  Plaintiff explains that the accused devices are sold as kits including vaporizers and accessories. *Id.*  Thus, as to the base, Francom correctly apportioned by isolating the patent practicing unit, the vaporizer, from the rest of the kit. *Id.* at 14-15.  In determining the amount attributable to the vaporizer, as opposed to the entire kit, Francom consulted "manufacturer cost lists, invoices, inventory lists, and other documents that show the costs of the kit." Francom Report, Docket No. 107-2 at ¶¶ 40-47.  As to the rate, Plaintiff argues that Francom considered many factors including Defendants' typical profit margins for similar devices, Defendants' claimed profit margins for the accused products, and the "novel combination" of a removable atomizer, removable mouthpiece, and novel gas flow path covered by the '334 Patent.  *See* Docket Nos. 152, 161 (sealed) at 19-20.

At the outset, Plaintiff's argument that simply subtracting out accessories from a "kit" to isolate the value of the device comprises an "apportionment" of the royalty base is not persuasive.  This process is better characterized as isolating the smallest salable patent practicing unit.  The Federal Circuit is clear that even upon such isolation, the work of apportionment is not complete.

---

[2]  Plaintiff denies that Francom applies the EMVR.  Docket Nos. 152, 161 (sealed) at 21.  Accordingly, the Court declines to find that Francom applied EMVR either correctly or not.  The Court considers only whether Francom apportioned properly.

*VirnetX, Inc. v. Cisco Sys., Inc.* 767 F.3d 1308, 1327 (Fed. Cir. 1986) ("Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology").

Here, the accused vaporizers include both features covered by the claims of the '334 Patent (*e.g.*, removable atomizer, mouthpiece, and gas flow path) and unclaimed features (batteries, circuit boards, features related to wireless connectivity, etc.). A proper apportionment here requires further delineation of these unclaimed features and their treatment either within the royalty base or within the royalty rate. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (finding "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more") (internal citations omitted). Plaintiff's reliance on *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015) is therefore misplaced. The *AstraZeneca* Court found that in some instances where "there is no unpatented or non-infringing feature in the product," apportionment in the base may be unnecessary even if the entire market value rule does not apply. *Id.* at 1338. Here, however, it appears that there are unpatented and/or non-infringing features in the product, as discussed below. *AstraZeneca* does not excuse apportionment under these circumstances. Accordingly, the Court **GRANTS** Defendants' motion as to apportionment.

Specifically, in discussing *Georgia-Pacific* Factor 13, Francom includes a section in his report titled, "Differentiation." Francom Report ¶ 154. This section lists several features that Defendants' contend differentiate the accused devices from the teachings of the '334 Patent. *Id.* ¶¶ 154, 156. These include color variation, replaceable batteries, Bluetooth connection, smartphone application, OLED display, RGB lighting, and an option to purchase a "dry herb atomizer." *Id.* The substance of Francom's report describes the ways in which these "differentiated features" are: 1) already disclosed by the '334 Patent, 2) undesirable, and/or 3) not actually distinguishing. *See id.* ¶¶ 161, 163, 165 (features already disclosed); *id.* ¶¶ 162, 166–170, 171–173 (features undesirable); *id.* ¶¶ 164, 174–175 (features not distinguishing).[3] Francom does not explain how these features would decrease the royalty rate. If anything, Francom's

---

[3] Francom mistakenly attributes disclosure in the specification regarding these features to claim 1 but claim 1 does not teach these features. *Compare* Francom Report ¶¶ 161, 163, 165, 172, 174 *with* '334 Patent, Claim 1.

characterization suggests these factors tend to increase or do not affect the royalty rate.  Absent these factors, Francom's conclusion appears supported only by his analyses of "business risk," and "wholesale and retail prices," which are the only remaining aspects of his factor 13 discussion. *See id.* ¶¶ 151-52 and 176.

   While the Court does not fully agree with Defendants that each and every one of these specific features must necessarily be apportioned out, the Court also does not find that Francom's analysis relieves him of the obligation to perform an apportionment.  Surely not all of these features contribute to the value of the patented vaporizer.  Thus, Francom failed to perform an adequate apportionment.  Accordingly, the Court **GRANTS** Defendants' motion as to the apportionment issue.

### 2.  *Francom's Excess Profits Analysis*

Defendants challenge Francom's excess profits calculations as improper because he compares the profit margins of the accused products to profit margins of "disparate products," including "ash trays," "water pipes," "travel cases," and "concentrate extraction."  Docket Nos. 107, 133-1 (sealed) at 16.  Plaintiff characterizes the calculations as appropriate, despite the differences in the products, because they show what Defendants would stand to gain by selling the accused products.  *See* Docket Nos. 152, 161-1 at 23.  In other words, they show that "the accused devices were critical to the success of Defendants' business."  *Id.*

Here, the Court does not find the calculations fundamentally incorrect or improper. Defendants do not and cannot argue that they sold other products that are more comparable to the accused products than those Francom considered.[4]  Still, the Court appreciates Defendants' point about the differences among these types of products and finds this type of differentiation would be an appropriate topic for cross-examination.  It is not, however, enough to render Francom's opinions as to excess profits wholly inadmissible.  For this reason, the Court **DENIES** Defendants' motion as to the excess profits calculations.

### B.  Plaintiff's Motion to Strike Opinions of Defendants' Technical Experts

Plaintiff asks the Court to exclude several portions of Hatton and Kodama's expert reports as (1) unsupported by Defendants' invalidity contentions or (2) applying unreliable methodologies.

---

[4] Defendants do identify the Oura device, but, as discussed in ruling on Plaintiff's summary judgment motion, there is a dispute of fact as to whether the Oura device is within the scope of the litigation.  Moreover, Francom addressed the Oura devices as making up a very small portion of Defendants' revenue.  *See* Docket No. 152, 161 (sealed) at 25.

*See generally* Docket No. 114.  Defendants argue their invalidity contentions provided sufficient disclosure and that expert testimony based on visual observation and disassembly is appropriate here.  *See generally* Docket No. 159.  For the following reasons, this Motion is **GRANTED IN PART** and **DENIED IN PART**.

As a threshold matter, Defendants fail to include pin citations to their invalidity contentions in several places.[5]  This is inconsistent with L.R. 7-5 and also made it more difficult for the Court to determine whether the contentions provided adequate disclosure for the challenged testimony.  Going forward, Defendants shall prepare accurate briefing, in compliance with the local rules, including pin citations to relevant evidence and authority.  Failure to do so may result in sanctions, including an adverse ruling on the motion at issue.

First, Plaintiff challenges Hatton's Invalidity Report (Docket No. 114-6) at ¶¶ 190-195 and Kodama's Invalidity Report (Docket No. 114-7) at ¶ 135.b for including allegedly unsupported identifications of the "gas flow path conduit" in the Kane I reference.[6]  Docket No. 114 at 17.  For limitation 1b, including the "gas flow path conduit" term, Defendants' Invalidity contentions disclosed the following:



FIG. 1

---

[5]  *See e.g.*, Docket No. 159 at 1, 2, 8, 9, 12, and 13 (missing pin citations).

[6]  "Kane" refers to U.S. Pat. Nos. 10,321,714 (Kane I) and 10,743,580 (Kane II), both titled "Water Cooled Vaporizing System."

Docket No. 114-4 at 2.[7]  Though Defendants only highlight the alleged inlet and outlet in different colors, Defendants still identify FIG. 1 of Kane as meeting the entire limitation.  FIG. 1 shows a series of arrows connecting the inlet and outlet.  In view of Defendants' disclosure, it is not unreasonable to think Defendants intended to take the position that the "channel" is the pathway of arrows connecting the inlet and outlet.  Of course, whether this disclosure actually meets the limitation may be subject to dispute.  For instance, to the extent the construction requires a physical channel, there is a possible dispute of fact as to infringement.  This potential fact dispute does not, however, render the disclosure insufficient.  For these reasons, the Court **DENIES** Plaintiff's motion as to these portions of Hatton's report.

Second, Plaintiff challenges Hatton's Invalidity Report at ¶¶ 206, 209, 210 for including an unsupported identification of "heating coils 65" in Kane.  Docket No. 114 at 17.  Because the Court alters its construction of "heating element" to "an element that heats via resistive heating," there would be good cause for Defendants to amend their invalidity contentions to identify additional "heating elements" consistent with the Court's broader construction.  *See Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL 789197, at *2 (N.D. Cal. Feb. 26, 2014).  Accordingly, the Court **DENIES** Plaintiff's motion as to these portions of Hatton's report.  For the same reasons, the Court **DENIES** Plaintiff's motion as to Kodama's Invalidity Report at ¶ 135.b and Hatton's deposition testimony (Docket No. 114-10) at 82:21-83:20.[8]

Third, Plaintiff challenges Hatton's Report at ¶ 247 as containing an allegedly undisclosed obviousness theory.  Docket No. 114 at 19-20.  Defendants' invalidity contentions disclosed that the Pepcom prototype included a removable atomizer based on: (1) a September 2017 atomizer assembly drawing showing "a threaded electrode," (2) a November 2017 email, again discussing threading, (3) the "Project Kirby Cookbook" again discussing threading.  Docket No. 145-8 at 13.  Defendants' contentions do not disclose the "splicing" theory that Hatton now offers.  Thus, Defendants did not disclose a single reference obviousness challenge, based on the Pepcom

---

[7]  In their opposition brief, Defendants also point to disclosures in their contentions made in connection with element 1e.  *See* Docket No. 159 at 8-9.  Because element 1e does not include the "gas flow path conduit" language, these disclosures are not relevant and the Court disregards them for purposes of resolving Plaintiff's motion.

[8]  At the hearing, Plaintiff indicated the Court did not address Hatton's deposition testimony concerning claim 1.  *See* Rough Hearing Tr. at 15:3-4.  That is not correct.  The Court addresses that testimony here.  Again, because the testimony concerns the "heating element" and the Court grants Plaintiff's motion to amend the construction for "heating element," there is potentially good cause for Hatton to amend his opinions, including by identifying further claim 1 of Kane.

prototype and a person having skill in the art's knowledge of splicing a connector, in its contentions. Accordingly, the Court **GRANTS** Plaintiff's motion as to this portion.

Fourth, Plaintiff challenges Hatton's Invalidity Report at ¶¶ 257, 258, 260 for including an allegedly unsupported invalidity position based on the Pepcom prototype in combination with the Kuna and/or Eksouzian references. Docket No. 114 at 20. Defendants disclosed the Kuna and Eksouzian references as examples of removable atomizers in Appendix F. Docket No. 145-7 at 2. Defendants' invalidity chart mapping the Pepcom prototype to the asserted claims references Appendix F on the cover page. Docket No. 145-4 (Appendix C). Defendants should have indicated they intended to rely on the art in Appendix F under the 1d section of Appendix C. Still, given the reference of the cover page and the fact that Appendix F is titled "Prior Art References . . . that Disclose Removably Attachable Atomizers," the contentions did provide Plaintiff sufficient notice of Defendants' invalidity theories. Accordingly, the Court **DENIES** Plaintiff's motion as to these portions of Hatton's report.

Fifth, Plaintiff challenges Hatton's Report at ¶¶ 265, 266, 268 for including various allegedly unsupported invalidity positions. Docket No. 114 at 20-21. As to ¶ 265, Defendants' invalidity contentions are insufficient. Defendants disclosed only that "U.S. Patent No. 8,534,296 to Groff ("Groff") discloses . . . the convoluted mouthpiece of claim 11 of the '334 Patent. It would have been obvious to combine the mouthpiece of Groff with any of the other references or combinations that meet the limitations of claim 1 . . . ." Docket No. 145-6 at 1. Defendants do not disclose a single reference obviousness position based on Kane and a person of ordinary skill in the art's knowledge to modify the waterpipe portion of Kane I. Accordingly, the Court **GRANTS** Plaintiff's motion as to ¶ 265. The same reasoning applies to ¶ 266.[9] As to ¶ 268, Defendants do not disclose that it would have been obvious to combine any of the five prior art atomizers with Kane, as Hatton opines. Rather, Defendants disclose that it would have been obvious to combine one or more of these atomizers with U.S. Patent No. 8,910,625 to Bernhard et al. *See* Docket No. 145-6 at 8. Disclosure of a combination relying on a different primary reference is insufficient to support Hatton's opinions. Accordingly, the Court **GRANTS**

---

[9] Again, Plaintiff argued the Court did not address this paragraph in its tentative ruling. *See* Rough Hearing Tr. at 15:3-4. The Court addresses it, albeit briefly, here. Again, Defendant's invalidity contentions do not disclose a single reference obviousness combination involving Kane. Accordingly, Hatton's testimony that it would have been obvious to combine the conduit outlet and inlet of Kane to form a channel is not supported. The Court grants Plaintiff's motion as to this portion of Hatton's testimony.

Plaintiff's motion as to ¶ 268.

Finally, Plaintiff challenges both Hatton's Non-infringement Report (Docket No. 114-12) at ¶¶ 85 and 97 and Kodama's Non-infringement Report (Docket No. 114-13) at ¶¶ 79, 81, 127, and 128 as containing opinions based on allegedly insufficient testing of the heating characteristics of the accused devices.  Docket No. 114 at 14.  Here, the experts performed a visual inspection and disassembly of the accused devices but never turned on the heater in the accused devices.  *See* Docket No. 114-12 at ¶ 85, 97; Docket No. 114-10 at 132:22-25; Docket No. 114-11 at 47:14-17, 47:23-24, 118:13-119:19.  To the extent these experts opine regarding structural features or general heating characteristics of the accused devices, the Court finds the challenged testimony reliable.  Hatton and Kodama may fairly reach conclusions about these properties based on a visual inspection and disassembly of the accused devices.  Accordingly, the Court **DENIES** Plaintiff's motion as to ¶ 85 of Hatton's report[10] and ¶ 128 of Kodama's report.

To the extent the experts opine regarding the performance of the accused devices, based on information that could only be ascertained by turning on the heater, the Court finds the testimony unreliable.  For instance, broad testimony based only upon visual inspection and disassembly does not necessarily account for possible differences in the behavior of vaporizable products that could only be determined via actual testing.  For these reasons, the Court **GRANTS** Plaintiff's motion as to Kodama's Noninfringement Report at ¶¶ 79 and 127, to the extent he opines that the shape of the Carta 2 heater more quickly and evenly vaporizes material, and ¶¶ 81 and 127, to the extent he opines that vaporization will happen in the entire chamber instead of just at the bottom.  The Court also strikes the portion of ¶ 79 describing the shape of the Carta 2 as a "key selling point."  Kodama is not a marketing expert.  This is beyond the scope of his expertise and beyond the type of testimony that Defendants indicated he would provide.  The Court also **GRANTS** Plaintiff's motion as to ¶ 97 of Hatton's report.  Hatton admits that he bases that testimony on information that Defendants' attorneys told him.  Docket No. 114-10 at 45:6-19.  This is not an appropriate basis for expert opinion.

    C.    <u>Plaintiff's Motion to Strike Opinions from Defendants' Damages Expert Shelly Irvine</u>

Plaintiff argues that certain portions of Irvine's damages opinion should be excluded

---

[10] Though ¶ 85 does address the performance of the accused device, the Court finds Hatton's testimony appropriately limited to and based on specific structural configurations of the accused devices and the vaporizable material.  Thus, Hatton can fairly discuss how these features would behave based on his visual inspection and disassembly.

because: (1) her apportionment analysis relies on documents that Defendants did not timely produce during fact discovery and employs an improper bill of materials (BOM) cost method to calculate the value of the patented features, (2) Irvine should not have used the Carta 2 atomizer as a purported non-infringing alternative in the royalty rate calculation, and (3) Irvine possesses no knowledge nor expertise to opine on the vaporizer marketplace.  Docket No. 121 at 1.  For the following reasons, this Motion is **GRANTED IN PART** and **DENIED IN PART**.

1. <em>Irvine's Apportionment Analysis</em>

Plaintiff moves to strike Irvine's apportionment opinions on three bases.  First, Plaintiff contends that "Irvine's apportionment opinion is based on the Zhu Declaration Exhibits."  Docket No. 121 at 15 (citing Docket No. 121-3, Ex. A, Irvine Report ¶¶ 65-75).  Although fact discovery closed on July 28, 2023, Plaintiff argues that these documents were responsive to requests from 2022 but first produced by Defendants on September 27, 2023.  *Id.*  The documents are related to the Carta OG and Carta 2 devices.  *Id.*  In opposition, Defendants do not dispute this timeline or Irvine's reliance on the Zhu Declaration Exhibits.  Instead, they argue that the delay was substantially justified because Irvine needed the information from the Zhu Declaration Exhibits to rebut Plaintiff's damages expert's (Francom) BOM-cost analysis, which Defendants contend "failed to account for the very information required to perform a proper apportionment."  Docket No. 143 at 8.  Moreover, "because Irvine disclosed her report on September 27, 2023 and was deposed October 13, 2023 . . . [before] [t]he expert discovery deadline . . . [of] October 20, 2023," Defendants contend that the disclosure is harmless.  *Id.* At 10-11.

Defendants do not dispute first producing the Zhu Declaration documents after the close of fact discovery and thus, bear the burden of showing the untimely disclosure is substantially justified or harmless.  *Yeti by Molly*, 259 F.3d at 1107.  Here, the Court agrees with Plaintiff that Defendants have shown neither.  Beginning with substantial justification, Defendants' position is circular.  They contend that Irvine needed the Zhu Declaration Exhibits to rebut Francom's expert report because Francom's opinion did not consider the very documents Defendants failed to timely produce.  If the documents Defendants did timely produce were incomplete or inaccurate, Defendants cannot blame Plaintiff for that issue.

The Court now turns to harmlessness.  Relying on the special master's recommendation in *Syneron Med. Ltd. v. Invasix, Inc.*, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018), Defendants contend that the late disclosure does not harm Plaintiff because "[Plaintiff] took the opportunity to

16

depose Irvine before the close of expert discovery." Docket No. 143 at 11. However, in *Syneron*, as Plaintiff correctly notes, "[t]he Special Master finds that Syneron's failure to disclose the licenses was substantially harmless, because they were disclosed 30 days before the close of ***fact*** discovery." *Id.* at *13 (emphasis added). Here, as Plaintiff points out, the Zhu Declaration Exhibits constitute "fact witness evidence . . . [which] had [Defendants] produced the engineering drawings and BOM-cost documents during the fact discovery window, [Plaintiff] could have pursued additional fact discovery regarding these documents and related contentions." Docket No. 170 at 7. Thus, even if the Zhu Declaration Exhibits were available before the expert discovery deadline, this does not satisfy Defendants' burden to show harmlessness. Plaintiff was not able to conduct additional fact discovery after the deadline had passed. *See MLC Intell. Prop., LLC v. Micro Tech., Inc.*, 10 F. 4th 1358, 1372 (Fed. Cir. 2021) (affirming district court striking damages opinion where "MLC had failed to disclose in discovery all of the evidence that Milani relied on in support of that opinion" despite the fact that "[MLC] ultimately disclosed them during expert discovery"). Defendants present no other argument in support of their position that the Court should find the untimely production of the Zhu Declaration Exhibits harmless.[11]

Plaintiff next argues that Irvine's apportionment opinion should be excluded because "her narrow view of the inventive aspects of the invention as being limited to the BOM-cost of the components of the removable atomizer alone completely ignores the evidence in this case, including from Defendants' own technical experts." Docket No. 121 at 21. Specifically, Plaintiff notes that "Defendants' own technical expert Kodama agrees that the novel invention 'provides significant advantages in terms of usability, durability, and overall user experience, over prior portable electronic devices.'" *Id.* at 6 (citing Docket 121-11, Ex. I, Kodama Invalidity Report ¶ 80.). In opposition, Defendants argue that "Irvine's apportionment analysis is appropriate . . . [because] Irvine reviewed SHO's technical expert reports and assessed the patented component applications in portable e-rigs and their specific configuration." Docket No. 143 at 12.

When "the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone."

---

[11] At the hearing, Defendants argued that Irvine should still be allowed to testify on apportionment based on opinions of other technical experts. Defendants, however, do not point to any specific sections of the Irvine Report where the analysis did not rely on or incorporate the Zhu Declaration. Even if such sections existed, Irvine's apportionment opinion must be struck anyway because it failed to apply the appropriate comparison.

*AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015).  Moreover, "it is improper to assume that a conventional element cannot be rendered more valuable by its use in combination with an invention . . . [and] it has long been recognized that a patent that combines 'old elements' may 'give[] the entire value to the combination' if the combination itself constitutes a completely new and marketable article."  *Id.* at 1338-39 (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. Mfg. Co.*, 225 U.S. 604, 614 (1912)).  Here, Plaintiff argues that the combination and specific configuration of an atomizer and mouthpiece, even if considered conventional elements, confer inventive value.  Docket No. 121 at 21.  Similarly, Irvine's report acknowledges that "it is the application of these components in portable e-rigs *and* their specific configuration, as laid out in the '334 Patent, that constitute the incremental benefit of the claimed inventions."  Docket No. 121-3, Ex. A, Irvine Report ¶ 67.  *See id.* ¶ 44 ("[T]he purported novelty of this feature is limited to its application in a specific claimed combination, including the removably attachable atomizer and mouthpiece.").  Nevertheless, Irvine's apportionment opinion focuses only on the individual components of the removable atomizer.  *See id.* ¶ 154 ("I calculate apportionment factors . . . by focusing my apportionment on the components (as identified by Defendants' technical experts) that I understand correspond to the claim limitations of the '334 Patent.").  It omits any discussion of the combination of elements in the claimed invention.  In other words, Irvine fails to compare the value of the claimed invention as a whole to the value of the conventional elements standing alone.[12]  *See* Docket No. 121-3, Ex. A, Irvine Report ¶¶ 58-76.  Because it fails to perform the proper comparison, Irvine's apportionment analysis is not "the product of reliable principles and methods" and does not reflect "a reliable application of [her] principles and methods to the facts of the case."  Fed. R. Evid. 702.

It is unnecessary to address Plaintiff's alternative argument that Irvine's apportionment opinion should be excluded because it improperly equated the invention's features' BOM-costs with their values.

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion to strike Irvine's

---

[12] At the hearing, Defendants argued that ¶¶ 77-84 of the Irvine Report analyzes the value of the claimed combination. However, this portion only discusses the alleged flaws in Dr. Francom's excess profit calculation for Defendants' products.  Neither these paragraphs nor the section discussing the *Georgia-Pacific* factors explain how Irvine considered the combination of conventional elements in the apportionment analysis.  *See* Docket No. 121-3, Ex. A, Irvine Report ¶¶ 58-84, 154-157.  Defendants also argued that Schedule 3.2 of the Irvine Report accounted for the value of conventional and nonconventional components.  However, Schedule 3.2 considers the component costs of Plaintiff Puffco's Peak products, which are not relevant to the apportionment analysis.  *See Syneron*, 2018 WL 4696969, at *6 ("The law requires the apportionment of the accused product, not that of the accuser's.").

apportionment opinions.

### 2. *Irvine's Use of the Carta 2 as a Non-Infringing Alternative*

Plaintiff argues that the Court should strike Irvine's opinion that "Defendants and Puffco would have factored in the Carta 2 atomizer as a non-infringing alternative when conducting the hypothetical negotiation and would have settled on a royalty rate equal to no more than the difference in BOM cost between the Carta OG and Carta 2 atomizers as of 2022 (two or more years after the hypothetical negotiation)."  Docket No. 121 at 22.  Plaintiff contends that the opinion is improper because: 1) the Carta 2 atomizer, as a proposed alternative, was not available on the hypothetical negotiation date and 2) Irvine offered no evidence or analysis with respect to the purported "costs to Defendants, . . . resulting impact on the price of the Carta OG, and whether the 're-designed' device would be suitable for Defendants or the consumers."  *Id*. at 23.[13]  In opposition, Defendants argue that use of potential non-infringing substitutes like the Carta 2 is appropriate "to meet the above requirements for entitlement to lost profits . . . by satisfaction of the four-part test set forth in the *Panduit* test."  Docket No. 143 at 15 (cleaned up).  Defendants contend that Plaintiff did not assess the *Panduit* test and that "the Carta 2 was available during the relevant 'accounting period.'"  *Id.* (citing *Nichia Corp. v. Feit Elec. Co., Inc.*, No. CV 20-359-GW-EX, 2022 WL 17222250 at *24 (C.D. Cal. Oct. 12, 2022)).  Moreover, Defendants argue that "Irvine does not argue that the difference in BOM-cost prices between the atomizers equates the design-around cost."  *Id.* at 16.

First, the Court finds that the *Panduit* test is inapplicable here.  As Plaintiff notes, that test pertains to the availability of lost profits rather than the reasonable royalty analysis.  However, the availability of non-infringing alternatives may affect the reasonable royalty analysis.  *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *AstraZeneca AB*, 782 F.3d at 1340.

However, an allegedly non-infringing alternative cannot be relevant to the reasonable royalty analysis unless available *at the time infringement began*.  *See AstraZeneca AB*, 782 F.3d at 1340-41 (finding that alleged non-infringing alternatives were irrelevant because they were unavailable to accused infringer at the beginning of infringement).  Defendants do not dispute

---

[13]  In the alternative, Plaintiff contends Irvine's opinion becomes irrelevant and should not be presented to a jury if the Court grants its motion for summary judgment that the Carta 2 atomizer infringes the '334 Patent.  Docket No. 121 at 22-23.  As explained elsewhere in this Order, triable issues of fact remain as to this issue.

Plaintiff's contention that the Carta 2 was not available at the time alleged infringement began on January 3, 2020.  Nor have Defendants provided any evidence that the Carta 2 was available at that time.  Indeed, Defendants did not launch the Carta 2 until two years later, in February 2022. Docket No. 121 at 23.  Thus, the Carta 2 device cannot be used as a non-infringing alternative in Irvine's reasonable royalty rate determination.

Next, the Court concludes that even if the Carta 2 could constitute a non-infringing alternative, Irvine's opinion has not adequately explained how she calculated the $██ re-tooling cost.  Irvine first determined the difference in material cost for the atomizers in the Carta OG and Carta 2 to be $██.  Docket No. 121 at 19 (citing Docket No. 121-3, Ex. A, Irvine Report ¶ 162, at n.363).  Irvine then opines that, based on her discussions with Defendant SHO's Head of Product, "SHO would expect to incur additional expenses, such as design and development costs (*e.g.*, testing, refining), tooling costs, and cost arising from changes to packaging and the Carta user manual."  Docket No. 121-3, Ex. A, Irvine Report ¶ 163.  Without any further explanation, Irvine reaches the conclusion that "a desire to avoid undertaking an expensive retooling effort would act as an incentive for SHO to enter into a license agreement with a royalty that would equal (but not exceed) the difference in cost between the two components."  *Id.*  Consequently, Irvine makes an unexplained leap from the difference in atomizer cost to the retooling cost without discussion on how she arrived at that conclusion.  Again, the Court cannot find that Irvine's analysis constitutes a "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

Accordingly, the Court **GRANTS** Plaintiff's motion to strike Irvine's opinion seeking to use the Carta 2 as a non-infringing alternative in the reasonable royalty analysis.

### 3. *Irvine's Opinions of the Vaporizer Marketplace*

Finally, Plaintiff moves to preclude Irvine from "offering any testimony or opinion concerning the '334 Patent's 'footprint in the marketplace.'"  Docket No. 121 at 1.  Plaintiff argues that "Irvine testified that she has no knowledge or expertise on the marketplace for portable electronic vaporizers."  *Id.* at 25.  In the Motion, Plaintiff identifies paragraphs 9, 11, 25-34, 57, 67, 85, 86, and 157 of Irvine's report as examples where Irvine seeks to "offer opinions about the marketplace for vaporizers and the '334 Patent's 'footprint' in that marketplace."  *Id.*  In opposition, Defendants argues that "Irvine only references the '334 Patent's 'footprint in the marketplace' or 'improvements over prior art' when citing to other expert reports."  Docket No.

143 at 16 (citing Docket No. 107-3 at ¶¶ 9, 57, 67, 85).  Moreover, Defendants represent that "[a]t no point does Irvine opine on the vaporizer industry as an expert . . . [and] Irvine does not claim to have such knowledge and does not intent to testify as a technical or industry expert."  *Id.* at 16-17.  In reply, Plaintiff argues that Irvine does not cite to technical experts when opining about the invention's footprint in the marketplace and "even in instances where she does cite to a technical expert report to support her opinions about the invention, neither of Defendants' technical expert reports support her conclusory opinions."  Docket No. 170 at 20-21.

Given Defendants' representation, the Court agrees with Plaintiff that Irvine should not opine on the vaporizer market or incremental improvement over prior art as if she were a technical or industry expert.  Expert testimony is only admissible in areas where the expert has "scientific, technical, or other specialized knowledge . . . ."  Fed. R. Evid. 702(a).  However, Irvine may offer her opinions on other issues, and her analysis of those other issues may employ assumptions based on the opinions of Defendants' technical or industry experts.  Plaintiff may reserve the right to object at trial should Irvine offer an opinion that falls outside these bounds.

Turning to Irvine's report, the Court will review the paragraphs raised by Plaintiff in the Motion and Reply:

- Paragraphs 25-33 provide an overview of the vaporizer industry and cite to publicly available information.  They do not contain any opinions offered by Irvine.  Paragraph 34 offers an opinion but cites to Irvine's discussion with Defendants' technical experts.  Accordingly, these paragraphs will not be excluded.

- Paragraphs 9, 11, 57, 85, 86, and 157 reflect Irvine's opinions but do not cite to technical expert reports.  Accordingly, references to "the footprint of the invention" or "the incremental improvement over prior art" in these paragraphs will be excluded.

- Paragraph 44 does not explicitly reference "the footprint of the invention" nor "the incremental improvement over prior art."  Moreover, Plaintiff did not raise this paragraph in its initial motion, nor did it raise the argument that Irvine's report includes conclusory opinions based on technical report references.  Accordingly, nothing from this paragraph will be excluded.

D.    Plaintiff's Motion to Amend Claim Construction

Plaintiff requests that the Court amend its construction of "heating element" based on evidence that became available after the *Markman* hearing in this matter.  *See generally* Docket

No. 114.  In opposition, Defendants primarily challenge the appropriateness and timeliness of Plaintiff's motion.  For the following reasons, the Court alters its construction of "heating element" to "an element that heats via resistive heating."

The Court finds alteration necessary in view of the evidence Plaintiff presents, to ensure the litigation proceeds with the correct construction.  *See In re Papst Licensing Digital Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact.  That determination is to be made as the case moves forward."); *see also Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) (recognizing that district courts may revisit and alter claim constructions as "understanding of the technology evolves")  Thus, the relevant Federal Circuit authority allows district courts to "alter" constructions where necessary; it does not limit district courts to mere "clarification," as Defendants contend.  For these reasons, the Court declines to consider Plaintiff's motion under the reconsideration standard, even though reconsideration may be appropriate here.

Moreover, the Court bases its decision to alter its claim construction only on evidence Defendants made available after the March 3, 2023 claim construction ruling.  For this reason, the Court does not find that alteration at the summary judgment stage would prejudice Defendants.  Rather, the amended construction is based on Defendants' own understanding of the term and on documents and information that were always within Defendants' control or Defendants' power to prepare.  The Court would view the request differently if it were based on either evidence that *Plaintiff* chose not to produce until after claim construction or based on public information available at the time of claim construction.

Here, several pieces of evidence from Defendants support construing "heating element" as "an element that heats via resistive heating."  First, Defendants' technical expert, Hatton, prepared a report and offered deposition testimony confirming his understanding that "heating element" is a term of art encompassing a known class of structures that heat via resistive heating.  Hatton Aug. 2023 Invalidity Report, Docket No. 115-8 at ¶ 20 ("In other vaporizers . . . the chamber containing the vaporizable material would be heated (commonly by a resistive heating element in thermal contact with the chamber) . . . ." and "[t]he technology that made up all of these components – holding vaporizable material making electrical connections between components – resistive

heating, directing a flow of air through the device, etc.—was not complex and was well known to people with even minimal experience in vaporizer or consumer product design."); Hatton Oct. 12, 2023 Dep. Tr., Docket No. 115-9 at 30:10-24 (opining that "'heating element' is term used in the industry" and "could refer to a heating trace or [] more typically would refer to a component containing a heating trace or a bare coil" and "a heating element might typically include some conducted element that produces heat via resistive heating, but it could also refer to an unshielded component like a coil")  Hatton's published patent applications confirm his understanding.  *See* Docket Nos. 115-10, 115-11, 115-12, and 115-13 (referencing a "resistive heating element"). Second, Defendants' 30(b)(6) witness, Samuel Jurist, appeared to confirm his understanding that "heating element" is a term of art.  Jurist Depo. Tr., Docket No. 115-7 at 36:5-7 ("There's a lot of different atomizer designs.  But, simply, you have some sort of heating element.  And some sort of airflow path that goes – you know, out of the atomizer.").  Defendants made Jurist available for deposition on July 20, 2023.  Third, Defendants' document production includes a document from the manufacturer of two of the accused products confirming their understanding that "heating element" is a term of art.  Docket Nos. 115-4, 136-1 (sealed) at 5-6 (describing flexible printed circuit in Carta products as "heating element").  Finally, Defendants' patent application related to the accused Carta 2 atomizer confirms Defendants' understanding that "heating element" is a term of art referring to resistive heating.  *See* Docket No. 115-3 at ¶¶ Abstract, [0033]. [0072]-[0077], and Claim 1.  The application was published on July 13, 2023.  Additionally, Plaintiff supplied supplemental authority in which the International Trade Commission recently construed "heating element" consistent with the above.  Docket No. 179-1.  Though the Court need not consider this evidence in view of the overwhelming evidence described above, it also provides helpful context.

This evidence strongly suggests that a person of ordinary skill in the art would understand "heating element" in this context to refer to a specific class of structures that heat via resistive heating.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) ("The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.") (internal citations omitted); *see also TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013) ("[I]t is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.") (internal citations omitted).

Accordingly, the Court **GRANTS** Plaintiff's Motion and construes "heating element" as "an element that heats via resistive heating."

    E.    <u>Defendants' Motion for Partial Summary Judgment</u>

For the following reasons, Defendants' Motion for Partial Summary Judgment is **DENIED**.

    1.  *Evidentiary Objections*

Plaintiff objects to Hatton's statement that he "understand[s] that on July 25, 2017 Plaintiff had in [its] possession a CAD assembly file named 'Kirby_01_0000_A_Master _Assem_170725.SLDASM[,]' which appears to be a 3D model of the Project Kirby device assembly created on or before July 25, 2017.  I understand that this CAD assembly file was included as or within an attachment in an email chain shown in '170725 – PUFFCO09910 – FW NOA Labs Kirby Prototype v2 Mechanical Work.pdf.'"  *See* Docket No. 149 at 2; Docket No. 108-2 ¶ 95.  The basis for this objection is an alleged lack of foundation under Fed. R. Evid. 702, an alleged lack of personal knowledge under Fed. R. Evid. 602, and improper expert opinion testimony under Fed. R. Evid. 702 and 703.  This objection is **OVERRULED**.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of," and those facts "need not be admissible for the opinion to be admitted" so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject . . . ."  Fed. R. Evid. 703.  In this portion of Hatton's expert report, he is explaining the documents he reviewed, providing context and foundation for the rest of the analysis, and stating the assumptions of the analysis.  These are all appropriate uses for these facts.  However, these statements will not be admitted to prove the truth of the factual assumptions underlying Hatton's opinions.

Plaintiff also objects to Hatton's statement that "[t]he bill of materials lists the drawing files for each component.  Most of the drawing files include dates, including all of the atomizer and glass part files, and all of those dates are from 2017."  *See* Docket No. 165-5 at 3-4; Docket No. 108-2 ¶ 141.  The bases for this objection are the same as the prior objection, and it is **OVERRULED**.  This statement is based on the witness' rational perception after reviewing the relevant document.  In addition, like the previous statement, this statement explains the documents Hatton reviewed, provides context and foundation, and states assumptions.  It is permissible for Hatton to state facts he was made aware of in this context.  Again, these statements will not be

admitted to prove the truth of the factual assumptions underlying Hatton's opinions.

Plaintiff also objects that the following alleged fact is vague and ambiguous: "The Court's construction of 'removably attachable' establishes that the atomizer PuffCo contends was likely present in the Prototype was 'removably attachable.'" Docket No. 176 ¶ 46. Although this alleged fact is neither vague nor ambiguous, the thrust of Plaintiff's objection is that this is a legal opinion rather than a fact. On this basis, the objection is **SUSTAINED**. This alleged fact is a legal conclusion rather than a fact. However, this statement will be treated as a statement of Defendants' position on invalidity.

### 2. *Infringement: Carta 2*

Defendants contend that the Carta 2 cannot infringe the '334 Patent because it does not contain a "heating element." Docket No. 108 at 15. Plaintiff disagrees. Docket No. 148 at 7.

Defendants have not shown they are entitled to summary judgment. First, the basis for Defendants' position is that the Carta 2 does not contain the required "heating element" because the Carta 2 does not contain a plate. *See* Docket No. 108 at 15-17. However, this position relies on the Court's previous construction of "heating element." The new construction, discussed *supra*, does not require a plate.

Second, Plaintiff has proffered evidence that the Carta 2 contains an element that heats via resistive heating in order to heat a container by thermal conduction, consistent with the Court's new construction of this term. Specifically, Plaintiff presented evidence that the Carta 2 ceramic container includes flat metallic resistive heating traces embedded in the sidewalls of the ceramic container. *See* Docket No. 144-1 ¶¶ 17-18. Defendants dispute whether the heating traces in the sidewalls operate independently of the traces, but this is not material to this claim limitation under the Court's revised construction. *See id.* In addition, Plaintiff presented evidence that the resistive heating traces embedded in the sidewall and the bottom of the container in the Carta 2 device heat the container by thermal conduction for the purpose of heating vaporizable product placed in the container. *See id.* ¶¶ 21-22.

Defendants' remaining arguments are unpersuasive. Even if Defendants were correct that Bajpai conceded that the Carta 2 made a meaningful technological advancement over the '334 Patent, that would not be dispositive of infringement. Even highly innovative new products may infringe an older patent if the product satisfies every limitation of one or more claims from that patent. Simply put, innovativeness is not the test of infringement.

### 3.   *Invalidity: Anticipation via Public Use*

A patent has a presumption of validity.  *See* 35 U.S.C. § 282(a).  The burden of establishing invalidity is on the moving party.  To meet this burden, the moving party must do so with clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd' P'ship*, 564 U.S. 91, 95 (2011); *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).  "Although an exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'"  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

Section 102(a)(1) provides that, "[a] person shall be entitled to a patent unless . . . the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." § 102(a)(1).  However, "[a] disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art . . . if . . . the disclosure was made by the inventor . . . ." § 102(b)(1).  "A determination that a claim is anticipated involves a two-step analysis: the first step requires construing the claim, and the second step in the analysis requires a comparison of the properly construed claim to the prior art."  *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) (citations and internal quotations omitted).  "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention."  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."  *Id.* For prior art to anticipate a claim, "it must be sufficient to enable one with ordinary skill in the art to practice the invention."  *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).

Anticipation under 35 U.S.C. § 102 is a question of fact, but it may be resolved on summary judgment if no genuine dispute of material fact exists.  *OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*, 701 F.3d 698,704 (Fed. Cir. 2012) (internal citation omitted).  Moreover, "[s]ummary judgment is proper if no reasonable jury could find that the patent is not anticipated."  *Id.* (citing *Zenith Elec. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356-57 (Fed. Cir. 2008).

Based on this analytical framework, the parties have raised three issues with respect to anticipation. First, Defendants contend that the prototype Peak device anticipates Claims 1-11 and 13 of the '334 Patent because it reflects every limitation of those claims. Second, Defendants contend that the disclosures Plaintiff made at the Pepcom event qualify as "public use." As part of this analysis, Defendants contend that the claimed invention was (a) ready for patenting at the time of the Pepcom event and (b) was commercially exploited at that time. Third, as an alternative to the analysis above, Defendants contend that the prototype Peak device was an "obvious variant" of the claimed invention and can be invalidated without passing through the obviousness analysis.

a.   Whether the Prototype Anticipates the Claimed Invention

Defendants have not met their burden of proving that the prototype Peak device reflects all the limitations of the relevant claims of the '334 Patent. Defendants' anticipation analysis does not discuss the characteristics of the prototype Peak device. Docket No. 108 at 17-25; Docket No. 165 at 3-8. Nor do Defendants argue in their Motion that any of the claim limitations are met by that device. *Id.* For this reason alone, Defendant's Motion fails as to anticipation.

In addition, Plaintiff has provided argument of its own about the characteristics of the prototype Peak device. Specifically, Plaintiff denies that the prototype Peak device failed to satisfy two groups of claim limitations. First, Plaintiff denies that the prototype Peak device contained a removably attachable atomizer. Docket No. 148 at 11. Second, Plaintiff denies that the prototype contained the Atomizer Air Flow Path Limitations, namely "an atomizer housing comprising one or more atomizer housing walls that at least partially define an atomizer internal flow path therein," "second container outlets capable of flowing the gas having the vaporizable product entrained therein into [the] atomizer internal flow path," and "one or more atomizer outlets capable of receiving the flow of gas from the atomizer internal flow path, and providing the flow of gas to the conduit inlet of the base." *Id.* at 11-12.

As to the "removably attachable atomizer," the parties do not meaningfully dispute that the atomizer was hardwired to the prototype. Docket No. 176 ¶ 72. Defendants contend that hardwired atomizers are still removably attachable because they can be desoldered but do not present evidence establishing that the atomizers were not hardwired. *Id.*; *see also* Hatton Invalidity Report, Docket No. 108-2 ¶¶ 155-56. In support of their position, Defendants cite Hatton's testimony that "[t]he 'replaceable hardwired' atomizer can be electrically disconnected from the base by desoldering it . . . ." Docket No. 132-3 ¶ 155. However, Plaintiff cited testimony from

Bajpai that the atomizer actually could not be removed and that pulling out the atomizer would probably break the wires and render the device non-functional.  Docket No. 118-16 at 5-6.  Bajpai explained that detaching the atomizer could not be done without breaking the soldered connection and that the atomizer would not be capable of being reattached or replaced with a replacement piece without using a soldering iron.  Docket No. 118-20 ¶ 99.  Because Defendants have not provided a sufficient basis to Bajpai's testimony (or addressed it at all), they have not shown that there are no genuine disputes of material fact on this issue.  In addition, as the Court construed this limitation, the concept of reattachment refers to a replacement part necessary for operation.  Docket No. 65 at 12.  Although the replacement piece need not be identical to the original piece, it must perform the same function as the original piece in the same way and should fit seamlessly into the device.  *Id.*  Here, Defendants have offered no reason why desoldering and resoldering the atomizer would be necessary for operation of the device.  Also, desoldering and resoldering the atomizer would not provide the seamless fit required by the Court's construction.  The issues raised by the parties with respect to this limitation are also addressed in further detail *infra*, in connection with Plaintiff's Motion for Partial Summary Judgment.

As to the Atomizer Air Flow Path Limitations, Defendants merely contend that no evidence exists that the air flow path disclosed in the '334 Patent is different from that which existed in the prototype.  Docket No. 176 ¶ 48.  Plaintiff contends that the prototype Peak device may have contained ████████.  *Id.*  However, because Defendants have the burden of proof on invalidity, this response is not sufficient to entitle them to summary judgment.  Defendants rely on Hatton's testimony, but that testimony merely indicates that Plaintiff would have no reason to use ██████ and that it would have been difficult to create one without creating certain documentary evidence; Hatton was not able to opine directly about the functioning of the prototype Peak device. Docket No. 132-3 ¶¶ 162-65.  Kodama's testimony was similar: it questioned the lack of drawings, 3D files, or other documentation showing ██████ and it questioned whether ██████ would work in the manner contended by Plaintiff.  Docket No. 132-4 ¶¶ 118-19.  Given the uncertainty about the interior of the prototype Peak device, Defendants' evidence permits, rather than compels, a jury inference that the prototype Peak device met the Atomizer Air Flow Path Limitations.  Also, Plaintiff proffered responsive evidence that confirms the appropriateness of denying summary judgment.  Although Bajpai concedes that there is no documentation supporting the notion that the device contained ██████, Bajpai pointed out that some of the devices Plaintiff was considering

at the relevant time contained ███████ and it cannot be determined by visual inspection whether the prototypes at Pepcom fell into this category.  Docket No. 132-7 at 13-14.  Bajpai also testified that, at the relevant time, Plaintiff was experimenting with various components without thoroughly documenting those experiments.  This supports the conclusion that the prototype Peak device might have used ███████ rather than meeting the Atomizer Air Flow Path Limitations.

### b. Whether the Pepcom Activities Were "Public Use"

The parties dispute whether Plaintiff's activities at Pepcom constitute public use.  "A bar under § 102(b) arises where, before the critical date, the invention is in public use and ready for patenting."  *Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 938 (Fed. Cir. 2013) (quoting *Invitrogen v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005)).  As for the first requirement, "either public accessibility or commercial exploitation" qualifies.  *Id.*  Commercial exploitation "likely requires more than . . . a secret offer for sale . . . ."  *Id.* at 938-39 (quoting 424 F.3d at 1380).

Whether a particular display constitutes a public use is based on the totality of the circumstances based on factors such as: (1) the nature of the activity that occurred in public, (2) public access to and knowledge of the public use, (3) the existence of an implied obligation of confidentiality, and (4) the skill and knowledge of the observers.  *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 967 (Fed. Cir. 2020); *Sinskey v. Pharmacia Ophthalmics Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992).

The parties' first dispute is whether a public use other than for the intended purpose qualifies under the public-use bar.  Plaintiff argues that, at Pepcom, vaporizable product was never placed in the device, the heater was never engaged to vaporize the product, and gas having the vaporized product never flowed through the device.  Docket No. 148 at 14.  Indeed, Defendants concede that product was never "smoked" using the device.  Docket No. 165 at 3.  Rather, Defendants have proffered evidence that, at Pepcom, a journalist held the prototype Peak device and described the device.  Docket No. 176 ¶¶ 63-64.  A video of the journalist was later posted to YouTube.  *Id.*

Plaintiff relies primarily on *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007), which held that "the Cherry Model 5 was not in public use as the term is used in section 102(b) because the device, although visually disclosed and only tested one time with a NDA signed by the typing tester, was never connected to be used in the normal course of

business to enter data into a system."  Elsewhere, *Motionless Keyboard* noted that the "Cherry Model 5 was not used in public, for its intended purpose, nor was the Cherry Model 5 ever given to anyone for such public use."  *Id.*  The Federal Circuit has reaffirmed the rule of *Motionless Keyboard* that "a partial demonstration of a system's . . . capabilities" is not public use.  *Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 943 (Fed. Cir. 2013); *see also Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1307 (Fed. Cir. 2002) (holding public use "require[s] actual use by someone at some point").[14]

Defendants rely on *Pronova* for the proposition that "[a]n invalidating public use need not be the intended use of the invention disclosed or claimed in the patent as long as the invention is fully disclosed without restriction."  549 F. App'x at 937.  However, this portion of *Pronova* was describing the argument of the parties rather than the holding of the Federal Circuit.  Nevertheless, *Pronova* did hold that "'use' of a pharmaceutical formulation can[] occur [before] it is used to treat the condition it is intended to counteract, or at least physically ingested."  *Id.* at 943.

*Minerva Surgical, Inc. v. Hologic, Inc.*, 59 F.4th 1371, 1379 (Fed. Cir. 2023) is more applicable here.  There, the Federal Circuit noted that "[d]isplaying a product at a trade show by demonstrating to observers the product in its normal operation, or a simulation thereof, generally constitutes a 'public use' of the displayed product."  *Id.*  For example, when a medical device was "pitched . . . to various sophisticated industry members, who were allowed to scrutinize the . . . device closely and see how it operated," this was sufficient to show public use.  *Id. Minerva* also held that "public use may . . . occur where . . . the inventor used the device such that at least one member of the public without any secrecy obligations understood the invention."  *Id.*  This was distinguished from the "mere display" of the invention in *Motionless Keyboard*, where the disclosures "only provided a visual view of the new keyboard design without any disclosure of the claimed technology, which involved entering data into a system."  *Id.* (cleaned up) (quoting 486 F.3d at 1385).

Based on a review of these cases and the parties' arguments, it appears that triable issues of fact remain whether the Pepcom event constitutes public use.  Defendants bear the burden of proving invalidity but they have not introduced evidence of the skill and knowledge of the

---

[14] Here, Plaintiff also relies on *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 681 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings*, 775 F. App'x 674 (Fed. Cir. 2019).  However, *IBM* is inapplicable because it was about whether the prior art system anticipated the claims rather than whether the prior art system was used for its intended purpose.

observers at the Pepcom event.  In *Minerva*, the sophistication of the attendees was important to the Federal Circuit's analysis.  In addition, factual disputes remain about the nature of the alleged public use.  Not every portion of the event was captured on video, and the fact that a journalist was allowed to take possession of the prototype Peak device and present it to the camera would support an inference that at least one attendee understood the invention and that attendees had sufficient opportunity to scrutinize the prototype Peak device.  However, there is no direct evidence that attendees understood the invention and no direct evidence that attendees other than the journalist could scrutinize the invention.  Thus, triable issues of fact remain.

It is unnecessary to address here Plaintiff's position that *Motionless Keyboard* forecloses Defendants' anticipation argument: summary judgment would be inappropriate for the alternative reasons already stated.  For similar reasons, it is unnecessary to address Plaintiff's position that "commercial exploitation" requires a sale, offer for sale, or a charge for use of the invention.

The parties also dispute whether the claimed invention was ready for patenting.  A device can be shown to be ready for patenting either "by proof of reduction to practice before the critical date" or "by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998).  This issue is necessarily bound up with the issue of whether the prototype Peak device practiced the claimed invention: if Plaintiff created a working prototype that practiced the claimed invention, the invention has necessarily been reduced to practice and thus is ready for patenting.  *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1379 (Fed. Cir. 2013).  As explained in the prior section, triable issues of fact remain.  It is not necessary to address Defendants' alternative argument that Plaintiff's CAD drawings show the invention was reduced to practice in 2017, prior to the Pepcom event.  For the reasons already stated, summary judgment would be denied even if these drawings did show the invention was reduced to practice.

### c.  Obvious Variation

In the event that the arguments discussed above do not succeed, Defendants argue that the '334 Patent is nevertheless anticipated because the prototype Peak device was an "obvious variant" of the claimed invention that can anticipate the '334 Patent without a full obviousness analysis.  Defendants place principal reliance on *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1326 (Fed. Cir. 2009) for the proposition that "the public use bar applies to obvious variants of the

31

demonstrated public use." This proposition is surely correct: public use constitutes prior art and prior art can invalidate a patent either through anticipation or through obviousness. However, Defendants want *Clock Spring* to stand for a broader proposition. Specifically, Defendants contend that "something less than a full-scale obviousness analysis is appropriate when an invention is ready for patenting and the record demonstrates that it is an obvious variant of a demonstrated public use." Docket No. 108 at 25. Defendants also wish to dispense with the *Graham* factors.

Defendants' reading of *Clock Spring* is not persuasive. *Clock Spring* never mentioned the *Graham* factors or announced that it was establishing a different obviousness test for contexts like this one. Indeed, the Federal Circuit would not have the power to overturn Supreme Court precedent on obviousness. Also, *Clock Spring* stated that "[i]n order for a use to be public within the meaning of § 102(b), there must be a public use with all of the claim limitations." *Id.* at 1325. If Defendants' position was adopted and the prototype Peak device could anticipate the '334 Patent without a removably attachable atomizer, that would contravene this part of *Clock Spring*. *Clock Spring* is difficult to follow, because the Federal Circuit said both that applying the prior art to fill cavities would have been obvious but that it was not reaching the issue of obviousness. *Id.* at 1326, 1329. However, there are two plausible readings of the paragraph relied on by Defendants. First, the reference to "obvious variants" may have been a reference to the principle of inherency. Thus, the Federal Circuit may have been saying that the prior art reference, which described "[p]inhole areas of corrosion," inherently described the use of filler to fill the pinholes in view of other statements in the prior art and the underlying purpose of the experiment. *Id.* at 1326. Second, the reference to "obvious variants" may have actually been a reference to obviousness. Even so, the relevant paragraph described the prior art, the differences between the prior art and the claimed invention, and the existence of a motivation to turn the prior art into the claimed invention. Although the Federal Circuit's analysis was brief, this analysis expressly considered certain of the *Graham* factors. The analysis did not expressly address the level of ordinary skill in the art or secondary considerations, but that may have been unnecessary because those factors were either not disputed or not material. Because neither reading of *Clock Spring* supports Defendants' position, the Court declines their invitation to recognize a new brand of obviousness analysis for public use cases.

Because *Clock Spring* did not establish a shortcut to obviousness for so-called "obvious

32

variants," it is unnecessary to proceed further with this analysis.

### 4.  *Invalidity: Obviousness*

"The grant of summary judgment for obviousness must be done on a claim by claim basis." *Knoll Pharm. Co. v. Teva Pharms. USA, Inc*., 367 F.3d 1381, 1384 (Fed. Cir. 2004). "The accused infringer must prove by clear and convincing evidence that each claim that is challenged cannot reasonably be held to be non-obvious." *Id*.

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "An obviousness determination requires finding that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Regents of Univ. of California v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018) (citation omitted). Obviousness is a question of law. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). However, "[w]hether a person of ordinary skill in the art would have been motivated to modify or combine teachings in the prior art, and whether he would have had a reasonable expectation of success, are questions of fact." *Id.*

In addition, certain factual inquiries known as the *Graham* factors underlie this determination: "(1) the scope and content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) objective evidence of non-obviousness, such as commercial success, long-felt but unsolved need, failure of others, copying, and unexpected results." *Apple Computer*, 234 F.3d at 26 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). The question of obviousness requires an "expansive and flexible approach" in which courts are invited, where appropriate, to look at any instructive secondary considerations that are contained in the fourth *Graham* factor. *KSR*, 550 U.S. at 415. A motion for summary judgment may be granted when the factual inquiries into obviousness present no genuine issue of material facts. *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 2001).

### a.  Level of Ordinary Skill in the Art

The parties have stipulated that a person of ordinary skill in the art for purposes of the '334 Patent "is a person with at least an associate's degree in engineering or the equivalent, and at least five years of experience with vaporizing or similar devices." Docket No. 176 ¶ 43. In addition,

they have agreed that "more education, such as a Bachelor of Science degree in Mechanical Engineering, Electrical Engineering or Industrial Design or related fields could reduce the number of years of experience to at least one to three years of experience." *Id.* This stipulation is adopted for purposes of the present Motion.

b.  Scope and Content of the Prior Art

Defendants contend that, even if their anticipation argument is rejected, that the prototype Peak device meets every limitation of the '334 Patent except the removably attachable atomizer. They also contend that U.S. Patent No. 10,321,714 ("Kane") and U.S. Patent No. 10,271,579 ("Garay") reflect this "removably attachable atomizer" limitation and, in connection with the prototype Peak device, render the '334 Patent obvious.

For the reasons identified above, there is a genuine dispute as to whether the prototype Peak device meets the Atomizer Air Flow Path Limitations.  If it does not, neither of the combinations identified by Defendants satisfies the Atomizer Air Flow Path Limitations.  This precludes a grant of summary judgment.

c.  Differences Between the Prior Art and Claimed Invention

In addition to the matters already discussed, Defendants' briefing offers no argument explaining why a POSITA would be motivated to combine the prototype Peak device with either Kane or Garay.  Docket No. 108 at 26-31; Docket No. 165 at 8-10.  This is an additional reason why Defendants' Motion must be denied.  Defendants have proffered, but did not cite in their briefing, expert testimony about motivation to combine the prototype with Kane or Garay.  *See* Docket No. 108-2 ¶¶ 259-60.  However, Plaintiff has offered its own expert testimony regarding motivation to combine.  Docket No. 118-20 ¶¶ 246, 279-83.  Because Defendants have offered no comparison of the parties' positions on this issue and no persuasive reason to disregard Plaintiff's expert testimony, summary judgment would not be appropriate.

d.  Secondary Considerations

Secondary considerations of nonobviousness counsel strongly against granting the Motion. Plaintiff has presented evidence of a long-felt but unresolved need for the invention.  Bajpai declared that consumers of vaporizable cannabis concentrate had long desired a device that would replicate the effects, flavor, and experience of a real (torch) dab without the need to use a blowtorch and other equipment and without the social stigma of doing so.  Docket No. 148-2 ¶ 33. Defendants object that this testimony is not supported by other evidence in the record.  However,

34

this testimony is based on Bajpai's years of experience in the industry, so it remains admissible. *Id.* The weight to be given to this testimony is a jury question rather than a question to be resolved at summary judgment.

Plaintiff has also presented some limited evidence of copying. It is undisputed that Defendants ordered a Puffco Peak Pro and discussed that device and the Carta 2 at an internal presentation. Docket No. 176 ¶¶ 85-86. Coupled with the other evidence discussed here, this could support a finding that Defendants copied the claimed invention.

Plaintiff has also presented evidence of commercial success. Plaintiff has sold more than 500,000 Peak vaporizers and more than 350,000 Peak Pro vaporizers. Docket No. 176 ¶ 61. Defendants urge the Court to disregard this evidence because there is no nexus between the features of Plaintiff's commercial success and the claimed invention, citing the testimony of Defendants' damages expert. *See* Docket No. 107-3 ¶¶ 85-90. However, this testimony is not relevant because it addressed royalty rates rather than obviousness. In addition, "[w]hen a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). "If a patentee makes the requisite showing of nexus between commercial success and the patented invention, the burden shifts to the challenger to prove that the commercial success is instead due to other factors extraneous to the patented invention, such as advertising or superior workmanship." *Id.* Here, Plaintiff has presented evidence of commercial success, and it appears undisputed that Plaintiff's products practice the invention claimed in the '334 Patent. Defendants have not presented evidence that the products' commercial success is attributable to other factors; they have only contended that Plaintiff failed to provide adequate context for its evidence of commercial success. Based on *Eaton*, this position is unpersuasive.

Plaintiff has also presented evidence of industry praise, including articles describing Plaintiff's products and supporting expert testimony. *See* Docket No. 176 ¶ 90; Docket No. 148-2 ¶¶ 35-39, 43-51. Indeed, Defendants concede that Plaintiff has provided evidence of industry praise. Docket No. 165 at 9.

Defendants respond, however, that the evidence described above does not preclude summary judgment because each piece of evidence is linked to the Pepcom event, the very event

that Defendants contend invalidates the '334 Patent. This position is unpersuasive for multiple reasons. For starters, Defendants have presented no authority that the secondary-considerations analysis works this way, and the Court has located none. Nor is Defendants' reasoning sound. According to Defendants, it is paradoxical that Plaintiff can publicly disclose its invention for the purposes of gaining industry praise while using that praise to defend itself from the charge of obviousness. But Defendants are not facing a "catch 22": if the claimed invention had been obvious, it would have been unlikely to gain industry praise, despite the Plaintiff's efforts to promote it. Indeed, nearly every product is the subject of marketing efforts that include disclosures about the product and its operation. Defendants might have a point if Plaintiff had bribed a reporter to obtain the favorable coverage it is now citing or if Plaintiff had ghostwritten the articles it now relies on. But there is no evidence that Plaintiff sought to manipulate the coverage of its product— other than by showing its new products at a trade show and seeking press attention, as many manufacturers do. Here, Defendants have offered no reason why Plaintiff's product would not have been more likely to receive industry praise the less obvious it was. Accordingly, the logic behind the secondary considerations remains applicable here. But even accepting Defendants' arguments, triable issues would remain on the secondary considerations because Defendants have presented no evidence tracing any particular portion of Plaintiff's sales or its own alleged decision to copy Plaintiff's products back to the Pepcom event. In addition, the Pepcom event could not have been the cause of the long-felt but unresolved need cited by Plaintiff, which existed for years before Pepcom.

Although the secondary considerations are not always controlling, they cannot be disregarded for purposes of this Motion. These secondary considerations "may often be the most probative and cogent evidence of nonobviousness in the record." *Ortho-McNeil Pharm. v. Mylan Labs., Inc.,* 520 F.3d 1358, 1365 (Fed. Cir. 2008). "Such evidence of these secondary considerations may give rise to genuine issues of material fact and preclude summary judgment of obviousness." *Int'l Gamco, Inc. v. Multimedia Games Inc.*, 732 F. Supp. 2d 1082, 1106 (S.D. Cal. 2010) (citing *Ecolochem, Inc. v. Southern CA Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000)). Further, the Court must fully weigh the secondary considerations in assessing obviousness based on the *Graham* factors. *See Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1380 (Fed. Cir. 2012) (reversing summary judgment that claims were obvious for failing to "fully weigh objective indicia evidence"). The cases relied on by Defendants did not arise at the summary-judgment stage are

distinguishable on this basis. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005) (reviewing findings of fact after a bench trial); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1370 (Fed. Cir. 2007) (same). Thus, the evidence discussed in this section weighs strongly against granting the instant Motion.

For each of the foregoing reasons, Defendant's Motion for Partial Summary Judgment is **DENIED**.

 F. <u>Plaintiff's Motion for Partial Summary Judgment</u>

  1. *Infringement: Carta OG*

Plaintiff argues that the Carta OG meets each element of Claims 1-11 and 13 of the '334 Patent. Docket No. 118 at 17. Plaintiff argues there is no dispute of fact because Defendants conceded infringement in verified interrogatory responses. *Id.* Defendants do not address the Carta OG in their opposition brief. In their Statement of Genuine Disputes, Defendants dispute that the Carta OG infringes, relying on a January 6, 2023 interrogatory response. Docket No. 144-1 ¶ 10 (citing Docket No. 118-5 at 12). Defendants responded that they disagreed that the Carta OG includes a "heating element" within the meaning of the '334 Patent because the Carta OG heating component is not ceramic. *Id.* However, Defendants' supplemental response, filed July 19, 2023, expressly withdrew the disagreement as to the "heating element" term in view of the Court's claim construction ruling. *Id.* at 20. The Court's further amendment of the construction for "heating element," only broadens the term and in no way limits it to a ceramic component. *See* § IV.D, *supra*. Accordingly, finding no genuine dispute of fact, the Court **GRANTS** Plaintiff's motion as to the Carta OG.

  2. *Infringement: Carta 2*

Plaintiff argues the Carta 2 meets each element of each asserted claim of the '334 Patent. Docket No. 118 at 17. Defendants argues the Carta 2 does not infringe either literally or under the doctrine of equivalents because it does not include a "heating element" within the meaning of the '334 Patent. Docket No. 144 at 6. As discussed above, the Court amended the construction for "heating element" to be "an element that heats via resistive heating." *See* § IV.D, *supra*. There is no genuine dispute of fact that the Carta 2 includes a "heating element" under the Court's amended construction. *See* Docket No. 144-1 ¶¶ 24-26 and 30 (discussing resistive traces in the container). Defendants do not dispute that the Carta 2 meets any of the other limitations of the claims of the '334 Patent. *Id.* ¶ 11. Accordingly, finding no genuine dispute of fact, the Court **GRANTS**

Plaintiff's motion as to the Carta 2.

### 3. *Infringement: Oura*

Plaintiff argues the Oura meets each element of Claims 1-11 and 13 of the '334 Patent. Docket No. 118 at 22. Defendants argue the Oura is outside the scope of litigation because all sales are subject to a settlement agreement negotiated to resolve *Kandypens, Inc. v. Puff Corp.,* No. CV 20-358-GW-KSx (C.D. Cal.). Docket No. 144 at 10. Defendants also argue that the Oura device does not infringe because it does not have a "heating element" within the meaning of the '334 Patent. *Id.* at 11.

As to the license defense, there is unfortunately no record evidence in support of Defendants' position. For instance, Defendants do not present any evidence that it purchases the Oura devices from Kandypens. Rather, Defendants merely state, in their interrogatory responses, that "all sales of the OURA have been licensed or otherwise authorized by the settlement agreement in the *Kandypens* litigation" and "the OURA is outside the scope of this litigation." Docket No. 118-5 at 40. This bare argument does not present a basis to deny Plaintiff's motion.

As to the "heating element," the Court amended the construction for "heating element" to be "an element that heats via resistive heating." *See* § IV.D, *supra*. There is no genuine dispute of fact that the Oura includes a "heating element" under the Court's amended construction. *See* Docket No. 144-1 ¶¶ 44, 46 (discussing metal wire coil attached to conductive elements). Defendants do not dispute that the Oura meets any of the other limitations of the claims of '334 Patent. *Id.* ¶¶ 42-43. Accordingly, finding no genuine dispute of fact, the Court **GRANTS** Plaintiff's motion as to the Oura. In granting Plaintiff's motion, however, the Court finds only that the Oura meets the elements of the claims at issue. The Court does not make any determination as to the applicability of the licensing defense. Thus, Defendants may argue the licensing defense at trial, to the extent they can present evidence supporting their position.

### 4. *Invalidity: Anticipation via Public Use*

Plaintiff seeks partial summary judgment that the Pepcom public use does not *anticipate* the '334 Patent. Docket No. 118 at 24. The Court **GRANTS** Plaintiff's motion for several reasons.

First, in opposition, Defendants largely misunderstand the issue by focusing their analysis on whether the '334 Patent is an "obvious variant" of the Pepcom prototype. *See* Docket No. 144 at 12. As discussed above in § IV.E.3.c, Defendants misunderstand the *Clock Spring* case. To establish anticipation, the patent challenger must present evidence that a single prior art reference

38

discloses each and every limitation of each asserted claim, either expressly or inherently. *See* § IV.E.3.c, *supra*. *Clock Spring* does not disturb this requirement. Thus, all of Defendants' arguments and evidence concerning obviousness and obvious variants are irrelevant here. None of this material raises a triable issue as to *anticipation.*

Second, Defendants fail to present sufficient evidence establishing that the Pepcom prototypes included a removable atomizer. Both parties agree that there is no evidence showing, expressly, what kind of atomizer the prototype included. Docket No. 144-1 ¶¶ 53, 55. Plaintiff presents some circumstantial evidence suggesting the prototypes likely included a hardwired atomizer. *Id.* ¶¶ 54, 57. Defendants argue that this hard-wired atomizer meets the Court's construction for "removably attachable." Docket No. 144 at 14. Defendants are incorrect. The Court construed "removably attachable" to mean "capable of being detached and reattached with a replacement piece." Docket No. 65 at 27. In adopting this construction, the Court explained that the purpose of removing the mouthpiece and atomizer is to allow for cleaning and replacement. *Id.* at 11. The Court also reasoned that Defendants' potential invalidity argument, "as described by Plaintiff, appears to lack merit because it would amount to creation of a new, modified device, which would no longer qualify as prior art." *Id*.

In support of their position, Defendants point to a single paragraph in Hatton's Invalidity Report:

> Further, if the term "removably attachable" were interpreted to require that when the atomizer is removed from the base, the electrical connection is broken, the "replaceable hardwired" atomizer still meets the Court's construction of "removably attachable. The "replaceable hardwired" atomizer can be electrically disconnected from the base by desoldering it, after which it is still "configured to be electrically connected to the one or more components for electrically connecting to the power source and/or controlling the device that are housed in the base." It can then be reattached or replaced with a replacement piece by re-soldering the wires to the atomizer, or by soldering the wires to a replacement atomizer. I accordingly conclude that even if the term "removably attachable" is interpreted to require that the electrical connection between the atomizer and base is broken when the atomizer is removed, the "replaceable hardwired" atomizer still meets the Court's construction of "an atomizer that is removably attachable to the base.

Docket No. 108-2 ¶ 155. Hatton's testimony relies entirely on the idea that removing and replacing the atomizer would involve soldering and desoldering the electrical connections. A user of the vaporizer would not desolder and resolder the electrical connections every time they wanted to clean the device or replace the atomizer. Doing so requires time, special tools, and a ventilated

area.  The setup required would considerably cut against the value of creating a product with a removable atomizer.  Moreover, desoldering and resoldering the wiring amounts to creation of a new device.  This is the type of device that the Court cautioned would no longer anticipate in its claim construction ruling.  For these reasons, Hatton's testimony is not consistent with the Court's construction.  Absent Hatton's testimony, no other cited evidence supports Defendants' position that the prototypes anticipate the '334 Patent.

Finally, at the hearing, Defendant asked the Court to "reserve" the anticipation issue for trial based on testimony from Plaintiff's employees as well as CAD drawings in Plaintiff's possession, allegedly showing the atomizer was removable and not hardwired.  *See* Rough Hearing Tr. at 23:5-12.  Defendant did not raise this evidence in its opposition brief or in disputed facts.  *Id.* at 24:1-15.  Instead, as discussed above, Defendant chose to rely only on Hatton's testimony.  Here, Plaintiff had to show that Defendant "does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102.  Plaintiff did so.  The burden then shifts to Defendant to "set forth . . . specific facts showing that there is a genuine issue for trial."  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  Here, Defendant neglected to mention this new evidence at all in the briefing and even at the hearing, fails to provide citations to this evidence.  Thus, it is not before the Court and Plaintiff did not have a chance to evaluate it.  For these reasons, the Court finds that Defendant failed to set forth specific facts regarding its arguments about Plaintiff's employees and the CAD drawings.  Defendant cannot reserve this material to argue anticipation at trial.

Accordingly, the Court **GRANTS** Plaintiff's motion.

### 5. *Invalidity: Kane*

Plaintiff seeks partial summary judgment that Kane does not *anticipate* the '334 Patent.  Docket No. 118 at 28.  Defendants do not address Plaintiff's arguments on this point in their opposition brief.  Further, there is no genuine dispute of fact that Kane does not disclose a "mouthpiece that is removably attachable to the base," either expressly or inherently.  In their Statement of Genuine Disputes, Defendants indicate they dispute that Kane fails to disclose the removably attachable mouthpiece.  Docket No. 144-1 ¶ 72.  However, Defendants cite only Hatton's Invalidity Report at ¶ 196 in support of their position.  *Id.*  There, Hatton opines only:

> Pertaining to '334 Patent claim element 1c, I understand that Plaintiff disputes that Kane I discloses "a mouthpiece that is removably attachable to the base." I understand that Figure 2 of Exhibit C2 shows a mouthpiece that is removably

attachable to the base where the "base" embodied by Kane I includes the outlet pipe. I understand that Kane I describes a mouthpiece that is "coupled" to the outlet pipe (citation). I understand that the part separation between the outlet pipe and the mouthpiece **_renders removable attachability of the mouthpiece to the outlet pipe as obvious_** because there would otherwise only need to be one part instead of two parts (the outlet pipe and the mouthpiece). I therefore conclude that Kane I discloses "a mouthpiece that is removably attachable to the base.

Docket No. 108-2 ¶ 196 (emphasis added).  Hatton's opinion states a single reference obviousness challenge.  In other words, Hatton opines that the teachings of Kane, in combination with the knowledge of a person having ordinary skill in the art as to the removable mouthpiece component, meet each and every element of the claims of the '334 Patent.  Hatton does not opine that Kane actually discloses, expressly or inherently, a removable mouthpiece.  Thus, this evidence cannot support Defendants' position that Kane anticipates the asserted claims of the '334 Patent.  For at least this reason, the Court **GRANTS** Plaintiff's motion as to anticipation based on Kane.  This ruling does not foreclose any arguments that Defendants may bringing related to obviousness based on Kane and either the knowledge of a person having ordinary skill in the art or disclosures from other references.

## V.   Conclusion

For the reasons stated in this Order, the Court rules as follows:

- Defendants' Motion to Exclude Certain Opinions and Testimony from David B. Francom is **GRANTED IN PART** and **DENIED IN PART**.
- Plaintiff's Motion to Strike Opinions from Defendants' Damages Expert Shelly Irvine is **GRANTED IN PART** and **DENIED IN PART**.
- Plaintiff's Motion to Strike Opinions of Defendants' Technical Experts is **GRANTED IN PART** and **DENIED IN PART**.
- Plaintiff's Motion to Amend Claim Construction is **GRANTED**.
- Defendants' Motion for Partial Summary Judgment is **DENIED**.
- Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

41